IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| UNITED STATES | * | |
|---|---|---|
| Plaintiff, | * | |
| v. | * | CRIM. NO. RDB-17-0069 |
| HAROLD T. MARTIN, III, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On February 8, 2017, the Grand Jury returned an Indictment against Harold T. Martin, III, charging him with twenty counts of Willful Retention of National Defense Information in violation of 18 U.S.C. § 793(e). (ECF No. 33.) The Defendant's trial is scheduled to begin on June 17, 2019. Now pending before this Court are the Defendant's motions to suppress certain evidence at his upcoming trial. (*See* ECF Nos. 128, 129, 130.) On November 14, 2018, the Court conducted a hearing on these motions.[1] For the reasons explained herein, the Defendant's Motion to Suppress Tangible and Derivative Evidence (ECF No. 128) is DENIED, the Defendant's Motion to Suppress Cell-Site Location Information Seized Without a Warrant (ECF No. 129) is DENIED, and the Defendant's Motion to Suppress Statements (ECF No. 130) is GRANTED.

---

[1] That hearing was conducted under seal as there was a potential for references to classified material. A transcript of the hearing, with appropriate redactions, will be made available for public review in due course.

## FACTUAL BACKGROUND[2]

During the investigation of this matter, multiple search warrants were issued by this Court. The first warrant (the "Twitter search warrant"), issued on August 25, 2016, authorized the Government to receive information associated with the Twitter account @HAL_999999999. (*See* ECF No. 140-1.) The warrant was supported by an affidavit submitted by FBI Special Agent ("SA") Jeremy Bucalo, and described a recent incident involving the posting of what was purported to be stolen government property on multiple online file-sharing websites. (*Id.* ¶¶ 10–22.) The affidavit further provided ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ received a Twitter message from @HAL_999999999. (*Id.* ¶¶ 22–23.) In these messages, @HAL_999999999 asked for a meeting with the ▮▮▮▮▮▮▮▮ and stated "shelf life, three weeks". (*Id.* ¶ 23.) Based on this information, the affiant identified the Defendant, an individual whose identity was known to the affiant and who was a former government contractor. (*Id.* ¶ 22.) The affiant averred that the Defendant had the ability to access property of the United States that appeared to be what was purported to be stolen property that was publicly posted on the Internet. (*Id.*) The affidavit also stated that monitoring of the Defendant's use of his government computer

---

[2] At the motions hearing, the parties presented evidence and testimony on the Defendant's Motion to Suppress Statements (ECF No. 130). Specifically, the Government introduced the testimony of Special Agent ("SA") Ryan Davis and Task Force Officer ("TFO") Paul Scarzello, both of whom participated in the execution of the search warrant for the Defendant's residence. The Defendant presented the testimony of Anthony Contrini, a neighbor of the Defendant, and Deborah Shaw, the Defendant's romantic partner, both of whom observed some of the events on August 27, 2016. When referencing their testimony herein, the Court is unable to cite to the transcript of the motions proceedings because it is not yet available. Thus, to expedite the issuance of this opinion, the Court recites the witness' testimony here based on its own detailed account of the hearing.

revealed that he received notifications associated with the Twitter handle "@HAL_999999999". (*Id.* ¶ 26.) Finally, the affidavit provided that, on a publicly available profile on a social networking website, the user hal999999999 had a display picture matching the MVA photo of the Defendant. (*Id.* ¶ 27.)

The second warrant issued by this Court authorized the Government to search the Defendant's residence, person, and vehicle[3] (the "residence search warrant"). (ECF No. 140-2.) The affidavit supporting this warrant contained all of the information included in the Twitter affidavit. (*See id.*) In addition, the affidavit stated that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The affiant averred that a review of what was purported to be stolen government property publicly posted on the Internet fit the description of the information ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The affidavit further stated that the Twitter account @HAL_999999999 was created by a user with the email address hmartin999@gmail.com, an email address associated with the Defendant according to open source databases. (*Id.* ¶¶ 17, 23.) The affidavit provided that this Twitter account was repeatedly accessed by a user with an IP addressed assigned to Hal Martin at 7 Harvard Road, Glen Burnie, Maryland, 21060. (*Id.* ¶ 23.) MVA records also provide that Martin resides at this address, and that he owns a teal Chevy Caprice sedan, License Plate #5CL2057. (*Id.* ¶¶ 25–26.)

---

[3] The Government also obtained a warrant for the installation of a GPS tracking device on the Defendant's vehicle. (ECF No. 140-3.) However, the Defendant did not challenge this warrant in its motion or at the motions hearing and, according to the Government, no data was recovered from the tracking device. Therefore, the Court will not address this search warrant in this opinion.

3

At approximately 2:30 p.m. on August 27, 2016, law enforcement officers went to the Defendant's residence at 7 Harvard Road in Glen Burnie, Maryland, to execute the search warrant for his residence, person, and vehicle. Upon arrival, nine SWAT agents approached the Defendant after observing him outside of his residence. One of the SWAT agents, SA Davis, testified that the SWAT agents were armed with rifles and handguns and dressed in protective gear. SA Davis stated that he was also carrying a crow bar and a battering ram when he approached the Defendant.

As the SWAT agents approached the Defendant, SA Davis testified that at least three agents had their guns drawn and pointed at the Defendant. The agents commanded the Defendant to step away from the front door to his residence and show them his hands. The Defendant complied, and SA Davis testified that he then approached the Defendant and ordered him to get down on the ground. SA Davis put the Defendant's left hand behind his back to maintain control over him as he lied down on the ground, and then SA Davis handcuffed the Defendant. SA Davis testified that the Defendant remained handcuffed for approximately thirty minutes.

While the Defendant was outside, SWAT agents secured his residence. (ECF No. 141 at 3.) They employed a "flash-bang" device immediately inside the front door to assist them, a device that makes a loud noise and creates "over pressurization." SA Davis described the effect of the device as "temporarily disorienting," and testified that the Defendant, who was approximately fifteen feet from the front door at the time it was employed, likely experienced these effects. Defense witnesses Anthony Contrino and Deborah Shaw, both of whom were

approximately two houses away from the Defendant's residence at the time, testified that they heard a "loud noise" and "bang."

In addition to the nine SWAT agents, other law enforcement officers were also present on the scene. Specifically, FBI Task Force Officer ("TFO") Paul Scarzello testified that, in addition to himself, there were seven other FBI agents present: SA Laura Pino, SA Jeremy Bucalo, TFO Brooke Donovan, Supervisory Special Agent ("SSA") Louis Luciano, SSA Daniel Gray, TFO Sean Lewis, and FBI Computer Scientist Susi Hajeski. In addition, Contrino testified that he observed "at least three" Maryland State Trooper vehicles outside of the Defendant's residence while the Defendant was handcuffed outside. Both Contrino and Shaw testified that the State Troopers blocked all vehicular traffic on the street outside of the Defendant's residence.

Once the residence was secure, SA Davis took the Defendant inside. SA Davis testified that he instructed the Defendant to sit on the couch inside of his living room and then removed the Defendant's handcuffs. SA Davis then left the Defendant in the living room with SA Bucalo, and agents Pino and Scarzello joined them in the living room shortly thereafter.[4] (*See* Gov. Ex. 19 at 7–8.) These three agents were dressed in civilian clothing and were not visibly armed.

The agents then began to interrogate the Defendant. Agents Bucalo, Pino, and Scarzello conducted most of the questioning, but other agents also joined the interrogation at various points and asked questions. (*See, e.g.,* Gov. Ex. 19 at 8, 33, 41, 61 (SSA Luciano); 154-65 (SSA Gray); 158 (Hajeski); 181–224 (TFO Donovan).) At the beginning of the

---

[4] SA Davis testified that he and the other SWAT agents left the Defendant's residence after approximately thirty minutes.

5

interrogation, SA Bucalo told the Defendant that he was not under arrest, that his participation was voluntary, and that he was free to leave. (*See* Gov. Ex. 18; Gov. Ex. 19 at 3.) Soon thereafter, in response to a comment made by the Defendant, SA Pino confirmed that he was not under arrest.[5] (Gov. Ex. 19 at 13.) However, later in the interrogation, the agents did not correct the Defendant when he said to them, "[y]ou come in here, you eh, uh, put me in handcuffs and under arrest or whatever." (*Id.* at 129.) The Defendant never asked to leave or to stop the interrogation.

During the interrogation, the agents confronted the Defendant with incriminating evidence discovered on his property. (*Id.* at 169–71, 181–82.) They repeatedly emphasized to the Defendant the importance of being honest with them, (*see id.* at 63, 65, 66, 96, 117, 128, 169, 184, 217), and accused the Defendant of lying to them on multiple occasions (*id.* at 128, 130, 181, 184). For instance, TFO Scarzello told the Defendant "we know you're not being honest with us," and TFO Donovan asserted "[y]ou have to stop denying now." (*Id.* at 130, 181.) TFO Donovan later stated, "[y]ou can sit here and deny, deny, deny, but the feeding game is over. Alright. You're a bad man. There's no way around that. You're a bad man." (*Id.* at 183.) The Defendant admitted to having taken classified government documents and data home from work and told the agents in detail how he had done so. (*Id.* at 136–44, 151–52, 170–78, 187.)

The Defendant left the interrogation space only once during the interrogation, at which time he went to help agent Hajeski access his computer equipment in his home office. (*See*

---

[5] When the Defendant expressed reservations about discussing classified matters in his home, SA Pino offered to speak to the Defendant in an authorized Sensitive Comparted Information Facility (SCIF). (Gov. Ex. 19 at 13.) In response, the Defendant stated, "If I'm not under arrest, you guys can come down to my work next week or whatever." (*Id.*) SA Pino then replied, "No, you're not." (*Id.*)

6

Gov. Ex. 19 at 157.) Agents Bucalo and Scarzello accompanied the Defendant at that time. (*See id.*) Throughout the remainder of the interrogation, the Defendant was in the living room with FBI agents. At one point, the Defendant asked an agent to walk with him to the refrigerator to get a bottle of water. (*See id.* at 155.) Rather than walk with the Defendant to the refrigerator, or allow the Defendant to walk alone, the agents retrieved the water for him. (*Id.* at 166.)

The Defendant was separated from his partner, Deborah Shaw, throughout the interrogation. (*See* Gov. Ex. 19 at 158, 223.) An agent told the Defendant that Shaw was outside, "waiting to get into the house to know where her life is leading." (*Id.* at 183.) When the Defendant asked to speak to Shaw at the end of the interrogation, the agents allowed him to do so, but told the Defendant "you can't touch her or any of that stuff." (*Id.* at 224.) Shaw testified that she was only permitted to speak to the Defendant for sixty seconds.

The Defendant's interrogation lasted approximately four hours. (*See* Gov. Ex. 18.) The agents never gave the Defendant *Miranda* warnings.[6] (*See id.*)

After the execution of the foregoing search warrants, the Government obtained additional search warrants. Specifically, the Government obtained warrants to search the curtilage of the Defendant's residence and to receive records regarding various electronic accounts associated with the Defendant. (*See* ECF Nos. 140-4, 140-5.) The Government also obtained a search warrant for the Defendant's work station at UMBC, where he had completed coursework for a Ph.D. in information security management. (*See* ECF No. 140-6.) Finally, the Government acquired historical cell-site location information for the Defendant's cell

---

[6] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

phone number pursuant to an order issued by Magistrate Judge Gallagher under the Stored Communications Act, 18 U.S.C. § 2703(d). (*See* ECF No. 140-7.)

The Defendant has filed motions to suppress the evidence seized pursuant to the search warrants, the historical cell-site location information, and his statements to law enforcement agents. (ECF Nos. 128, 129, 130.) The Court will address each of the motions in turn.

## ANALYSIS

### I. Defendant's Motion to Suppress Tangible and Derivative Evidence

The Defendant filed a Motion to Suppress Tangible and Derivative Evidence seized by the Government pursuant to the search warrants. (ECF No. 128.) Specifically, the Defendant argues that the Twitter and residence search warrants were not supported by probable cause and, further, that they were so deficient that no objectively reasonable officer would have relied in good faith on their legality. (ECF No. 152.) The Defendant challenges the subsequently issued search warrants—*i.e.*, for the curtilage of his residence (ECF No. 140-4), electronic accounts (ECF No. 140-5), and work station at UMBC (ECF No. 140-6)—on the grounds that they were premised on evidence seized pursuant to the Twitter and residence warrants and, therefore, the evidence obtained pursuant to them is fruit of the poisonous tree. (ECF No. 152 at 3.) *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (holding that evidence must be excluded where it was obtained as a result of the exploitation of the police's illegal actions).

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court of the United States "has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) (citing *Johnson v. United States*, 333 U.S. 10, 13–14 (1948)). The magistrate is required "simply to make a practical, commonsense decision whether, given all the circumstances in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Significantly, the Fourth Amendment exclusionary rule does not bar the admission of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a magistrate later found to be invalid. *United States v. Leon*, 468 U.S. 897, 913–14 (1984). The evidence will be suppressed only if (1) the issuing judge was misled by information that the affiant knew or should have known was false, (2) the judge "wholly abandoned" her neutral role, (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is so facially deficient that no reasonable officer could presume it to be valid. *Id.* at 923 (citations omitted).

When a defendant challenges a search warrant, the government bears the burden of proof by a preponderance of the evidence at a suppression hearing. *See United States v. Matlock*, 415 U.S. 164, 177–78 n.14 (1974). In reviewing the search warrant, this Court must show "great deference" to the probable cause determination of a magistrate judge. *Blackwood*, 913 F.2d at 142. "[T]he task of the reviewing court is not to conduct a *de novo* determination of

probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

In this case, there was a substantial basis for the Magistrate's finding of probable cause to issue the search warrant for information associated with the Defendant's Twitter account. *See Upton*, 466 U.S. at 728. The affidavit provides that the Defendant's Twitter messages ███ ███████████████████████████████ in which he requested a meeting ██████████ ███████ and stated "shelf life, three weeks" – were sent just *hours* before what was purported to be stolen government property was advertised and posted on multiple online content-sharing sites, including Twitter. (ECF No. 140-1 ¶¶ 14–23.) Further, and significantly, the affiant averred that the Defendant was a former government contractor who had access to the information that appeared to be what was purported to be stolen government property that was publicly posted on the Internet. (*Id.* ¶¶ 25–27.) Thus, although the Defendant's Twitter messages could have had any number of innocuous meanings in another setting, these allegations regarding the context of Defendant's messages provide a substantial basis for the Magistrate's conclusion that there was a "fair probability" that evidence of the crime of Theft of Government Property, in violation of 18 U.S.C. § 641, would be found in information associated with the Defendant's Twitter account. *See Gates*, 462 U.S. at 238.

For the same reason, the Magistrate also had a substantial basis for finding probable cause to issue the search warrant for the Defendant's residence, person, and vehicle, which was supported by an affidavit that included all of the information outlined in the Twitter affidavit. *See Upton*, 466 U.S. at 728.

Because there was a substantial basis for the Magistrate's findings of probable cause to issue these warrants, the Court rejects the Defendant's argument that the good-faith exception cannot save the warrants because they were so lacking in probable cause that no reasonable officer could rely on them. (*See* ECF No. 152 at 2–3.) Therefore, even in the absence of probable cause to search the Defendant's Twitter account, residence, person, and vehicle, the good-faith exception applies and thus the evidence is admissible.[7] *See Leon*, 468 U.S. at 913–14, 923.

## II. Defendant's Motion to Suppress Cell-Site Location Information Seized Without a Warrant

The Defendant also moved to suppress the cell-site location information ("CSLI") obtained by the Government on or about December 14, 2016 pursuant to an order issued by Magistrate Judge Gallagher under the Stored Communications Act, 18 U.S.C. § 2703(d). (ECF No. 129.) Relying on the Supreme Court's recent decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Defendant argues that the CSLI must be suppressed because it was obtained without a warrant. (ECF No. 129.)

In *Carpenter*, the Supreme Court held that the government's acquisition of an individual's historical CSLI constitutes a search within the meaning of the Fourth Amendment. 138 S. Ct. at 2220. Thus, the Court concluded that "the Government must generally obtain a warrant supported by probable cause before acquiring [CSLI]." *Id.* at 2221. "In the absence

---

[7] Because there was a substantial basis for the Magistrate's findings of probable cause to issue the Twitter and residence search warrants, the Court need not address the Defendant's argument that evidence obtained pursuant to the subsequently issued search warrants is fruit of the poisonous tree. (*See* ECF No. 152-3.)

of a warrant," the Court said, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.*

Soon after the Supreme Court issued its decision in *Carpenter*, the United States Court of Appeals for the Fourth Circuit considered the precise issue presented here – whether *Carpenter* rendered inadmissible CSLI that was obtained by the government prior to *Carpenter* by way of a court order issued under the Stored Communications Act. *See United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018). The Fourth Circuit reasoned that the exclusionary rule's "sole purpose ... is to deter future Fourth Amendment violations," and, therefore, "when investigators act with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule will not apply." *Id.* (citations omitted). Thus, the Fourth Circuit held that the exclusionary rule did not apply because the investigators reasonably relied on court orders issued under the Stored Communications Act to obtain the CSLI, which was a permissible method at the time of acquisition.[8] *Id.*

Here, as in *Chavez*, the Government obtained the CSLI prior to *Carpenter* pursuant to an order issued by a magistrate under the Stored Communications Act. (*See* ECF No. 140-7.) At the time, the binding authority in this Circuit was that "the government does not violate the Fourth Amendment when it obtains historical [CSLI] from a service provider without a warrant." *United States v. Graham*, 824 F.3d 421, 425 (4th Cir. 2016) (en banc), *abrogated by Carpenter*, 138 S. Ct. 2206. Therefore, under *Chavez*, the CSLI is not subject to the exclusionary rule because the officers relied in good faith on then-existing precedent when they acquired

---

[8] *See United States v. Graham*, 824 F.3d 421, 425 (4th Cir. 2016) (en banc), *abrogated by Carpenter*, 138 S. Ct. 2206.

it.[9] *See* 894 F.3d at 608. *See also United States v. Chambers*, — F. App'x —, 2018 WL 4523607, at *3 (2d Cir. Sept. 21, 2018) (concluding that, before *Carpenter*, "it was objectively reasonable for authorities to think that if they complied with the [Stored Communications Act], no warrant based on probable cause was constitutionally required to obtain cell-site information from a third-party."); *United States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018) (same).

## III. Defendant's Motion to Suppress Statements

The Defendant also moved to suppress the statements he made to law enforcement agents during the August 27, 2016 search of his home. (*See* ECF No. 130.) The Defendant argues for suppression chiefly on the basis that the statements were obtained during a custodial interrogation in the absence of *Miranda* warnings. (*Id.*; ECF No. 150.) The Government does not dispute that the Defendant was subject to interrogation and was never given *Miranda* warnings. (ECF No. 141 p. 20 n.19.) Therefore, the only issue before the Court is whether the Defendant was in custody at the time of his interrogation such that *Miranda* warnings were required. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) ("Absent formal arrest, *Miranda* warnings only apply where there has been such a restriction on a person's freedom as to render him in custody.") (internal quotation marks and citations omitted).

The test for determining whether an individual is "in custody" for *Miranda* purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)

---

[9] The Defendant argues that *Chavez* was wrongly decided and that, even prior to *Carpenter*, the Government could not have reasonably relied on court orders issued under the Stored Communications Act to obtain an individual's CSLI. (ECF No. 152 at 4.)

(internal quotations omitted); *see also Parker*, 262 F.3d at 419. This inquiry is an objective one, and asks whether "a reasonable man in the suspect's position would have understood his position" as being "in custody." *Berkemer*, 468 U.S. at 422. In other words, "the court considers whether a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Hashime*, 734 F.3d 278, 282–83 (4th Cir. 2013) (internal quotation marks and citations omitted).

"Facts relevant to the custodial inquiry include, but are not limited to, the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Hashime*, 734 F.3d at 283 (internal quotation marks and citations omitted). Also relevant are the suspect's isolation and separation from family. *Id.*

In this case, the facts demonstrate that a reasonable person in the Defendant's position would have perceived a police dominated atmosphere before and during the interrogation. The Defendant was initially approached by nine SWAT agents dressed in protective gear, some of whom had their guns drawn at the Defendant.[10] Multiple other officers were also on the scene, including eight FBI agents and three State Trooper vehicles — a fact that "goes a long way towards making the suspect's home a police dominated atmosphere." *United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008). The Defendant was immediately placed face down on the ground and handcuffed, "demonstrating that the officers sought out [the

---

[10] When asked why the SWAT agents initially approached the Defendant in this manner, SA Davis testified that they "approach people this way because we want to overwhelm them so that they feel forced to comply with us."

Defendant] and had physical dominion over him." *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012). Although the Defendant's handcuffs were removed prior to the interrogation, "the experience of being singled out and handcuffed would color a reasonable person's perception of the situation and create a reasonable fear that the handcuffs could be reapplied at any time." *Id.* at 195.

Further, after his initial detention, the Defendant was interrogated by three agents for approximately four hours.[11] During the interrogation, the agents confronted the Defendant with incriminating evidence discovered on his property, which may certainly cause a reasonable person to feel compelled to cooperate with the police. Moreover, the Defendant's freedom of movement was significantly restricted during the interrogation. Indeed, he was only permitted to leave the interrogation space once—*i.e.*, when he went to his home office to help Hajeski access his computer equipment—at which time he was accompanied by agents. In addition, the Defendant was isolated from his partner until the end of the interrogation – a tactic that the Supreme Court has recognized as one of the distinguishing features of a custodial interrogation. *See Miranda*, 384 U.S. at 445–46. *See also Hashime*, 734 F.3d at 284 (stating that, where the defendant was isolated from his family members, "[i]t is little wonder

---

[11] In support of its argument that the Defendant's interrogation was noncustodial, the Government points to the fact that the Defendant was informal with the interrogating agents, even collegial at times. (ECF No. 141 at 26.) However, the Defendant's statements and attitude during the interrogation are subjective factors that speak primarily to the *voluntariness* of his confession; these facts have little, if any, relevance in the *Miranda*-custody analysis. *See Hashime*, 734 F.3d at 285 (noting that the defendant's demeanor and statements during the interrogation – including that he "want[s] to help [the agents]" and that he "love[s] helping cops" – are subjective factors that speak primarily to the voluntariness of his confession). *But see United States v. Hargrove*, 625 F.3d 170, 182 (4th Cir. 2010) (noting that the Court's finding that the defendant was not in custody was "bolstered by the evidence in the record as to [the defendant's] own conduct at the time – cooperative, loquacious, and expressing interest in working undercover to help the Task Force"). As the Supreme Court has emphasized, the test for whether an interrogation was custodial is an objective one: "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. The test, in other words, involves no consideration of the actual mindset of the particular suspect subjected to police questioning." *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (internal quotation marks and citations omitted).

that [the defendant] testified that, during the interrogation, 'I didn't think I had any chance to leave ...'"); *Craighead*, 539 F.3d at 1087 (observing that "it is difficult to see how [the defendant] was free to leave if he was, apparently, not free to invite others into the storage room of his own house," where he was interrogated). Taken together, these facts demonstrate that a reasonable person in the Defendant's position would have felt that he was not free to leave. *See United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (finding that the defendant was interrogated in a police dominated environment where his residence was "inundated with over twenty-three FBI agents," the defendant was awakened at gun point and guarded at all times, and the defendant was questioned by two armed agents in a vehicle outside of his house for three hours); *see also Cavazos*, 668 F.3d at 194 (holding that the defendant's in-home interrogation was custodial where more than a dozen officers entered and searched the defendant's home early in the morning, the defendant was awakened from bed and initially handcuffed, the defendant was separated from his family and interrogated by two agents for one hour, and the defendant's movements were continually monitored). *Cf. United States v. Hargrove*, 625 F.3d 170, 179–81 (4th Cir. 2010) (finding that the defendant's in-home interrogation was not custodial where, among other things, the defendant was never placed in handcuffs and there was evidence that the defendant was permitted to move about the house unguarded during the interrogation).

That the agents told the Defendant that he was not under arrest, was free to leave, and that his participation was voluntary did not render his interrogation noncustodial. Although these statements are "highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody,'" these statements are not

sufficient in and of themselves to show a lack of custody. *Hargrove*, 625 F.3d at 180. The "broader setting" of the Defendant's interrogation makes clear that the agents' few statements to him at the beginning of his four-hour interrogation "cannot erase its custodial nature."[12] *Hashime*, 734 F.3d at 284. That is, on the afternoon of the interrogation, approximately 17-20 law enforcement officers swarmed the Defendant's property. The Defendant was initially approached by nine armed SWAT agents, handcuffed, and forced to lay on the ground. During the four-hour interrogation, the Defendant was isolated from his partner, his freedom of movement was significantly restricted, and he was confronted with incriminating evidence discovered on his property. In this police dominated environment, a reasonable person in the Defendant's position would have believed he was not free to leave, notwithstanding the agents' statements to the contrary. *See Hashime*, 734 F.3d at 283–85 (finding that the officers' statements to the defendant that he was not under arrest, that his participation was voluntary, and that he could leave any time did not erase the "custodial nature" of the interrogation where the defendant was awoken at gunpoint to a flood of armed officers, his movements were restricted, and he was isolated from his family while he was interrogated in a basement storage room); *see also Craighead*, 539 F.3d at 1085–89 (holding the defendant's in-home interrogation was custodial where, even though the defendant was told that he was not under arrest and was

---

[12] Moreover, these statements were weakened by the agents' subsequent statements to the Defendant. That is, later in the interrogation, SA Bucalo told the Defendant, "[y]ou need my help. I need your help." (Gov. Ex. 19 at 92.) He also said, "[w]e can help you fix the mistake" and "[t]his is your chance to work with us." (*Id.* at 169, 180.) TFO Scarzello further stated, "[y]ou know that us being here in this fashion, we know enough about this, ok. In the fashion we came in, that there is, we, we have a lot of information that we know is in your pocket." (*Id.* at 123.) In addition, the agents repeatedly emphasized the importance of being honest with them, and even accused the Defendant of lying to them. For instance, SA Bucalo said "[h]ow many times do I have to tell you to be honest with us?", and TFO Donovan asserted, "you have to stop denying now." (*Id.* at 128, 181.) Taken together, these statements certainly weakened the agents' initial statements to the Defendant that he was not under arrest, was free to leave, and that his participation was voluntary. *See Hashime*, 734 F.3d at 283–84 (finding that the officers' statements that the defendant was not under arrest, was free to leave, and that his participation was voluntary were undercut by later statements to the defendant that the officer "need[s[ to know the truth", wanted him "to be completely honest", and that the defendant could not be left alone).

17

free to leave, a police dominated atmosphere was effected by the fact that there were eight law enforcement officers present on the scene, the defendant was interrogated in a closed storage room while an officer apparently stood guard at the door, and the defendant was isolated during the interrogation).

Similarly, this broader setting belies any conclusion that the Defendant's home on the day of the interrogation was the traditional comfortable environment that supports a finding that the interrogation was noncustodial. *See Hashime*, 734 F.3d at 284 (rejecting the argument that the home setting of the defendant's interrogation rendered it noncustodial where the defendant felt that he could not freely move through his house because there were officers "everywhere" telling him what to do, where to go, and where not to go). *See also United States v. Mittel-Carey*, 493 F.3d 36, 39–40 (1st Cir. 2007) ("While an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, ... the level of physical control the agents exercised ... weighs heavily in the opposite direction."); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the defendant] was being held is the degree to which the police dominated the scene.").

Considering the totality of the circumstances, the Court concludes that the Defendant was in custody at the time of his interrogation and thus *Miranda* warnings were required. The Court reaches this conclusion even if, as the Government contends, the burden is on the Defendant to demonstrate that he was in custody.[13] Therefore, the Defendant's Motion to

---

[13] Although the Fourth Circuit has not yet addressed this issue, several other courts have held that the defendant bears the burden of demonstrating that he or she was in custody at the time that incriminating statements were made for purposes of *Miranda*. *See, e.g., United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986). *See also United States v. Carr*, 63 F. Supp. 3d 226, 235 (E.D.N.Y. 2014); *United States v. Peterson*, 506 F. Supp. 2d 21, 23 (D.D.C. 2007); *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005). Different judges of the same district in this Circuit have reached slightly different conclusions on this issue. *Compare United States v. Freeman*, 61 F. Supp.

Suppress Statements (ECF No. 130) is granted and the Defendant's statements to law enforcement agents on August 27, 2016 are inadmissible at his upcoming trial.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress Tangible and Derivative Evidence (ECF No. 128) is DENIED, and the Defendant's Motion to Suppress Cell-Site Location Information Seized Without a Warrant (ECF No. 129) is also DENIED. However, the Defendant's Motion to Suppress Statements (ECF No. 130) is GRANTED. A separate order follows.

DATED this 3rd day of December, 2018.

BY THE COURT:

_____/s/_____
Richard D. Bennett
United States District Judge

---

3d 534, 536 (E.D. Va. 2014) (stating that "[i]nitially, the burden of proof is on the defendant who seeks to suppress the evidence," and "once the defendant establishes a basis for the motion to suppression, the burden shifts to the Government"), *with United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) (stating that "the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings"). The Court need not decide this issue here because the Court finds that, regardless of which party bears the burden of proof, the totality of the circumstances demonstrates that the Defendant was in custody at the time of the interrogation.