REDACTED / CLEARED FOR PUBLIC RELEASE

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3    ------------------------------)
                                    )
 4    UNITED STATES OF AMERICA      )
            v.                      ) Criminal Docket No. MJG-17-0069
 5    HAROLD T. MARTIN, III,        )
              Defendant             )
 6    ------------------------------)
                                          Baltimore, Maryland
 7                                        November 14, 2018
                                          10:23 AM to 5:54 PM

 8             THE ABOVE-ENTITLED MATTER CAME ON FOR
                          MOTIONS HEARING
 9         BEFORE THE HONORABLE RICHARD D. BENNETT

10                   A P P E A R A N C E S

11    On behalf of the Government:
            Harvey Eisenberg, Assistant U.S. Attorney
12          David Aaron, U.S. DOJ Trial Attorney
            Zachary A. Myers, Assistant U.S. Attorney
13          Nicolas Mitchell, Assistant U.S. Attorney

14    On behalf of the Defendant:
            James Wyda, Federal Public Defender
15          Deborah Boardman, Assistant Federal Public Defender
            Shari Derrow, Assistant Federal Public Defender

16
      Also present:
17          FBI Special Agent Laura Pino
            FBI Supervisory Special Agent Paul Maric
18          Maura Peterson, CISO
            Hope Daily, Law Clerk

19

20

          Proceedings recorded by mechanical stenography,
21    transcript produced by computer.

22    --------------------------------------------------------

               MARTIN J. GIORDANO, RMR, CRR
23            FEDERAL OFFICIAL COURT REPORTER
               U.S. Courthouse, Fourth Floor
24               101 West Lombard Street
                 Baltimore, Maryland 21201
25                   410-962-4504
```

REDACTED / CLEARED FOR PUBLIC RELEASE

**PROCEEDINGS OF NOVEMBER 14, 2018**

    **THE CLERK:**  All rise.  The United States District Court for the District of Maryland is now in session, The Honorable Richard D. Bennett presiding.

    **THE COURT:**  Good morning, everyone.

    **MR. EISENBERG:**  Good morning, Your Honor.

    **THE COURT:**  This is calling the case in a sealed, secure proceeding, *United States versus Harold T. Martin, III*, Criminal Number RDB-17-069.

    This is a hearing on open motions, and it is a sealed proceeding.  Certain portions of it will be released for public dissemination after I have had an opportunity and the Court Security Officer have had an opportunity to review all portions of it in terms of for any classified material or national defense information, and counsel will have input on that as well when that time comes.  And so, if there is any need to have any witnesses from an open proceeding testify, that will be done at the end of the day.  So we've taken all precautions here as required under the Classified Information Procedures Act.

    If counsel will identify themselves for the record, please.

    **MR. EISENBERG:**  Good morning, Your Honor.

    **THE COURT:**  And, by the way, since we don't have this being taped normally and acoustics are fading and my wife

```
 1    insists that I'm losing slightly hearing in my right here,
 2    although I think it might be that I just ignore her sometimes,
 3    but, whatever the reason is, she maintains that my hearing is
 4    fading, so if everyone keeps their voices up, it will be very
 5    helpful.
 6              On behalf of the Government?
 7         MR. EISENBERG:  I have a stray line to throw out
 8    first about your wife, but she's always right, you know.
 9              Your Honor, good morning.  Harvey Eisenberg,
10    Assistant United States Attorney for the District of Maryland.
11              Seated to my immediate left, Special Agent Laura Pino
12    of the FBI.  She is the case agent for this case.
13         MR. AARON:  David Aaron, Your Honor, for the
14    Department of Justice.  Good morning.
15         THE COURT:  Good morning.
16         MR. MYERS:  Zach -- excuse me.  Assistant U.S.
17    Attorney Zachary Myers on behalf of the United States.
18         THE COURT:  Yes.  Mr. Myers, nice to see you.
19              And Mr. Nicolas Mitchell, correct?
20         MR. MITCHELL:  Yes, Your Honor.
21         THE COURT:  Your position is?
22         MR. MITCHELL:  I'm with the U.S. Attorney's Office
23    for the District of Maryland as well.  Assistant United States
24    Attorney.
25         THE COURT:  Okay.  You're an Assistant U.S. Attorney
```

1    as well.  Well, welcome.

2              MR. MITCHELL:  Yes.  Thank you.

3              THE COURT:  I'm not sure if you've been in my

4    courtroom before.

5              MR. MITCHELL:  I have.

6              THE COURT:  I think once, you have.

7              MR. MITCHELL:  I have, Your Honor.

8              THE COURT:  Always nice to see you, and welcome.

9              And on behalf of the Defendant?

10             MS. BOARDMAN:  Good morning, Your Honor.

11             Deborah Boardman, Assistant Federal Defender.  With

12   me are my colleagues, Jim Wyda and Shari Derrow.

13             We represent Harold Martin.

14             THE COURT:  Yes.  Good morning to you, Ms. Boardman

15   and Mr. Wyda and Ms. Derrow.  Good morning to all of you.

16             And good morning to you, Mr. Martin.

17             THE DEFENDANT:  Good morning, Your Honor.

18             THE COURT:  Good morning, sir.

19             So, with that, why don't you all be seated just for a

20   moment.

21             MR. EISENBERG:  Your Honor, would you like for me --

22             THE COURT:  Yes, Mr. Eisenberg?

23             MR. EISENBERG:  Yes.  Would you like the record to

24   notice who the two individuals in the back are?

25             THE COURT:  Yes.  I'd be glad to hear from them.

1          **SS/A MARIC:**  Paul Maric.  I'm a Supervisory Special

2    Agent with the FBI, Baltimore.

3          **THE COURT:**  Yes.  Thank you.  Thank you for being

4    here.  Thank you.

5          **SS/A MARIC:**  Thank you, Judge.

6          **MR. CRUIKSHANK:**  Your Honor, my name is

7    Andrew Cruikshank.  I'm an attorney with the Office of General

8    Counsel for the National Security Agency.

9          **THE COURT:**  Yes.  Nice to see you.  You're from the

10   NSA.  It's nice to have you here as well, and welcome.

11          You all may be seated for a minute.  Let me just go

12   over a little bit of a shopping list here with respect to what

13   we have before us here.

14          There are some motions that were filed recently that

15   are still open and we're really not going to be addressing

16   today, but let me just note on the record here.  There is a

17   motion that was filed yesterday by the Defendant, a motion for

18   discovery pursuant to § 4 of the Classified Information

19   Procedures Act, which is Paper Number 152, essentially

20   requesting the Government to produce mirror images of the

21   devices used to create the electronic database created by the

22   National Security Agency, which he contends contains some

23   information from certain electronic storage devices that were

24   seized from his residence, and then also seeking mirror images

25   of the computers containing operating systems seized from

1    Mr. Martin's residence.

2          The Government has not had an opportunity to respond

3    to this yet, so we're not going to be dealing with it today.

4    The reason I just bring it up is that, perhaps at the close of

5    these proceedings, we can -- maybe, quite frankly, in case I

6    overlooked it at the end of a busy period here, how much time

7    does the Government need to respond to this, and then we'll

8    just do a briefing schedule here on this?  I don't know what

9    the Government's position on it is.  Normally I ask you at this

10   time, but --

11          MR. MYERS:  Your Honor --

12          THE COURT:  -- is this going to require briefing or

13   not, Mr. Myers?

14          MR. MYERS:  Your Honor, I've had a chance to review

15   it.  It's completely up to the Court.  I'm able to briefly

16   respond and provide Your Honor with an exhibit sort of -- at

17   high level, before we spend a bunch of time briefing, the

18   Government's reaction to the affidavit from their expert is

19   frankly that the expert doesn't know how to do the things that

20   the Government disclosed to the Defense, months before he first

21   appeared, he needed to know how to do, in order to effectively

22   work through the protocol --

23          THE COURT:  Without getting into the matter of the

24   expert, the bottom line on it is you don't know necessarily if

25   the Government is opposing this is what you're saying?

1      MR. MYERS:  The Government is absolutely opposing the

2  motion, Your Honor.

3      THE COURT:  It is opposing?

4      MR. MYERS:  Yes, it is, Your Honor.

5      THE COURT:  Okay.  That's fine.  And my point is

6  that --

7      MR. EISENBERG:  Let's brief it.

8      THE COURT:  -- we'll just do a quick briefing

9  schedule here now.  How much time do you need to respond to

10  this, and the Defendant will have enough time to respond, and

11  I'll deal with it accordingly in another hearing.

12      MR. MYERS:  Yes, Your Honor.

13      THE COURT:  We're not going to deal with it today, so

14  we're not --

15      MR. MYERS:  The Government would ask for two weeks,

16  Your Honor.

17      THE COURT:  All right.  That's fine.  So two weeks

18  from today would be -- today is the --

19      MR. MYERS:  With the holiday.

20      THE CLERK:  November 28th.

21      THE COURT:  November the 28th?  Wednesday, November

22  the 28th?  That's the Wednesday after the Thanksgiving weekend.

23      MR. MYERS:  It is, Your Honor.

24      THE COURT:  Okay.

25      MR. MYERS:  Could we do --

1          THE COURT:  Mr. Myers, I'm sure you and Mr. Aaron

2    will address it, but I have doubts that Mr. Eisenberg will

3    address it over the Thanksgiving weekend, so --

4          MR. MYERS:  That's correct, Your Honor.  Would the

5    following Monday be acceptable to the Court?

6          THE COURT:  That's fine.  We'll do it Monday --

7          THE CLERK:  December the 3rd.

8          THE COURT:  Thank you, Ms. Smith.

9          THE CLERK:  You're welcome.

10         THE COURT:  Monday, December the 3rd, all right, for

11   the response by the Government.

12         And then, Ms. Boardman or Mr. Wyda or Ms. Derrow --

13   Ms. Derrow, you're doing a lot of writing here.  Maybe we

14   should ask you how much time you want.  Really, seriously, how

15   much time do you all think you need for a reply on this?  A

16   week?  Ten days?  What would you like?

17         MS. DERROW:  Ten days is fine, Your Honor.

18         THE COURT:  What?

19         MS. BOARDMAN:  Ten days.

20         MS. DERROW:  Ten days.

21         THE COURT:  Ten days.  All right.  Then you'll

22   respond, let's say, by Thursday --

23         THE CLERK:  December the 13th.

24         THE COURT:  -- December 13.  Okay.  And Ms. Daily

25   will keep track of this for me.  That's how we'll deal with

1    that.

2              MR. MYERS:  And, Your Honor, I guess the Government

3    would just like to clarify that, given their motion and the

4    briefing deadline, that the Defense does not intend to return

5    to the NSA with its expert during the pendency of their motion?

6              THE COURT:  I'm sorry.  You're saying that you assume

7    that they do not?

8              MR. MYERS:  I assume that they do not, only

9    because --

10             THE COURT:  Well, they're entitled to do what they

11   want -- I don't know whether they can bind themselves now as to

12   whether that's the case or not.

13             MS. BOARDMAN:  We can't make that representation.  We

14   can work offline with them about this.

15             THE COURT:  That's fine.  That's fine.  Quite

16   frankly, based on my previous rulings, they're certainly

17   entitled to go back if they want.  I mean, we'll just have to

18   do --

19             MR. MYERS:  Yes, Your Honor.

20             THE COURT:  And if for some reason the need to go

21   back to the NSA requires a longer period of time for briefing,

22   that's fine.  We can work it out.  That's fine.

23             MR. MYERS:  Yes, Your Honor.

24             THE COURT:  All right.  So the second matter before

25   we start with today's suppression hearing is a request for the

1    Government to provide essentially -- we have Papers 131 and

2    136.  Wait a minute on here.

3         (Pause.)

4         **THE COURT:**  This was a *pro se* motion, it appears,

5    that was correspondence from Mr. Martin requesting that I

6    instruct counsel to provide him and his counsel with access to

7    his social media accounts, Paper Number 131.

8         And then Paper Number 136 is a supplement to that

9    correspondence, which was dated September 17th, and, although

10   it doesn't have a gavel by it on the clerk's docket, it is a

11   matter that appears to still be an open matter here.  I don't

12   know whether it is still or not.

13        Are you familiar with this, Ms. Boardman, in terms of

14   your client's -- apparently his *pro se* submissions on those?

15        **MS. BOARDMAN:**  Yes, Your Honor.

16        **THE COURT:**  Okay.  Where are we from the point of

17   view of the Government on it?  The Government hasn't responded

18   to my knowledge.

19        **MR. MYERS:**  That is correct, Your Honor.

20        The Defendant is represented by counsel, and, because

21   of that, the Government didn't respond in writing to the *pro se*

22   filing.  The Government provided what it obtained pursuant to

23   the search warrants from the providers.  An exact copy of what

24   we provided, we provided to the Defense.  What the Defendant's

25   asking for *pro se* simply doesn't exist.

1      **THE COURT:** Okay.

2      **MR. MYERS:** We provided him what we have on that, and

3  that would be our response should we --

4      **THE COURT:** All right. Ms. Boardman, is there

5  anything further on this to pursue from your point of view?  I

6  mean, basically, this is a moot question now; is that right?

7      **MS. BOARDMAN:** Your Honor, based on the Government's

8  representation that they have given us every single piece of

9  social media evidence related to Hal Martin that's in their

10  possession, it is moot for now.  We may come to the Court with

11  additional issues, but, right now, we are satisfied.

12      **THE COURT:** Okay. That's fine.  So we'll just

13  indicate, Ms. Daily, that that's moot for now.

14          And, with that, I think that we are ready to proceed.

15          What I would propose is:  The motions which are

16  pending before the Court are, first of all, Paper Number 128,

17  the Defendant's motion to suppress tangible and derivative

18  evidence, and that essentially relates to essentially the

19  various search warrants that were filed essentially with

20  respect to the searches and seizures on August the 27th of 2016

21  of the Defendant's person and his alleged car and his

22  residence, the curtilage of -- the search warrant with respect

23  to the curtilage of his residence on August 28th; search

24  warrants that were executed with respect to Google, Yahoo,

25  Samsung, Cloud, and Verizon Wireless accounts; on

```
 1    September 28th, search warrants to -- this is all 2016 -- to

 2    search Twitter accounts allegedly associated with Mr. Martin;

 3    and October 7, 2016, the search warrant with respect to the

 4    work area at the University of Maryland Baltimore County, the

 5    contention being that these search warrants -- the affidavits

 6    underlying these search warrants did not establish probable

 7    cause under the principles of Illinois versus Gates, the 1983

 8    Supreme Court opinion, and also the deficiency of the search

 9    warrants such that good faith exceptions under United States

10    versus Leon would not apply, as well as any and all evidence

11    derivative from those searches under the principles of

12    Wong Sun, the Supreme Court opinion.

13              This has been very thoroughly briefed, and, to my

14    knowledge, we're not going to have any -- basically, we'll take

15    whatever testimony the Government wants to provide on this, but

16    that's one set.  That's one motion that we'll deal with.

17              The second motion is the Paper Number 129, the

18    Defendant's motion to suppress cell site location information

19    with respect to the search warrant that was issued on --

20    essentially, in terms of a motion to suppress that evidence.

21              And then, finally, we have the Paper Number 130, the

22    motion to suppress the Defendant's statements that were

23    obtained on August 27 of 2016 during the search of his

24    residence.

25              With respect to those pending motions, I would note
```

1    that certainly, ordinarily, as to almost all of those, the

2    Government may present testimony and evidence as it bears the

3    burden of proof by a preponderance of the evidence with respect

4    to the admissibility of that evidence.

5           With respect to the motion to suppress statements,

6    that has a more nuanced analysis in terms of who bears the

7    burden on that.  So, from my point of view, I think what I'd

8    like to do is proceed with the matter of the two motions to

9    suppress, Paper Numbers 128 and 129, which has been fully

10   briefed, to the extent that the Government wishes to present

11   evidence as to that, and we will proceed in due course, or, if

12   the evidence is merely going to proceed with respect to the

13   matter of the statements, then I just need to hear from whoever

14   the Government is on this, and then I'll hear from Defense

15   counsel.

16          What is the Government's position with respect to the

17   motions to suppress tangible and derivative evidence, as well

18   as the Defense motion to suppress cell site location

19   information?  Is the Government presenting any testimony in

20   connection with that evidence?

21          **MR. EISENBERG:**  No, Your Honor, we are not.

22          **THE COURT:**  Just proceeding on the papers, then?

23          **MR. EISENBERG:**  Yes, Your Honor, we are.

24          **THE COURT:**  From the point of view of the Defense,

25   Ms. Boardman, what is the position of the Defense with respect

1    to whether the Defense desires to present any testimony or

2    evidence with respect to those two motions, or are you content

3    with the Court proceeding on the papers?

4            **MS. BOARDMAN:**  On the papers for the search warrant

5    motions, Your Honor, yes.

6            **THE COURT:**  All right.  Okay.  But as to cell site as

7    well?

8            **MS. BOARDMAN:**  Correct.

9            **THE COURT:**  Okay.  All right.

10           **MS. BOARDMAN:**  And we want argument, of course.

11           **THE COURT:**  That's fine.

12           **MS. BOARDMAN:**  Thank you.

13           **THE COURT:**  By the way, just one thing I want to

14   indicate.  If you'll please stand, Mr. Martin.  I want to make

15   sure you understand one matter here, sir, with respect to the

16   matter of a suppression hearing, and it's important for me to

17   always make sure that I'm satisfied that a defendant in a

18   criminal case understands the process here.

19           Pursuant to Rule 1101 of the Federal Rules of

20   Evidence, those rules do not apply to preliminary questions of

21   fact concerning the governing admissibility of evidence, okay?

22           Do you understand that, sir?

23           **THE DEFENDANT:**  Yes, Your Honor, I do.

24           **THE COURT:**  All right.  But, having said that, I want

25   to make sure you understand that, pursuant to Rule 104(d) of

1   the Federal Rules of Evidence, that, by testifying on a

2   preliminary question, a defendant in a criminal case does not

3   become subject to cross-examination on other issues in the

4   case.

5        The reason I'm advising you of that now and want to

6   make sure you're conscious of it as we proceed with this

7   hearing is that you obviously should rely upon the advice of

8   your counsel.  You have a Fifth Amendment privilege against

9   self incrimination.  The Government cannot call you as a

10  witness.  The Court cannot call you as a witness.

11       But, in the context of a suppression hearing with

12  respect to the admissibility of evidence -- in your discussions

13  with counsel, I'm sure they probably explained to you, you

14  don't waive all rights with respect to being cross-examined A

15  to Z on matters if you take the witness stand and you testify

16  about a specific matter.

17       Do you understand that?

18       **THE DEFENDANT:**  Yes, Your Honor.

19       **THE COURT:**  And, as to that matter, you may be cross-

20  examined, but you don't open yourself up to total cross-

21  examination on other matters under Rule 104(d) even though the

22  Rules of Evidence do not formally apply, and that's the process

23  here in this Court with respect to a suppression hearing if a

24  defendant at some point in time chooses to testify about a

25  specific matter.

1    Do you understand that?

2    **THE DEFENDANT:**  It's related specifically to the

3    matter at hand?

4    **THE COURT:**  I'm sorry.

5    **THE DEFENDANT:**  It's related specifically to the

6    matter at hand and the question --

7    **THE COURT:**  That's exactly right.

8    **THE DEFENDANT:**  Yes, sir.

9    **THE COURT:**  For example, if someone says, "The door

10   opened," and you say, "No, the door didn't open," you're free

11   to say and testify under oath, "No, the door didn't open," and

12   the Government is free to question you about whether the door

13   opened or not.  They're not free to question you about other

14   matters apart from that.

15   Do you understand that?

16   **THE DEFENDANT:**  Yes, sir.

17   **THE COURT:**  Is there anything else the Government

18   wants me to add on that point, Mr. Eisenberg?

19   **MR. EISENBERG:**  No, Your Honor.

20   **THE COURT:**  Ms. Boardman, from your point of view on

21   that?

22   **MS. BOARDMAN:**  No, Your Honor.

23   **THE COURT:**  All right.  You may be seated, sir.  I

24   just wanted to make sure you understood that.

25   So, with that, we shall proceed, then, with the

```
 1    matter of the motion to suppress -- with respect to the motions
 2    to suppress evidence.
 3              Does the Government desire to present any legal
 4    argument on that?  Again, I've read all the briefing on it, but
 5    does the Government desire --
 6              MR. EISENBERG:  Mr. Myers will present for the United
 7    States, Your Honor.
 8              THE COURT:  Okay.  All right.  Ms. Boardman, does the
 9    Defense desire to put on any legal argument on the search
10    warrants?
11              MS. BOARDMAN:  Yes, Your Honor.  Mr. Wyda will be
12    addressing these.
13              THE COURT:  Okay.  That's fine.  That's fine.
14              So, with that, what I propose to do is we'll
15    entertain legal argument on the search warrants, and then we'll
16    proceed with, I gather, testimony and evidence with respect to
17    the motions to suppress statements.
18              So, with that, Mr. Wyda, I'll be glad to hear from
19    you on your argument as to the motions to suppress tangible and
20    derivative evidence, as well the motion to suppress cell
21    site location information.
22              MR. WYDA:  Thank you, Your Honor.
23              Your Honor, the good faith exception does not apply
24    when the affidavit does not provide the magistrate judge with a
25    substantial basis for determining probable cause.  The Fourth
```

1  Circuit and other courts have used the metaphor "bare bones" to
2  describe facially invalid affidavits.  In this case, the
3  affidavits are bare.  I'm not even sure there are bones in
4  support of the affidavits.
5
6
7
8
9
10
11
12
13
14            This is like birds tweeting in the morning, and the
15  sun rising, and somehow suggesting that the birds made the sun
16  rise.  There is no logical or factual relationship between the
17  two events.
18
19
20
21
22
23
24
25            Your Honor, what I'd propose to do -- the

1    constitutional flaw in the affidavits is that a close reading

2    of the affidavits reveals that the affidavits are without

3    bones, certainly without flesh on the bones.  What I would ask

4    Your Honor to do is to -- I have a copy for Your Honor from the

5    first affidavit shared with the Court.

6             THE COURT:  I think I have it all here in my

7    notebook.

8             MR. WYDA:  Okay.  Your Honor, there is an affidavit

9    that I want to walk you through, which is the Twitter

10   affidavit, Zach.

11            THE COURT:  Hold on one second, please.

12            MR. WYDA:  This is the --

13            THE COURT:  The Twitter affidavit you're referring to

14   is Document Number 140-1, which is sealed, affidavit in support

15   of search warrant, and it's by Special Agent Jeremy Bucalo,

16   correct?

17            MR. WYDA:  I believe that's right, Your Honor.  I

18   don't have the same numbers in front of me, but I believe

19   that's right.

20            THE COURT:  I have the file here.  It's the Exhibit 1

21   here that I've got in my notebook, a Twitter search warrant,

22   and I believe that, in the file, it's 140-1, affidavit in

23   support of search warrant, and --

24            MR. MYERS:  Your Honor --

25            THE COURT:  That's correct.  Special Agent

```
 1   Jeremy Bucalo, correct?
 2             MR. MYERS:  Jeremy Bucalo.  That's correct, Your
 3   Honor.
 4             THE COURT:  Bucalo.  I'm sorry.  Is he here in court
 5   here today?
 6             MR. MYERS:  He is.
 7             THE COURT:  Okay.
 8             MR. MYERS:  The Defense has asked us to make him
 9   available, and so he's here if they wish to call him.
10             THE COURT:  I just want to know if I mispronounced
11   his name in front of him.
12       (Laughter.)
13             THE COURT:  Bucalo, is that his name?
14             MR. MYERS:  It is Bucalo.
15             THE COURT:  Bucalo?
16             MR. MYERS:  And Your Honor is correct that the
17   Government filed as Exhibit 1 to our response --
18             THE COURT:  Yes.
19             MR. MYERS:  The search warrant is also in the
20   Government's exhibit book provided to the Court as Exhibit
21   Number 1.
22             THE COURT:  Okay.  All right.  Go ahead, Mr. Wyda.
23             MR. WYDA:  Your Honor, again, I'm going to walk you
24   through.  Again, the first page of the affidavit, the second
25   page of the affidavit, and the third page of the affidavit down
```

1    to probable cause are pretty standard boilerplate.

2         I want to direct your attention to -- the statement

3    of probable cause begins at the bottom of Page 3, and it goes

4    on to the top of Page 8.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23          **MR. WYDA:**  Right.

24          **THE COURT:**  So there is that specific reference there

25   to that Twitter account, correct?





15      Your Honor, again, "Shelf life, three weeks," I want

16  to draw your attention to that for a second.  At the bottom of

17  Paragraph 23, stated, "Shelf life, three weeks," which was

18  understood to mean that "Hal," the Twitter account person, was

19  in possession of information that would only be useful or

20  valuable for a short period of time.

```
 1
 2
 3              My suspicion is all of us in this room reach out to
 4      people and say, "Hey, we need to meet.  It's not time
 5      sensitive.  It's okay if we meet in the next couple of weeks,"
 6      or, "It's time sensitive, and we need to meet today," but no
 7      one interprets that as saying:  I've got information, and it's
 8      going to expire in whatever time frame you left in the message.
 9      The message itself says nothing about information.  It's an
10      interpretation from the agent.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13          MR. WYDA:  Uh-huh.
14          THE COURT:  Do I have that correct?
15
16
17
18
19
20
21
22
23
24
25          THE COURT:  Okay.
```



```
 1           MR. WYDA:  -- is an interpretation of the tweet.




 9

10           THE COURT:  Well, that's why I asked the question,

11    because I'm not really sure what you're --

12           MR. WYDA:  So the only link to --
```

1        MR. WYDA:   Sure.

2

3

4

5

6        MR. WYDA:   No.   So, Your Honor, just so we're --

7        THE COURT:   I mean, that's what the affidavit says.

8

9

10

11

12        THE COURT:   I'm looking at Paragraph 22.   I've got it

13   right here.

14

15

16

17

18

19

20

21

22

23

24

25



1              Your Honor, I want to play this out a little bit

2    longer.



1
2
3
4
5
6
7
8
9
10
11              **THE COURT:**  Well, I understand what your argument is,
12  and obviously the standard here for me is not to conduct a *de*
13  *novo* determination of the determination of probable cause by a
14  magistrate judge, but just to determine whether there is
15  substantial evidence supporting the decision to issue a
16  warrant, and your view is there is not substantial evidence
17  based upon that in terms of the connection between the tweeting
18  birds and the sunrise, and that's really your argument.
19
20
21
22
23
24
25

1

2

3             THE COURT:  I understand what your argument is.  All

4      right.

5             MR. WYDA:  So I actually want to take you, just

6      briefly, if you don't mind, Your Honor, to the search of the

7      home, because --

8             THE COURT:  Well, I want to give the Government an

9      opportunity to respond on the matter of the search of the

10     Twitter --

11            MR. WYDA:  If you don't mind, it's related, and it

12     will be very brief, Your Honor.

13            THE COURT:  All right.  Go ahead.

14            MR. WYDA:  So I want to take you to the affidavit

15     regarding the search for the home.

16            THE COURT:  All right.  Hold on one second.

17            MR. WYDA:  I think this is telling.

18            THE COURT:  Wait a second.  Wait a second.  I'm here

19     now, going to the affidavit in support of Agent Bucalo.  Again,

20     did I pronounce his name correctly?

21            MR. EISENBERG:  Bucalo, Your Honor.

22            THE COURT:  Bucalo.  Bucalo.  Okay.  Hold on one

23     second.

24            MR. WYDA:  So, again, we've covered the Twitter --

25            THE COURT:  I'm looking again here at this affidavit

1    now in terms of the search of the residence.  This is

2    Paper 140-2 in the papers, and it relates to the affidavit in

3    support of the search of the residence at 7 Harvard Road, Glen

4    Burnie, Maryland, at 21060, as well as a Chevy Caprice sedan,

5    Maryland license plate Number 5, C like in cat, L like in lady,

6    2057, as well as the person of Harold Thomas Martin, date of

7    birth ███████ 1964.  That's what I'm looking at now.

8            MR. WYDA:  Great.  Your Honor, I want to take your

9    attention to Paragraph 21.

10           THE COURT:  Paragraph 21?

11           MR. WYDA:  Yep.

12           THE COURT:  All right.  Hold on.

13

14

15

16

17

18

19

20

21           So we lose the interpretation thing.  They're now

22   telling Judge Gallagher that the tweet said he had information

23   with a shelf life of three weeks.  So they've tweaked their

24   affidavit to make it a little bit more compelling.  Again, I

25   don't know why you do that other than you think you need a

1    little bit more, and they were less direct with Judge Gallagher

2    because of that.

3            The final thing I guess I wanted to point to Your

4    Honor, briefly, at the bottom of Paragraph 30 at Page 10, this

5    is probably my favorite effort by the Government to enhance the

6    probable cause, which I think is sorely lacking in this

7    affidavit.  So I'm at Page 10, Paragraph 30, and the agent

8    shares with the Court:  Moreover, based on my training and

9    experience, cyber criminals -- whoops.  I'm sorry, Your Honor.

10   I'm on the wrong sentence.  Sorry.

11           Apologize, Your Honor.  Could I take you back to the

12   Twitter affidavit?

13           THE COURT:  All right.  Give me a second.

14           MR. WYDA:  And, at Paragraph 20 -- 28.

15           THE COURT:  Paragraph 20 of the --

16           MR. WYDA:  Twenty-eight.

17           THE COURT:  -- Twitter affidavit.

18           MR. WYDA:  Twenty-eight, Your Honor, Page 9.

19           THE COURT:  All right.  Okay.  I have Page 8.  Where

20   are you looking?

21           MR. WYDA:  I'm sorry.  Page 9 of the affidavit --

22           THE COURT:  Page 9.

23           MR. WYDA:  -- Paragraph 28.  The paragraph starts,

24   "In my training and experience..."

25           THE COURT:  Yes.  I see it.

1          MR. WYDA:  "In my training and experience,

2     individuals engaged in criminal activities online

3     communicate --"

4          THE REPORTER:  A little bit slower.  I don't have it

5     in front of me.



 1

 2

 3

 4

 5

 6

 7          That's the Twitter affidavit, and, again, the Twitter

 8   information goes into all the other affidavits after that,

 9   contains everything.

10          I hope to get a chance to respond after the

11   Government speaks.

12          **THE COURT:**  Certainly.  I mean, I understand what

13   your argument is, Mr. Wyda.  Thank you very much.

14          And, with that, I'd be glad to hear from the

15   Government.  Mr. Myers?

16          **MR. MYERS:**  Thank you, Your Honor.

17          I think that, in the introduction of your questions

18   to Defense counsel before the Defense counsel's argument, the

19   Court absolutely identified the correct legal standard, which

20   is that you're here to review Judge Gallagher's ruling or

21   finding that the affidavit contained probable cause.

22

23

24

25

```
1
2
3
4
```

5      What we're here about is:  Did Judge Gallagher find

6    probable cause to believe that the Twitter account contained

7    evidence related to the crime?  So we're starting with:  Is

8    there probable cause for the Twitter account, that the search

9    would uncover evidence of wrongdoing?

10      Fourth Amendment requires no more.  The Court is well

11    aware of all of the case law about what the standard of

12    probable cause is that I'm not going to go back through, but

13    it's not an exacting standard.  The question is:  Was there

14    enough?  And we're not reviewing the Court for a hypertechnical

15    means.  We are also looking to see if the affidavit -- after

16    Judge Gallagher signs off on the affidavit, if an officer,

17    notwithstanding Judge Gallagher's ruling, you know, should have

18    known that there is no way that a reasonable officer could rely

19    on that, and that's just simply not what's present here.

```
20
21
22
23
24
25
```



17          THE COURT:  What paragraph are you referring to?

18          MR. MYERS:  I'd like to turn your attention to

19     Paragraph 4 of the Twitter affidavit.

20          THE COURT:  All right.

THE REPORTER:  I'm sorry.  One more time.





1

2

3            That's not a question before the Court.  The question

4    before the Court is:  Does this affidavit provide enough for

5    Judge Gallagher to find there was probable cause that evidence

6    just in this Twitter account -- we're not in his home yet.  And

7    Defense counsel isn't challenging the additional information

8    linking that Twitter account to the Defendant.

9            The question isn't whether the Defendant had good

10   operational security.  The question is whether there is

11   relevant evidence -- whether there is probable cause to believe

12   there is relevant evidence in the account.

13           And, following the execution of that warrant, the

14   Government sought and received from Judge Gallagher a second

15   warrant, or a second series of warrants for the house, the car,

16   his person, also a tracking warrant, and later curtilage, but

17   all of which, you know, substantially stemming from the same

18   facts, although the curtilage adds what they found during a

19   security search or -- excuse me -- a security sweep.

20

21

22

23

24

25

```
 1  ████████████████████████████████████████████████
 2          THE COURT:  You're referring to the first affidavit,
 3  the Twitter account?
 4          MR. MYERS:  Sorry.  Right now, Your Honor, I'm
 5  looking at the second affidavit.  This is Government Exhibit 2.
 6          THE COURT:  All right.  Go ahead.
 7          MR. MYERS:  And it's Paragraph 17 on Page 7.
 8          THE COURT:  Hold on one second.
 9          MR. MYERS:  Yes, Your Honor.
10      (Pause.)
11          THE COURT:  Yes, go ahead.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```





```
 1
 2
 3              And this isn't the trial beyond a reasonable doubt,
 4    but I think that, with those facts set forth in the affidavit,
 5    Judge Gallagher's decision -- you know, the Court should find
 6    not only that the officers relied on it in good faith, but that
 7    the affidavit does itself, in fact, set forth probable cause
 8    for each of the requested warrants.
 9              And, Your Honor, the Defense essentially is just
10    arguing fruits of the tree with the following warrants, so,
11    without our argument on those, we rely on the papers.
12              THE COURT:  I want to give Mr. Wyda an opportunity to
13    respond just on the matter of Twitter and residence.  We'll see
14    if we have any other arguments he wants to present.
15              MR. MYERS:  Yes, Your Honor.
16              THE COURT:  Mr. Wyda, I'd be glad to hear from you in
17    reply.
18
19
20
21
22
23
24
25
```



| | |
|---|---|
| 20 | **MR. WYDA:**  I think that's fair, Your Honor. |
| 21 | **THE COURT:**  Okay. |
| 22 | **MR. WYDA:**  You have to have substantial -- again, I |
| 23 | think Your Honor used the language earlier.  You have to have |
| 24 | substantial probable cause. |
| 25 | **THE COURT:**  Yes.  In other words, your emphasis is |

1

2

3

4

5

6

7

8

9

10

11

12

13          MR. WYDA:  That's a -- that's a crime.

14          THE COURT:  We can go round and round on this.  The

15  bottom line of it is your point is that, because there is no

16  direct connection, that --

17          MR. WYDA:  Take direct out of it, Your Honor.

18          THE COURT:  -- that it's speculative.

19          MR. WYDA:  There is no connection.

20          THE COURT:  I understand what your argument is.

21          MR. WYDA:  The connection is time.

22          THE COURT:  I understand.

23          MR. WYDA:  That's the only connection.

24          THE COURT:  I understand.

25



**MR. WYDA:**  Your Honor --

**THE COURT:**  -- in terms of --

**MR. WYDA:**  Well, no.  My analogy was the information is the same --

**THE COURT:**  Well, I'm not going to debate with you. I'm trying to give you the benefit of my thoughts, Mr. Wyda. You've been very aggressive, and I understand your argument. I've read the papers.  I understand the argument.  I'm not going to rule from the bench on this.  It's not my role to make a *de novo* determination, as you're well aware.  It is my determination -- there is due deference.  You haven't mentioned that yet.  There is due deference to Magistrate Judge Gallagher and the decision she made, and the legal standards are well defined.  We're well aware of them, and I understand what your argument is, and I understand that the passion with which you present it.  There is really no reason to go around the world on this.  As far as I'm concerned, the argument on the Twitter matter is done.

1              Is there anything else you want to say?  I understand

2      your argument.

3              MR. WYDA:  Thank you, Your Honor.  Nothing further.

4              THE COURT:  So we're finished with the Twitter

5      account, okay?  So is there anything else you want to say with

6      respect to the search of the residence?  You've moved quickly

7      to the residence.  If is there anything else you want to

8      address on the matter of the residence, you may.

9      ███████████████████████████████████████████████████

10     ███████████████████████████████████████████████████

11     ███████████████████████████████████████████████████

12     ███████████████████████████████████████████████████

13             THE COURT:  I'm sorry.  I'm on the affidavit for the

14     residence here, which is Paper 140-2.

15             MR. WYDA:  Right.  And I'm struggling a little bit

16     keeping track --

17             THE COURT:  That's all right.  Take your time.

18             MR. WYDA:  -- of my documents.  Thank you, Your

19     Honor.  One moment.

20         (Pause.)

21             MR. WYDA:  So I'm at Page 8 of the search warrant of

22     the home.

23             THE COURT:  All right.  I'm looking at the affidavit.

24     Are you looking at --

25             MR. WYDA:  Yes, Your Honor.  Paragraph 22 --

1     THE COURT:  I'm looking at the affidavit for the

2 search warrant from the home.  Is that what you're trying to --

3     MR. WYDA:  I'm looking at the affidavit.

4     THE COURT:  Okay.

5     MR. WYDA:  And it's at Page 8, Paragraph 22.

6

7

8

9

10

11

12

13

14

15

16     That's what you're referring to there?

17     MR. WYDA:  That's correct, Your Honor.

18     THE COURT:  Okay.  Go ahead.

19     MR. WYDA:  And, again, can I go to the next page,

20 Your Honor --

21     THE COURT:  Sure.

22     MR. WYDA:  -- Paragraph -- at Page 9 --

23     THE COURT:  Okay.

24     MR. WYDA:  -- the rest of that paragraph.

25     THE COURT:  Okay.



```
 1
 2
 3
 4
 5              That's it, Your Honor.  Thank you.
 6         THE COURT:  All right.  Thank you, Mr. Wyda.
 7         Mr. Myers, do you want to respond any further on
 8    that?
 9
10
11
12
13
14
15
16
17         THE COURT:  You're on the second affidavit.  You're
18    on the affidavit of the residence, Paper 140-2?
19         MR. MYERS:  Yes, Your Honor.  Also Government's
20    Exhibit 2.
21         THE COURT:  I'm looking at Paragraph 22.  Go ahead.
22    I'm sorry.
23         MR. MYERS:  Yes.  On the following page, the second
24    half of Paragraph 22, the top of Page 9 --
25         THE COURT:  Yes.
```

REDACTED / CLEARED FOR PUBLIC RELEASE

54



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  **THE COURT:**   All right.   You want to respond further

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

1  on that, Mr. Wyda?

2         MR. WYDA:  Your Honor, I'm tempted to, but I don't --

3         THE COURT:  The thrust of it is, in terms of, for

4  example, the specificity of your client's access to some of

5  this.

6         MR. WYDA:  So we're not disputing that my client had

7  access to this information.  We're not -- again, our point is

8  that many, many people --

9         THE COURT:  And the Government's response is that

10  there is greater indicia in terms of specificity of where this

11  information came from.

12

13

14

15

16

17         THE COURT:  Hold on.  I thought you weren't going to

18  go back to the tweets.  I thought we weren't going to go back

19  to the tweets.  I'm trying to focus on the affidavits as to the

20  residence, and my point is that your position is that it's --

21  some of the access to this information, the Government has

22  noted the information in the affidavit by Bucalo --

23  Agent Bucalo, in terms of your client's access to this type of

24  information, and your response has been that many people have

25  access to it, and the Government's response is that there is

REDACTED / CLEARED FOR PUBLIC RELEASE

1   specificity in terms of the access.

2              I'm just giving you an opportunity to respond to

3   that.  You're disputing that there is greater specificity as to

4   many other sources for that information?  Is that your point?

5

6

7

8

9

10

11              **THE COURT:**  Okay.

12

13

14

15

16

17

18

19

20              **THE COURT:**  All right.  Well, thank you, Mr. Wyda, on

21   that.  Is there any other argument that the Defense wishes to

22   present with respect to essentially the warrants or affidavits

23   as to any of the other social media accounts or with respect to

24   cell site location information?  Anything further you want to

25   add in terms of this?

REDACTED / CLEARED FOR PUBLIC RELEASE

1    **MR. WYDA:**  No, Your Honor.  We'll rely on our papers

2    regarding the cell site location.  We're preserving that issue,

3    and, again, I think probably have exhausted the arguments for

4    the search warrant affidavits.

5    **THE COURT:**  No.  That's fine.  You're fine.  If I

6    leaned on you too hard, I apologize.  I'm just trying to make

7    sure we keep moving here.

8    **MR. WYDA:**  I've said all I have to say, Your Honor.

9    **THE COURT:**  That's fine.  Any other legal argument

10   that needs to be presented on the warrants before we get to the

11   matter of the motion to suppress statements?  From the point of

12   view of the Government, we're ready to move on to the matter of

13   the motion to suppress statements; is that correct?

14   **MR. EISENBERG:**  Yes, Your Honor, we are.

15   **THE COURT:**  Okay.  All right.  From the point of view

16   of the Defense, Ms. Boardman, we're ready?

17   **MS. BOARDMAN:**  We are, Your Honor.  If I could ask

18   the Court just for maybe for a seven- to ten-minute refreshment

19   break, and I would like to ask the agents, who I haven't been

20   able to ask them questions to, before they testify, a few

21   questions.  I tried to reach them yesterday, and I was unable

22   to do so.

23   **THE COURT:**  All right.  Well, that's fine.  We're not

24   going to have a deposition out in the hallway, but I don't

25   know --

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

1          **MS. BOARDMAN:**  No depositions in the hallway.

2          **THE COURT:**  I know, but my point is of what purpose

3   is it in terms of your -- the questioning an agent out in the

4   hallway, you're free to call whoever you want on the record

5   here, and --

6          **MS. BOARDMAN:**  That's fine, Your Honor.  May I just

7   go to the restroom?

8          **THE COURT:**  Well, no.  We're about to break for a

9   minute anyway.

10          **MS. BOARDMAN:**  Thank you.

11          **THE COURT:**  Let me just -- Mr. Giordano and Ms. Smith

12   had a meeting for like nine straight hours yesterday, and, at

13   his age, he's having difficulty here.

14          I'm just teasing you, Mr. Giordano.

15          **THE REPORTER:**  I got it.

16      (Laughter.)

17          **THE COURT:**  Before we get to the matter of the issue

18   of the motion to suppress statements, I do want to note that

19   we'll start -- I'll give you a break in a minute, Ms. Boardman,

20   so just stand by.  We're going to go to a break in a minute.

21          I do want to start initially with the legal issue

22   here in terms of the burden, in terms of there certainly seems

23   to be abundant case law that has held that the Defendant bears

24   the burden of demonstrating that he was in custody at the time

25   that the alleged incriminating statements were made, and I want

REDACTED / CLEARED FOR PUBLIC RELEASE

1    to give everyone an opportunity to address that, because I'm

2    not sure it's really an open question.  It's not been totally

3    defined in the Fourth Circuit.  It may or may not have been,

4    but I want to make sure that you understand that we'll first

5    start with that legal argument.

6            We're not going to get too lost into it, and I'm not

7    necessarily going to make a ruling now on what burden applies,

8    but I think I ought, to both sides, that it's not just a given,

9    that clearly the burden is upon the Government with respect to

10   those other matters that we've addressed thus far in terms of

11   by a preponderance of the evidence in response to a motion to

12   suppress, but, with respect to statements, it's a little

13   different.  It may or may not be, and I just want to give

14   everyone an opportunity to be alerted to that before we then

15   proceed with testimony.

16           What witnesses are going to be called by the

17   Government on this motion to suppress statements?

18           MR. EISENBERG:  The Government has two witnesses for

19   this motion.

20           THE COURT:  Okay.  And they are?

21           MR. EISENBERG:  Special Agent Paul Scarzello,

22   S-C-A-R-Z-E-L-L-O, who is, at that point in time, a task force

23   officer assigned to the FBI.  He's currently employed and was

24   on detail from NSA.

25           THE COURT:  Okay.

REDACTED / CLEARED FOR PUBLIC RELEASE

1     **MR. EISENBERG:**  Also, Special Agent, now Unit Chief,

2  Ryan Davis, who was a member of the SWAT team executing the

3  search warrant.

4     **THE COURT:**  Okay.  All right.  Okay.  Fine.

5     And, at this point in time, what witnesses is the

6  Defense presenting at this point in time?  Apart from those

7  witnesses that you'll cross-examine, what witnesses do you

8  believe you're going to be presenting?

9     **MS. BOARDMAN:**  We intend to present two civilian

10 witnesses, and we may or may not call two additional officers

11 or agents who were present at the scene.

12    **THE COURT:**  All right.  Well, I've blocked off pretty

13 much the whole day here, so we're fine.  So we'll take a break

14 now, and we'll start again in ten minutes.

15    **THE CLERK:**  All rise.  This Honorable Court stands in

16 recess for ten minutes.

17    (Recess taken, 11:41 a.m. - 11:59 a.m.)

18    **THE CLERK:**  All rise.  This Honorable Court now

19 resumes in session.

20    **THE COURT:**  All right.  You all may be seated.

21    We now will proceed with the motion to suppress

22 statements, Paper Number 130, and I would note that the issue I

23 just want to raise initially, and we don't necessarily have to

24 resolve it now.  We're going to proceed with the presentation

25 of testimony and address this motion to suppress statements

REDACTED / CLEARED FOR PUBLIC RELEASE

```
 1    made on August 27, 2016, when the Defendant was interrogated,

 2    but, just so you understand here, that, with respect to the

 3    issue of the burden, the Government has, in its papers, noted

 4    that the Defendant bears the burden of demonstrating that he

 5    was in custody at the time the incriminating statements were

 6    made.

 7          Let me just sort of summarize where I think the law

 8    is on this, and it may or may not be necessary that this be

 9    briefed in further detail by the parties.  I don't really

10    think -- we'll just wait and see if it's going to be necessary

11    or not.  We don't need to resolve it this morning.

12          But the Fifth Circuit and the Eighth Circuit and

13    multiple district courts have held that the Defendant does bear

14    the burden of demonstrating that he was in custody at the time

15    the allegedly incriminating statements were made.  The Eighth

16    Circuit case is United States versus Jorgensen,

17    J-O-R-G-E-N-S-E-N, 871 F.2d 725.  The Fifth Circuit opinion is

18    United States versus Davis, 792 F.2d 1299.  The Eighth Circuit

19    opinion was in 1989.  The Davis opinion by the Fifth Circuit

20    was in 1986.

21          There is also authority from several district courts,

22    including the Eastern District of Virginia, here in the Fourth

23    Circuit, United States versus Freeman, 61 F.Supp.3d 534, an

24    opinion by the United States District Court for the Eastern

25    District of Virginia in 2014.
```

REDACTED / CLEARED FOR PUBLIC RELEASE

1      There is an opinion that same year by the United

2  States District Court for the Eastern District of New York,

3  *United States versus Carr*, 63 F.Supp.3d 226.  That's 2014,

4  Eastern District of New York.  There is also an opinion from

5  the -- it appears also an opinion from the United States

6  District Court for the District of Columbia in *United States*

7  *versus Peterson*, 506 F.Supp.2d 21, an opinion in 2007.  And,

8  finally, in the Northern District of New York, *United States*

9  *versus Miller* at 382 F.Supp.2d 5350.

10      However, there is authority from the United States

11  District Court for the Eastern District of Virginia, and there

12  are two different opinions here by, I gather, two different

13  judges over in the Eastern District of Virginia, in *United*

14  *States versus Hunter*, 63 F.Supp.3d 614, an Eastern District of

15  Virginia opinion in 2014, holding that, where a defendant seeks

16  to suppress a statement under *Miranda versus Arizona*, the

17  Government bears the burden of establishing by a preponderance

18  of the evidence that the statement was not the product of

19  custodial interrogation conducted in the absence of *Miranda*

20  warnings.

21      And then the level of proof of that that has been

22  required by those Courts is at some variance in terms of, for

23  example, in the *Davis* opinion, the Fifth Circuit opinion I

24  noted, it held that the Defendant failed to demonstrate that he

25  was in custody where the only presented evidence was his

REDACTED / CLEARED FOR PUBLIC RELEASE

1   subjective opinion that he did not feel like he was free to

2   leave, whereas the Northern District of New York, 382

3   F. Supp.2d, a District Court opinion, held that the Defendant

4   satisfied the burden even though the Defendant bore the burden,

5   that the Defendant satisfied the burden by alleging a custodial

6   interrogation in the absence of *Miranda* warnings.

7           I just throw that out.  That's what the law is.  It

8   appears by the case law here that the clear weight of authority

9   is that the Defendant bears the burden of proving and

10  demonstrating that he was in custody at the time the

11  incriminating statements were made.

12          I'm not so holding now for purposes of -- in fairness

13  to the parties, I want you to understand that it's an issue

14  that is floating here, and we'll have to wait and see how we --

15  you know, if it's necessary to do any further briefing, I'll

16  give you all the option to do further briefing on it.

17          So, with that, we're ready to proceed.

18          For at least purposes now, without making a

19  determination that the Government bears the burden,

20  Mr. Eisenberg, I think that probably I'd prefer if, now, we

21  just have the Government begin its presentation of evidence.

22          **MR. EISENBERG:**  That's what we anticipated, Your

23  Honor, so it's fair --

24          **THE COURT:**  With respect to the events of August 27,

25  2016, the Government's first witness will be?

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

1      MR. EISENBERG:  Special Agent Ryan Davis.

2      THE COURT:  All right.

3      MR. EISENBERG:  And Mr. Aaron will be presenting.

4      THE COURT:  Yes.  Thank you, Mr. Aaron.  Thank you

5  very much.

6      MR. AARON:  Your Honor, before we begin, a couple of

7  administrative matters.  One is we do have a draft transcript

8  here for Your Honor to follow along.  We would like to play

9  some of the audio recording.

10      THE COURT:  Let me just say that I have a book up

11  here that you all had placed up here with respect to today's

12  motion hearing, and I --

13      MR. AARON:  It is not included in those exhibits,

14  Your Honor.

15      THE COURT:  Is there a draft transcript here in this

16  book, or --

17      MR. AARON:  No, Your Honor.  We have it here.  It's

18  classified, so we kept it at this table.

19      THE COURT:  All right.  Well, I'm looking here.

20  Items 18 and 19 say a working draft transcript, or is that --

21  I'm just trying to make sure I don't have any duplication up

22  here.

23      MR. AARON:  It's listed there, Your Honor, but it's

24  not, I believe, included in the binder itself --

25      THE COURT:  Oh, okay.

1          MR. **AARON:**  -- behind that tab.

2          MR. **EISENBERG:**  Your Honor, I can hand one up --

3          THE **COURT:**  No.  That's okay.  I got you.  Yes.  And

4     I'll need a copy of it.  Thank you very much.

5          MR. **AARON:**  Thank you, Your Honor.

6          THE **COURT:**  A copy is being presented to Defense

7     counsel as well; is that correct?

8          MR. **AARON:**  Yes, Your Honor.

9          MR. **EISENBERG:**  They already have it, Your Honor.

10         THE **COURT:**  Okay.  Good.  Thank you, Mr. Eisenberg,

11    and thank you, Mr. Aaron.

12         MR. **AARON:**  And, Your Honor, if we may just do a

13    sound level check with the recording playback level to see if

14    it's appropriate from Your Honor's perspective?

15         THE **COURT:**  That's fine.  That's fine.

16       (Whereupon, an audio recording was played.)

17         THE **COURT:**  That should be fine.

18         MR. **AARON:**  Thank you, Your Honor.

19         THE **COURT:**  All right.  With that, first witness.

20         MR. **AARON:**  The Government calls Special

21    Agent Ryan Davis, Your Honor.

22         THE **COURT:**  Come forward, please, sir.

23         THE **CLERK:**  Good afternoon, sir.  Please raise your

24    right hand.

25      **RYAN DAVIS, GOVERNMENT'S WITNESS, SWORN**

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    THE CLERK:  You may have a seat.

2    Please state and spell your full name for the Court,

3    and please keep your voice up.

4    THE WITNESS:  My name is Ryan Davis, R-Y-A-N,

5    D-A-V-I-S.

6    THE CLERK:  Thank you.

7    THE COURT:  All right.  You're going to have to keep

8    your voice up a little bit.  There is no microphone.

9    THE WITNESS:  Oh, no?  Okay.

10   THE COURT:  The microphone is off, so you're going to

11   have to keep your voice up a little bit.  Thank you very much.

12   You may proceed, Mr. Aaron.

13   MR. AARON:  Thank you, Your Honor.

14                **DIRECT EXAMINATION**

15   **BY MR. AARON**:

16   Q.  Special Agent Davis, where do you work?

17   A.  I work for the Federal Bureau of Investigation.

18   Q.  And what is your job title currently?

19   A.  I'm a unit chief.

20   Q.  And what's your current --

21   THE COURT:  I'm sorry.  You're going to have to -- I

22   apologize.  I'm used to the microphone here, and you're looking

23   away from me, talking towards the wall over there, and I'm

24   having trouble.  You're going to need to address your comments

25   to me as well.  I'm sorry.  Thank you very much.

Direct Examination of Ryan Davis

1              THE WITNESS:   I'm a unit chief in the

2    Counterintelligence Division.

3              MR. AARON:   Thank you.

4    BY MR. AARON:

5    Q.   And where were you assigned in August of 2016?

6    A.   To the Baltimore Field Office.

7    Q.   And was one of your duties at that time to be on the SWAT

8    team?

9    A.   Yes, sir, it was.

10   Q.   And for how many years did you work on SWAT teams?

11   A.   During the FBI, it was approximately four to five years.

12   Q.   Thank you.

13        On August 27th, 2016, as part of the SWAT team, were you

14   involved in the execution of a search warrant at 7 Harvard Road

15   in Glen Burnie?

16   A.   Yes, sir.

17   Q.   And was that the residence of Harold Martin, the Defendant?

18   A.   Yes, sir.

19   Q.   Prior to executing the warrant, did you receive any

20   briefing?

21   A.   Yes, sir.

22   Q.   Were you told about why SWAT was being asked to assist in

23   execution?

24   A.   Yes, sir, I was.

25   Q.   And, briefly, what was your understanding?

Direct Examination of Ryan Davis

1   A.  My understanding was that SWAT was required due to the

2   presence of weapons at the residence, as well as the

3   possibility of evidence being destroyed.

4   Q.  And were you given any physical details about the occupant

5   of the residence?

6   A.  Yes.  We were given a photograph of him, as well as a

7   physical description.

8   Q.  And, briefly, what was the physical description?

9   A.  He was a larger white male.

10  Q.  How did you get to the residence that day?

11  A.  We have a FBI SWAT van that we use.

12  Q.  And do you recall how many SWAT operators were on the team

13  that day?

14  A.  It was approximately nine of us.

15  Q.  And were you all dressed similarly?

16  A.  Yes, sir.

17  Q.  And can you briefly describe how?

18  A.  We have a standard uniform, which consists of

19  multi-camouflage pants and multi-camouflage top.  We would have

20  a protective vest on as well as protective helmet, and our --

21  whatever weapons we were assigned to carry that day.

22  Q.  Were you wearing helmets?

23  A.  Yes, sir.

24  Q.  And hearing protection?

25  A.  Yes, sir.

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1   Q.  What type of weapons did the SWAT operators carry that day?

2   A.  It's typically, or, on that day, it was an M4 rifle and a

3   handgun, a Glock handgun.

4   Q.  And did you have a specific assignment?

5   A.  Yes, sir.

6   Q.  And what was that assignment?

7   A.  I was assigned as the breacher for the SWAT team.

8   Q.  And can you very briefly describe what the breacher's role

9   is?

10  A.  Breacher carries extra tools -- a ram, a Halligan, which is

11  like a crowbar -- and I would be responsible for opening any

12  locked container or door that the SWAT team needed to get

13  access to.

14  Q.  Thank you.

15      Before you left the van, did you receive any information

16  about where Mr. Martin was or what he was doing?

17  A.  Yes, sir, we did.

18  Q.  And what was that?

19  A.  Over the radio, we were informed that Mr. Martin was either

20  in his vehicle or near his vehicle and was walking back towards

21  the front door of the residence.

22  Q.  And how did that affect the plan to approach him?

23  A.  It expedited our plan to approach him, because dealing with

24  an individual outside of a residence is a lot safer for us as

25  opposed to when he could be inside and have access to weapons.

Direct Examination of Ryan Davis

1    Q.  So, at some point, did you leave the van?

2    A.  Yes, sir.

3    Q.  And where was your weapon at that time?

4    A.  My weapon -- my handgun would have been holstered at my

5    side, and my rifle would have been slung across my chest, or my

6    back, because I was carrying a breaching tools.

7    Q.  And what happened after you left the van?

8    A.  After we left the van, the first few folks in the SWAT team

9    began giving verbal commands to Mr. Martin, who was still in

10   the front yard area, and I was following them as they were

11   giving verbal commands.

12   Q.  Do you recall whether they had their weapons up?

13   A.  Yes, they had their weapons up.

14   Q.  And what were they telling him to do?

15   A.  The best of my recollection, I believe they were telling

16   him to walk away from the front door and show his hands.

17   Q.  Did they identify themselves as FBI agents?

18   A.  Yes, they did.

19   Q.  And what did Mr. Martin do?

20   A.  He complied with the instructions.

21   Q.  Did you approach Mr. Martin?

22   A.  Yes, sir.

23   Q.  And what did you do?

24   A.  After complying with the first two SWAT officers, he walked

25   away from the residence.  At that point, I set down my

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE


breaching equipment and went to Mr. Martin to place him in handcuffs.

Q. Did you give him verbal instructions?

A. Yes, sir.

Q. And what were those verbal instructions?

A. I asked him to get down on the ground.

Q. And did he?

A. Yes, he did.

Q. Did you make physical contact with him?

A. Yes, sir.

Q. Can you describe that physical contact?

A. As I approached him, I approached him from his -- what would be his right side, and I grabbed his right wrist and put my left hand on his back to have physical contact with him while he was complying to go to the ground.

Q. And what's the purpose of putting your hand on his back like that?

A. It's just to maintain physical control over his person so that, if he decides to stop complying at any point, I have contact with him and can do any techniques I need to get him to the ground.

Q. Did you have to use any techniques to get him to the ground?

A. No, sir.

Q. Did you have to push him to the ground?

REDACTED / CLEARED FOR PUBLIC RELEASE

APPLIED FOR CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    A.   No, sir.

2    Q.   So he went down on his own power?

3    A.   Yes, sir.

4    Q.   In that process, did you twist his arm at all, anything

5    like that?

6    A.   No, I did not.

7    Q.   And so what did you do next?

8    A.   I then began handcuffing him, and I placed one handcuff on

9    him and realized that, due to the size of his shoulders, we

10   weren't going to be able to put one single strand of cuffs on

11   him, so I grabbed a second pair to make one long cuff to lessen

12   the strain on him.

13   Q.   Did you ever have to put strain on his shoulders to get the

14   cuffs on?

15   A.   No, sir.

16   Q.   I'm going to ask you --

17          MR. AARON:   Your Honor, if I may approach the witness

18   with the binder exhibit?

19          THE COURT:   Yes, certainly.

20          MR. AARON:   Exhibit binder.

21      (Document tendered to the Witness.)

22   BY MR. AARON:

23   Q.   I'll ask you to refer to Exhibit 9.

24          MR. AARON:   And, Your Honor, if I may put a copy of

25   that up on the easel?

Direct Examination of Ryan Davis

1      THE COURT:  That's fine.

2  BY MR. AARON:

3  Q.  Is that the exterior of 7 Harvard Road?

4  A.  Yes, sir.

5  Q.  Would you please -- I'll ask you to indicate with your

6  initials on that copy, then I'll ask you to get up and indicate

7  on the photograph where it was that you encountered Mr. Martin.

8  Do you have a pen there?

9  A.  I do not, sir.

10  Q.  You can use mine.  Thank you.

11      You can just put your initials.

12      (Witness complying.)

13      MR. AARON:  And then, Your Honor, may the witness

14  step down and indicate on the photograph?

15      THE COURT:  Yes.  Certainly.  Certainly.

16      MR. AARON:  I believe there is a ruler on the edge of

17  this desk if you want to use that to point.

18      THE WITNESS:  So I encountered him right here

19  (indicating) in this grass area, and that's where he was laid

20  down, in this area (indicating).

21  BY MR. AARON:

22  Q.  Thank you.  And that's the spot that you marked on the

23  exhibit as well?

24  A.  Yes, sir.

25  Q.  About how far is that from the front door?

REDACTED / CLEARED FOR PUBLIC FILE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    A.  It's about 15 feet.

2    Q.  And was he directly in front of the door, or was he offset

3    from the door?

4    A.  He was offset.

5    Q.  Thank you.

6    A.  So he was over here on the side, away from the door.

7    Q.  Thank you.  And you can have a seat.

8        (Whereupon, the witness resumed the stand.)

9    **BY MR. AARON**:

10   Q.  Do you recall whether a flashbang device was used at

11   Mr. Martin's residence that day?

12   A.  I had -- I did not hear a flashbang on that day.

13   Q.  And you were wearing hearing protection?

14   A.  Yes, sir.

15   Q.  Is it possible that one was used at the door after

16   Mr. Martin was in handcuffs?

17   A.  Yes, sir.

18   Q.  And, as a SWAT operator, are you experienced with flashbang

19   devices?

20   A.  Yes, sir, I am.

21   Q.  Can you briefly describe to the Court what they are?

22   A.  Flashbangs are a diversionary device that we use to help

23   our safety and safety of others, and it gives a -- really

24   three -- three separate distractions, first one being a loud

25   bang, a second one being a flash of light with some smoke, and

CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    the third one being kind of an over-pressure sensation where it

2    feels like air is pushing against you.

3    Q.   And so how would they typically be used inside an enclosed

4    space?

5    A.   Typically, a SWAT officer would deploy a flashbang at the

6    opening of an unknown area in order to give us a distraction so

7    we can safely enter that area.

8    Q.   Are they ever used when there is a dog in the house?

9    A.   Yes, sir.

10   Q.   And can you briefly describe why?

11   A.   So, in scenarios where we use them with a dog, typically if

12   there is a dog present, visual to us, and we don't know

13   anything about the dog, or if the dog is barking or being

14   somewhat aggressive, we will throw a flashbang to scare the

15   dog, to get the dog away from us, so that we can enter the

16   residence without having to harm the dog or having any harm

17   done to us.

18   Q.   And, if a dog attacked a SWAT operator that was entering a

19   house that had not been cleared, what could happen to that dog?

20   A.   The dog could be killed.

21   Q.   Based on your experience, can you describe the usual effect

22   on someone standing outside the house, 15 feet away, offset

23   from the door, when a flashbang goes off inside the door?

24   A.   So, if you're that distance away and you're outside, you're

25   going to have less of a over-pressure sensation, so you're

CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1   still going to hear the noise.  Depending on where you're

2   looking, you may or may not see the flashbang -- I'm sorry --

3   the actual flash.  And the over-pressure sensation is going to

4   be reduced in an outside environment.

5   Q.  While you were outside with Mr. Martin, did he talk to you

6   at all?

7   A.  Yes, sir.

8   Q.  And, in general, what did he say?

9   A.  He was asked -- asking me what was going on.

10  Q.  And what did you tell him?

11  A.  I told him someone would be with -- be coming shortly to

12  tell him what's going on.

13  Q.  At some point, did he stand up?

14  A.  Yes, sir.

15  Q.  And how did he stand up?

16  A.  I helped him get up off the ground.

17  Q.  Do you recall about how long he was on the ground?

18  A.  It was less than a minute.

19  Q.  After he got up, what did you do next?

20  A.  I walked him away from the front of the residence and

21  handed him off to another agent or officer that was in the

22  front perimeter area.

23  Q.  And then what did you do?

24  A.  I then turned around and went into the house to assist the

25  rest of the SWAT team with finishing securing the residence.

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1   Q.  And did you encounter Mr. Martin again?

2   A.  Yes, I did.

3   Q.  When was that?

4   A.  As I was going to exit the front door after we had

5   initially cleared the residence, Mr. Martin was right outside

6   the door with an agent or officer.

7   Q.  Was his demeanor, when you returned to him, any different

8   than when you had left him?

9   A.  No.  He was still being pleasant, compliant.

10  Q.  Did he appear to have been injured in any way while you

11  were gone?

12  A.  Not to me.

13  Q.  And what happened next?

14  A.  Then, at the request of Special Agent Bucalo, I brought

15  Mr. Martin inside the residence and sat him on a couch.

16  Q.  Thank you.

17         MR. AARON:  And, at this point, I'd like you to refer

18  to Exhibit 11 in your book.  And, Your Honor, I'll just put

19  that up on the easel as well.

20         THE COURT:  All right.

21  BY MR. AARON:

22  Q.  Is Exhibit 11 a sketch of the inside of the house?

23  A.  Yes, sir.

24  Q.  Of the first floor?

25  A.  Yes, sir.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    Q.  And can you tell:  Is that sketch drawn to scale?

2    A.  It is not to scale.

3    Q.  All right.  If you could mark with a "D" on your copy where

4    the front door is.

5    A.  Okay.

6        (Witness complying.)

7    Q.  And, if you don't mind stepping down and just indicating

8    for the Court where that front door is.

9    A.  The front door is right here (indicating).

10   Q.  Thank you.

11       And that's the door you brought Mr. Martin through?

12   A.  Yes, sir.

13   Q.  I'll let you get back to your seat.

14       (Whereupon, the witness resumed the stand.)

15   **BY MR. AARON**:

16   Q.  And what happened next after you brought Mr. Martin into

17   the house?

18   A.  I brought him over to the couch there in the same room over

19   to the left.

20   Q.  And is that Room C --

21   A.  Yes, sir.

22   Q.  -- on the diagram?  Thank you.

23       Did you talk at all with Mr. Martin inside the house?

24   A.  Yes, sir, I did.

25   Q.  Now, I'm going to ask you about Exhibit 18, which is not in

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1   your binder.  That's the recording.

2       Have you listened to portions of that exhibit?

3   A.  Yes, sir, I have.

4   Q.  And do you recognize the voices in that exhibit?

5   A.  Yes, sir, I do.

6   Q.  What are some of the voices you recognize?

7   A.  I recognize my voice, as well as Mr. Martin's, and Special

8   Agent Bucalo's.

9   Q.  Thank you.

10          MR. AARON:  Your Honor, if I may, I'd like to play a

11  portion of that exhibit.

12          THE COURT:  This is Government Exhibit 18?

13          MR. AARON:  Yes, Your Honor.

14          THE COURT:  Okay.  Government Exhibit 18.

15          MR. AARON:  Thank you.  And, for --

16          THE COURT:  Which are a CD of recorded statements?

17          MR. AARON:  Yes, Your Honor.

18          THE COURT:  All right.

19          MR. AARON:  If I could have my technical assistants.

20  This is going to be File -- there are several files on that CD.

21  This is File Backup_1, and it's going to go from the beginning

22  to 5 minutes, 51 seconds, corresponding in the draft transcript

23  to Pages 2 through 7.

24          THE COURT:  All right.  So -- I'm sorry.  You're

25  going to start here with the recording, and you've been kind

CLEARED FOR PUBLIC RELEASE

 1    enough to provide me with a draft interview transcript, but

 2    that's not what I have before me, the draft interview

 3    transcript.  This is just a recording of the initial contact;

 4    is that what this is?

 5              MR. AARON:  Your Honor, the transcript in the white

 6    binder that we handed up --

 7              THE COURT:  Yes.  The second binder.

 8              MR. AARON:  -- is a draft transcript of the audio

 9    recording from inside the house.

10              THE COURT:  Okay.  All right.  So we're starting

11    right with -- I have your exhibit list here, and I have

12    Government Exhibit 18 being the CD of recorded statements, and

13    19 being a working draft transcript.

14              MR. AARON:  That's correct, Your Honor, so --

15              THE COURT:  And what do I have before me now?  I have

16    Number 19?  Is that what I have before me?

17              MR. AARON:  Yes, Your Honor.  The binder is --

18              THE COURT:  Both of them will be admitted into

19    evidence.  Okay.

20              MR. AARON:  Thank you, Your Honor.

21              THE COURT:  Both the CD itself will be admitted into

22    evidence, and then the working draft transcript.

23              MR. AARON:  Thank you, Your Honor.

24              So, again, this would be File Backup_1 from the

25    beginning through 5 minutes, 51 seconds, corresponding to

UNCLASSIFIED/CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    Pages 2 through 7 of the draft transcript, which is 19.

2              If I may, Your Honor, pass the witness a copy of

3    Exhibit 19?

4              THE COURT:  That's fine.  That's fine.

5              THE REPORTER:  If you're going to be referring to it,

6    do you have another one?

7              MR. AARON:  Probably, yes.

8              THE REPORTER:  Thank you.

9         (Whereupon, a portion of an audio recording was played.)

10   **BY MR. AARON**:

11   Q.  In the draft transcript, do you recognize your voice as

12   being attributed to UM2?

13   A.  Yes, sir.

14   Q.  Did you hear Special Agent Bucalo on that audio?

15   A.  Yes, sir, I did.

16   Q.  And what was that he was telling the Defendant about

17   whether the Defendant was under arrest?

18   A.  He was telling him that he was not under arrest, that he

19   was free to leave, and he was free to speak to him.

20             MS. BOARDMAN:  Your Honor, I just would like --

21   that's what he just said.  I think we need to see what the

22   transcript says.

23             THE COURT:  The objection is sustained.

24             MS. BOARDMAN:  Thank you.

25             THE COURT:  The transcript is the transcript.  He can

UNCLASSIFIED/CLEARED FOR PUBLIC RELEASE

REDACTED/CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    explain what his view of it was.  He cannot explain what

2    Mr. Martin intended.  That's not within his province, so the

3    objection is sustained.

4          MR. AARON:  Thank you.

5    BY MR. AARON:

6    Q.  Just so we're clear, what was it on the audio that we just

7    heard, not relying on the transcript, that Agent Bucalo was

8    stating?

9    A.  He was telling him that he was not under arrest and that he

10   was free to leave anytime.

11   Q.  Thank you.

12         MS. BOARDMAN:  Your Honor, again, same objection.

13         THE COURT:  I'm sorry.  I'm not clear as to the

14   question.  I have a transcript here, okay?  And are you saying

15   there is portions that was turned off that are not in the

16   transcript?

17         MR. AARON:  No, Your Honor.  Just clarifying --

18         THE COURT:  All right.  Then, quite frankly, that

19   objection is sustained.  The transcript is the transcript, and

20   I'm not interested in having a witness explain how they

21   interpret the transcript.  That's an inappropriate question,

22   and the objection is sustained.

23         MR. AARON:  I apologize, Your Honor.

24         THE COURT:  That's fine.

25         MR. AARON:  The transcript is a draft.  The audio

REDACTED/CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1    contains a little more than is on the transcript.

2          THE COURT:  Well, that's what I'm trying to clarify,

3    then, is I have a transcript which the Government has

4    represented is what was said here, and this is what the

5    Government has presented, and I'm with you, and I'm reading

6    with it, but it's not going to be helpful to me to have him

7    have a witness -- any witness try to say what they think the

8    transcript -- the transcript is what the Government has

9    presented to me in terms of what is said here, and I have it in

10   front of me.

11         MR. AARON:  Thank you, Your Honor.  I'll just note,

12   Your Honor, for Your Honor's benefit that the transcript is not

13   a final, complete transcript.  It's draft.  And so, if Your

14   Honor listens to the audio of -- there are a couple words that

15   you can make out in the audio that didn't make it into the

16   transcript, Your Honor.

17         THE COURT:  Well, I don't -- the transcript I have,

18   Page 6, does not reflect any ambiguity or further filling in.

19   I think you're referring to on Page 6 of Government Exhibit 19,

20   and it's stated in a transcript:

21             "Martin:  Am I under arrest?

22             "UM 2:  Huh?  I'm not saying, I'm not saying that you

23   sped in it, I'm saying is it fast?"

24             And then:

25             "Martin:  Yeah, it's reliable," talking about the

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

```
 1   cars.

 2            MR. AARON:  Respectfully, Your Honor, I'm referring

 3   to Page 3 of the transcript, corresponding --

 4            THE COURT:  Wait a minute.  Wait a minute.  Hold on.

 5   Okay.  Page 3.

 6            MR. AARON:  Corresponding -- this is, I would say,

 7   four lines up.  This corresponds --

 8            THE COURT:  Okay.  You're on Page 4 now; not Page 3?

 9            MR. AARON:  Page 3, four lines from the bottom.

10            THE COURT:  All right.  Page 3, four lines from the

11   bottom.

12            MR. AARON:  And, if Your Honor --

13            THE COURT:  I see.  It says:

14            "Bucalo:  So we will have a full discussion,

15   completely volunteer.  You know, obviously UI at any time, you

16   are not under arrest."

17            Okay.  I see it.  It's in here in the transcript.

18   Okay.  I see it.

19            MR. AARON:  Yes, Your Honor.  And, if Your Honor

20   cares to review this later, the time stamp that I'm talking

21   about on the recording is at 1 minute and 40 seconds, but I'll

22   move on, or I can play it again now, Your Honor.

23            THE COURT:  Okay.  That's fine.

24            MR. MYERS:  Hold on one second.

25            MR. AARON:  It's 1 minute and 40 seconds.
```

1        **MR. MYERS:**  Yep.

2        (Whereupon, a portion of an audio recording was played.)

3            **MR. AARON:**  So that's the clip, Your Honor.  I can

4    move on.

5            **THE COURT:**  That's all right.  That's fine.

6    **BY MR. AARON:**

7    Q.  Now, later in the audio that we heard, that was you asking

8    the Defendant about his car?

9    A.  Yes, sir.

10   Q.  And that was when the Defendant asked if he was under

11   arrest?

12   A.  Yes, sir.

13   Q.  Can you describe the Defendant's demeanor when he asked

14   that question?

15   A.  Because of the nature of my question, he was kind of

16   smirking back as if he didn't want to say anything about how

17   fast his car was, because he was kind of joking that he might

18   be speeding in it.

19   Q.  And you're basing that on his facial expressions?

20   A.  Yes.

21   Q.  And his posture?

22   A.  Yes, sir.

23   Q.  And you responded back -- were you smiling when you

24   answered him back?

25   A.  Yes, sir.

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

1   Q.   And what was your overall demeanor when you were --

2   A.   I was joking back, saying, "I'm not saying you were

3   speeding in it."

4   Q.   Thank you.

5        Did you then turn -- as reflected in the audio, did you

6   turn Mr. Martin over to Special Agent Bucalo?

7   A.   Yes, sir.

8   Q.   And is that you on the recording removing the handcuffs?

9   A.   Yes, sir.

10  Q.   And what did you do next?

11  A.   I -- after I -- once Mr. Bucalo took possession of

12  Mr. Martin, I exited and went back to the SWAT van.

13  Q.   And what did you do in the van?

14  A.   Waited for the rest of the people to get there and leave.

15  Q.   Did the rest of the SWAT team eventually come to the van?

16  A.   Yes, they did.

17  Q.   And about how long did you have to wait before everyone got

18  there?

19  A.   It was less than half an hour.

20  Q.   And, after they all got in the van, what happened?

21  A.   We left.

22  Q.   Did any SWAT team member stay behind to guard the door?

23  A.   Not to my knowledge, no.

24  Q.   Did any SWAT team member stay behind to patrol through the

25  house during the interview with Mr. Martin?

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Ryan Davis

```
 1    A.   No, sir.

 2    Q.   And did the SWAT team all crowd into that living room with

 3    Mr. Martin?

 4    A.   No, sir.

 5    Q.   At any time, did you tell Mr. Martin that he was under

 6    arrest?

 7    A.   No, sir, I did not.

 8    Q.   Did you ever tell him that he would be arrested?

 9    A.   No, sir.

10    Q.   Did you ever tell him he had to answer questions?

11    A.   No, sir.

12    Q.   Did you threaten to harm him if he did not answer

13    questions?

14    A.   No, sir.

15    Q.   Other than when you initially kept control of him, did you

16    ever threaten or use force on him at all?

17    A.   No, sir.

18    Q.   And did you ever promise him anything?

19    A.   No, sir.

20    Q.   And how would you describe his demeanor inside the living

21    room up until when you left?

22    A.   Again, he was very pleasant and compliant.

23             MR. AARON:   Thank you, Your Honor.

24             MS. BOARDMAN:   Your Honor, I'm going to move these if

25    it's okay.   I've tripped twice already, and I don't want to do
```

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

 1   that.

 2               THE COURT:  That's all right.

 3               MS. BOARDMAN:  Thanks, Zach.

 4               THE COURT:  Thank you, Mr. Aaron.

 5               Cross-examination, Ms. Boardman.

 6               MS. BOARDMAN:  Yes, Your Honor.  Thank you.

 7                        **CROSS-EXAMINATION**

 8   **BY MS. BOARDMAN**:

 9   Q.  Good afternoon.  We talked yesterday; is that right?

10   A.  Yes, ma'am.

11   Q.  Nice to meet you in person.

12   A.  Nice to meet you, too.

13   Q.  Agent Davis, you said that you were one of nine SWAT team

14   members, correct?

15   A.  Yes, ma'am.

16   Q.  That went to 7 Harvard Road on August 27th, 2016?

17   A.  Yes, ma'am.

18   Q.  And you described your uniform and the firearms you had on;

19   is that right?

20   A.  Yes, ma'am.

21   Q.  You had on camouflage, correct?

22   A.  Yes, ma'am.

23   Q.  And a helmet?

24   A.  Yes, ma'am.

25   Q.  And your other colleagues on the SWAT team had on the same

Cross-Examination of Ryan Davis

```
 1    uniform, correct?

 2    A.   Yes, ma'am.

 3    Q.   And everyone was carrying rifles over their shoulders,

 4    correct?

 5    A.   Either in their hands or over their shoulders.

 6    Q.   Okay.  But everyone had a rifle?

 7    A.   Yes, ma'am.

 8    Q.   That was visible, correct?

 9    A.   Yes, ma'am.

10    Q.   And you also had a Glock automatic on your person, correct?

11    A.   Yes, sir, or yes, ma'am.

12    Q.   And that is visible -- yes, ma'am.

13         That was visible, correct?

14    A.   Yes, ma'am.

15    Q.   And did your eight other SWAT team members -- did they also

16    have Glocks visible on their person?

17    A.   It's a standard uniform, so I can't speak to that specific

18    day, but they most likely would have.

19    Q.   Okay.  Very good.

20         And I'm going to put up one of the Government's large

21    exhibits.

22              MS. BOARDMAN:  Which one is this?

23              THE COURT:  This is Government Exhibit 9?

24              MS. BOARDMAN:  Yes.  Thank you.

25    BY MS. BOARDMAN:
```

Cross-Examination of Ryan Davis

1   Q.  I am showing you Government's Exhibit 9.  Can you see it?

2   A.  Yes, ma'am.

3   Q.  I'm going to do my best, guys.  So this is Mr. Martin's

4   house, correct?

5   A.  Yes, ma'am.

6           MS. BOARDMAN:  And, just for the record, so we all

7   know, and I'll tell the Judge.  Judge, we will be playing a

8   video of the surveillance, so the Court will see much of what

9   Agent Davis is describing, but, for now, it's helpful to lay it

10  out.

11  **BY MS. BOARDMAN**:

12  Q.  Where, if you can tell us, in relation to this house, was

13  your van parked before you approached the residence?

14  A.  So, looking at the front of the residence, we are here

15  (indicating).  It would be to the left.

16  Q.  To the left.  So, if I represent to you this is 9 Harvard

17  Road, would it be approximately in front of 9?

18  A.  I don't -- it would have been one of the houses next to it.

19  I don't know the specific house it was, but it would not have

20  been in front of his residence.

21  Q.  Okay.  And it was the one to the left, correct?

22  A.  Yes, ma'am.

23  Q.  Okay.  All right.  And you were over there because you were

24  hiding?  You didn't want Mr. Martin to see you approach,

25  correct?

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1   A.  It's safe for us to not park in front of the residence and

2   come out.  It's safer for us to be down the street and walk up.

3   Q.  Right.  You were -- I mean, he, of course, wasn't expecting

4   your arrival, right?

5   A.  No, ma'am.

6   Q.  Okay.  And so, when you and the other agents -- you got out

7   of your van, all nine of you, correct?

8   A.  Yes, ma'am.

9   Q.  And you approached the house right here near the driveway;

10  is that accurate?

11  A.  Yes, ma'am.

12  Q.  And where was Mr. Martin when you approached the house?

13  A.  When we first approached the house, he was up by the front

14  door.

15  Q.  Up by the front door by this American flag here

16  (indicating)?

17  A.  I -- yes.  If that's a flag, yes, ma'am.

18  Q.  Yes.  Okay.

19      And you were a couple people back; is that right?

20  A.  Yes.  I would have been third or fourth in the line of

21  people.

22  Q.  And you had your hands full with breacher equipment, which

23  we'll talk about in a minute, correct?

24  A.  Yes, ma'am.

25  Q.  Did the people in front of you have their guns drawn?

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1   A.  Yes, ma'am.

2   Q.  And the guns meaning their rifles?

3   A.  Yes, ma'am.

4   Q.  And they were pointed at Mr. Martin?

5   A.  Yes, ma'am.

6   Q.  And the people in front of you barked orders at him,

7   correct?

8   A.  They gave him instructions to have him comply.

9   Q.  And the instructions were to stand away from his front

10  door?

11  A.  Yes, ma'am.

12  Q.  And to put his hands up?

13  A.  Yes, ma'am.

14  Q.  And, at some point, was he instructed to get down on the

15  ground?

16  A.  Yes, ma'am.

17  Q.  Who instructed him to get on the ground?

18  A.  I -- at that point, he had walked far enough away, and they

19  turned the instructions over to me, and I was giving him the

20  instructions to get on the ground.

21  Q.  And he complied with those instructions, correct?

22  A.  Yes, ma'am.

23  Q.  You actually helped him to the ground, correct?

24  A.  Yes, ma'am.

25  Q.  And you did so by grabbing his right wrist?

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1    A.   Yes, ma'am.

2    Q.   With your right hand?

3    A.   Yes, ma'am.

4    Q.   And you used your left hand on -- you put your left hand on

5    his shoulder; is that right?

6    A.   Yes, ma'am.

7    Q.   And you then placed him on the ground, correct?

8    A.   Yes, ma'am.

9    Q.   And, at that point, he is facedown on the ground?

10   A.   Yes, ma'am.

11   Q.   His face is in the grass?

12   A.   I don't know if his face was, but his chest, and his

13   stomach and his legs were, but I don't know if his face was

14   laying down or if it was up, but he was facedown.

15   Q.   His face was inches from the grass; we can agree?

16   A.   Yes, ma'am.

17   Q.   Okay.  And he -- you said he was about right here

18   (indicating), so in this grassy area near this -- the front

19   walk, correct?

20   A.   Yes.  It was away from the concrete.  I know it was in the

21   grass right in front of it.

22   Q.   All right.  Now, why would you put your -- why did you

23   touch him?

24   A.   So that I can keep control of his body in case he decides

25   to stop complying.  I didn't -- it was just more to keep my

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1    hands on him so I could react quicker if I had to.

2    Q.  So he was under your control, correct?

3    A.  Yes, at that point.

4    Q.  All right.  Now, while you were putting him on the ground,

5    you then put handcuffs on him, correct?

6    A.  Yes, ma'am.

7    Q.  Behind his back?

8    A.  Yes, ma'am.

9    Q.  All right.  And that's when he was still on the ground

10   facing down, correct?

11   A.  Yes, ma'am.

12   Q.  And what are the other SWAT team members doing while you're

13   doing this?

14   A.  They would be still -- again, they -- I wasn't facing them,

15   but they would be concentrating on securing the property.

16   Q.  Securing the property?

17   A.  Yes.

18   Q.  And, by "property," you mean securing the home, correct?

19   A.  Yes.

20   Q.  Securing the backyard?

21   A.  Yes.

22   Q.  The shed in the backyard?

23   A.  Yes, ma'am.

24   Q.  And certainly the front yard as well.  The entire home and

25   curtilage, correct?

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED; CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

```
1    A.   Yes.

2    Q.   All right.  And Mr. Aaron asked you about a flashbang?

3    A.   Yes, ma'am.

4    Q.   Do you -- well, I think we all agree a flashbang was used

5    that day?  You understand that, correct?

6    A.   Yes, ma'am.

7    Q.   All right.  And a flashbang -- well, where did they use the

8    flashbang, to your knowledge?  Was it by the front door?

9    A.   Yes.

10   Q.   So the flashbang was used in that front door, correct?

11   A.   I don't know exactly where it was placed, but I know our

12   standard operating procedures of where we would place it when

13   entering a threshold.

14   Q.   Where would that be?

15   A.   It would be in the -- the front three feet area, so that

16   the area where the door would open -- if a door opens, you know

17   that the ground where the door swung is clear of any objects,

18   so you would place it there.

19   Q.   Okay.  And, at the time the flashbang goes off, Mr. Martin

20   is facedown in the grass about 15 feet away from the door, you

21   testified, correct?

22   A.   Yes, ma'am.

23   Q.   And you had protective things for your ears, correct?

24   A.   Yes, ma'am.

25   Q.   So you didn't hear the flashbang, correct?
```

Cross-Examination of Ryan Davis

1    A.  No, ma'am.

2    Q.  Mr. Martin -- you didn't put any protective hearing on him,

3    did you?

4    A.  No, ma'am.

5    Q.  So it's obvious that he heard the flashbang, correct?

6    A.  I would assume he would.

7    Q.  Right.  Being so close to where it went off, correct?

8    A.  Yes.

9    Q.  And you also talked about one of the other diversionary

10   effects of a flashbang as over-pressurization; is that correct?

11   A.  Yes, ma'am.

12   Q.  Over-pressure?

13   A.  Yes, ma'am.

14   Q.  Okay.  Describe for us what over-pressure -- you used

15   another word.  I forget what it was.

16   A.  So it's -- it's like air pushing against you.  It feels

17   like a sensation where you feel -- it feels like someone is

18   pushing against you.

19   Q.  And he would have felt that considering where he was in

20   relation to the flashbang, correct?

21   A.  Yes, ma'am.

22   Q.  And you -- it also emits a very bright light, correct?

23   A.  Yes, ma'am.

24   Q.  And smoke?

25   A.  Yes, ma'am.

1   Q.  And it's quite disorienting, isn't it?

2   A.  It's temporarily disorienting, yes.

3   Q.  Now, you eventually pick Mr. Martin up off of the ground,

4   correct, or help him get up off the ground?

5   A.  Yes, ma'am.

6   Q.  And he's still handcuffed behind his back, correct?

7   A.  Yes, ma'am.

8   Q.  And you have your hands on him?

9   A.  Yes, ma'am.

10  Q.  And you walk him to another agent; is that correct?

11  A.  Agent or officer, yes.

12  Q.  Now, somewhere in the front lawn, in the street?  Where?

13  A.  It would have been away from the front of the residence.  I

14  don't remember specifically where it was, but it would have

15  been away from the residence since we were still inside the

16  residence clearing it.

17  Q.  The SWAT team was inside the residence clearing it?

18  A.  At that point, yes, ma'am.

19  Q.  And so you removed Mr. Martin from the front of his home to

20  somewhere away from the residence?

21  A.  The front area, yes.

22  Q.  And you handed him off to another agent or another officer,

23  correct?

24  A.  Yes, ma'am.

25  Q.  And of course he's still cuffed?

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1   A.   Yes, ma'am.

2   Q.   You said you're a breacher, correct?

3   A.   Yes, ma'am.

4   Q.   And, by "a breacher," you mean -- I think you told me

5   yesterday you're the person responsible for opening doors,

6   whether by force or otherwise, correct?

7   A.   Yes, ma'am.

8   Q.   What breacher materials or equipment did you have with you?

9   A.   On that day, I had a -- to the best of my recollection, it

10   was just a ram -- a standard battering ram that we use, and

11   a -- we call it a Halligan.  It's essentially a crowbar that

12   can help pry something open.

13   Q.   It's a what?  A crowbar?  What did you call it?

14   A.   It's called a Halligan --

15   Q.   Halligan?

16   A.   -- is the technical term.  It basically looks like a huge

17   crowbar that has the ability to pry open a door.

18   Q.   What does a battering ram look like?

19   A.   A long cylindrical tube.  They have different shapes, but

20   the one on that particular day was a long cylindrical tube that

21   was black with rubber on either end.

22   Q.   And you were holding both of those pieces of equipment?

23   A.   Yes.

24   Q.   As you approached the home?

25   A.   Yes, ma'am.

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1   Q.  And what was your purpose for holding them?  I just want

2   the record to be clear.

3   A.  Yeah.  So my role, if we had to make entry into the

4   residence, as the breacher, I would walk up, test the doorknob

5   to see if it's unlocked.  If it's unlocked, I would then wait

6   for our team leader to give instructions for me to open the

7   door if he was ready to have the door opened.

8   Q.  But you didn't have to actually use those materials that

9   day, correct, because the door was already open, right?

10  A.  No, ma'am.

11  Q.  Right.  Okay.

12      Now, before we go inside the house, I want to ask more

13  questions about what you saw outside the house.  Other than

14  your -- the nine members of the SWAT team with which you're

15  included, what other law enforcement officers were there?

16  A.  So I remember the night that we had -- we would have had --

17  it's our standard procedure to have a uniformed -- a marked

18  cruiser with a uniformed officer with us as well, so he would

19  have been there.  He or she would have been there.  And then if

20  there is any surveillance teams that were around assisting with

21  it, they may have --

22          THE COURT:  I'm sorry.  I'm having trouble hearing

23  you.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  You have to keep your voice up.

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1    THE WITNESS:  I'm sorry, sir.

2    THE COURT:  I can hear everything, but, for some

3    reason, your voice is fading off, Agent Davis.

4    THE WITNESS:  I apologize.

5    THE COURT:  I don't know why that is.  Just keep your

6    voice up.

7    THE WITNESS:  I'll answer this way.

8    There may have also been some members of Special

9    Agent Bucalo's team somewhere in the area, but that is not -- I

10   wouldn't be planning that or be involved in that.  I wouldn't

11   know where they were at.  I'm with the team.  I know where the

12   team is at.

13   BY MS. BOARDMAN:

14   Q.  Okay.  Is it fair to say that there was -- there were -- in

15   addition to your nine people, there were other law enforcement

16   officers, correct?

17   A.  Yes, ma'am.

18   Q.  A uniformed officer?  At least one, correct?

19   A.  Yes, ma'am.

20   Q.  And then other FBI agents as well, correct?

21   A.  Yes, ma'am.

22   Q.  All right.  Now, once you hand Mr. Martin off to the

23   custody of another agent, you then went into the home, correct?

24   A.  Yes.  I transferred his -- the securing of him to somebody

25   else, and I went inside to help the team.

RESUMED FLEA CORPORAL IGNORE

Cross-Examination of Ryan Davis

1    Q.   And what did you do inside?

2    A.   I helped -- they were still in the middle of clearing some

3    of the rooms, so I cleared -- I helped clear one of the

4    bedrooms and the garage.

5    Q.   And describe for us what "clearing" means.

6    A.   A SWAT operator will go into a room with someone else and

7    make sure that there are no people or threats there and locate

8    any weapons that may be in plain view before the search team

9    comes in.  The idea is to secure the whole house, make sure

10   that all the occupants are accounted for and any visible

11   weapons have been identified.

12   Q.   And then did any member of your team remove fire weapons

13   from the home?

14   A.   I believe --

15   Q.   I'm sorry.  Firearms from the home?

16   A.   I did not, but I believe, on that day, they did.

17   Q.   What do you know about that, their removal?

18   A.   So, if they would have -- again, I can't speak to what

19   their actions were, but, if they would have located firearms,

20   they would have cleared them and made them safe, have no --

21   separate the ammunition from the firearm, and put them in a

22   location -- typically, they would ask the case agent who we're

23   securing the house for, what he would like -- he or she would

24   like to do with them.

25   Q.   Now, after you cleared the house or helped clear the house,

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1    you then encountered Mr. Martin again, correct?

2    A.  Yes, ma'am.

3    Q.  And, if I recall correctly -- and correct me if I'm

4    wrong -- it was somewhere in the front yard again?  When you

5    were leaving, he was in the front yard?

6    A.  Yeah.  I was getting ready to exit the front room through

7    the front door, and Mr. Martin was right outside the front door

8    as they were bringing him towards the front of the residence.

9    Q.  Law enforcement officers were bringing him towards the

10   front of the residence, correct?

11   A.  Yes, ma'am.

12   Q.  And he was still handcuffed at the time?

13   A.  Yes, ma'am.

14   Q.  And did they have their hands on him directing him to the

15   house?

16   A.  I don't --

17   Q.  You don't remember?

18   A.  -- know specifically, no, ma'am.

19   Q.  So did you at that point take control of Mr. Martin and

20   bring him into the home?

21   A.  Yes.  We were bringing him in.  I -- they wanted to bring

22   him in and sit him down somewhere, so I walked him in and put

23   him on the couch while we figured out where Jeremy would like

24   to speak to him.

25   Q.  Okay.

REDACTED / CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1    A.   I'm sorry.  Agent Bucalo.

2    Q.   I understood.  All right.

3         All right.  I am now showing you Exhibit --

4              THE COURT:  This is Government Exhibit 11.

5              MS. BOARDMAN:  Thank you very much.  And this is a

6    sketch of the house.

7    BY MS. BOARDMAN:

8    Q.   And I'm at the bottom of the exhibit where it says, "First

9    Floor," and there is this sign for a door (indicating).  That's

10   the front door, correct?

11   A.   Yes, ma'am.

12   Q.   All right.  And you brought Mr. Martin inside of the house

13   through that front door, correct?

14   A.   Yes, ma'am.

15   Q.   And you put him on the couch over here to the left

16   (indicating); is that correct?

17   A.   Yes, ma'am.

18   Q.   And, by "on the left," I mean the far left, the wall that's

19   perpendicular to the front of the house, correct?

20   A.   Yes, ma'am.

21   Q.   All right.  And he was still handcuffed behind his back

22   when he was put on the couch, correct?

23   A.   Yes, ma'am.

24   Q.   All right.

25   A.   I don't know if he -- if we sat him and then uncuffed --

CLEARED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

```
 1    stood him back up and uncuffed him or if we uncuffed him and
 2    then sat him down, but it was right around the time he got to
 3    the couch is when he was uncuffed.
 4    Q.   And did you uncuff him?
 5    A.   Yes, ma'am.
 6    Q.   Incidentally, are you aware that, when the SWAT team
 7    approached Mr. Martin and ordered him to the ground, that he
 8    defecated on himself?
 9    A.   No, ma'am, I was not aware of that.
10    Q.   Did you eventually become aware of that?
11    A.   Yes, ma'am.
12    Q.   What did you hear?
13    A.   It's really in the last few days before this hearing,
14    having the questions asked of me by you --
15              MR. AARON:  Judge, I'm going to object.  This is
16    hearsay.
17              THE COURT:  I beg your pardon?
18              Well, the question is:  When did you become aware of
19    the fact that he defecated himself?  Is that the question?
20              MS. BOARDMAN:  That's better said, yes.
21              THE COURT:  And what is the answer?
22              THE WITNESS:  In the past few days --
23              THE COURT:  You didn't know at the time?  Your answer
24    is you did not know at the time, but you learned within the
25    last few days?
```

REDACTED AND SEALED FOR PUBLIC RELEASE

Cross-Examination of Ryan Davis

1    THE WITNESS:  Yes, sir.

2         THE COURT:  Okay.  All right.

3    BY MS. BOARDMAN:

4    Q.  How did you learn about it in the last few days?

5    A.  When you and the prosecutor team asked:  Were you aware

6    that he defecated himself?  So it wasn't until those questions

7    were asked that it was brought to my attention.

8    Q.  Okay.  So he's brought into the home, correct?

9    A.  Yes, ma'am.

10   Q.  And, at this point, you turn over custody to Agent Bucalo,

11   correct?

12   A.  His -- the possession, the control of Mr. Martin was

13   transferred to Jeremy at that point once I uncuffed him.

14   That's kind of our point where we transfer Mr. Martin to Jeremy

15   is when I uncuff him and Jeremy says that's okay to do.

16   Q.  Okay.

17        MS. BOARDMAN:  I might be finished.  Your Honor,

18   could I just check with my colleagues?

19        THE COURT:  Sure.  Sure.

20        MS. BOARDMAN:  Thank you.

21     (Pause.)

22        MS. BOARDMAN:  No more questions, Your Honor.  Thank

23   you, Agent Davis.

24        THE COURT:  Thank you, Ms. Boardman.

25        One second, Agent Davis.

REDACTED / CLEARED FOR PUBLIC RELEASE

Redirect Examination of Ryan Davis

```
 1              Any other questions, Mr. Aaron?

 2              MR. AARON:  Just a few, Your Honor.

 3              THE COURT:  All right.  We're going to take a break

 4   for lunch in a few minutes, but, if you need more time than

 5   that, we'll just recess now.

 6              MR. AARON:  Thank you, Your Honor.  I don't think

 7   I'll need more time.

 8              THE COURT:  That's fine.

 9              MR. AARON:  And I'll stand over here as well.

10              THE COURT:  That's fine.

11                       REDIRECT EXAMINATION

12   BY MR. AARON:

13   Q.  Special Agent Davis, the manner in which you approached the

14   Defendant, is that more or less routine for a SWAT operation?

15   A.  Yes, sir.

16   Q.  And can you briefly describe why you do it that way?

17   A.  It's to overwhelm the person so they realize that they have

18   no choice but to comply with us.

19   Q.  And is that done for safety?

20   A.  Yes, sir.

21   Q.  Whose safety?

22   A.  The officer -- not only the safety of the agents and

23   officers, but also of the person that we're approaching.

24   Q.  Do you know when the flashbang went off that Ms. Boardman

25   described?
```

REDACTED / CLEARED FOR PUBLIC RELEASE

Redirect Examination of Ryan Davis

1   A.   I don't know specifically.

2   Q.   Do you know whether the Defendant was on the ground or not

3   when that happened?

4   A.   So it didn't happen when he was still standing.  If it

5   happened, it was when he was on the ground and I was cuffing

6   him, and it would have happened behind me, which is why my

7   hearing protection, if it had gone off behind me, I wouldn't

8   have heard it.

9   Q.   Where are flashbangs ordinarily used?  Inside, or outside?

10  A.   It's both.

11  Q.   Okay.

12  A.   Ordinarily inside.

13  Q.   Do the effects that you described dissipate outside?

14  A.   Yes, sir.

15  Q.   Regarding the ram and the Halligan, were you still carrying

16  those when you made contact with the Defendant?

17  A.   No, sir.

18  Q.   What did you do with those?

19  A.   When he began complying with the first two agents, I

20  dropped those, I believe by the driveway area, so that I can

21  handcuff Mr. Martin.

22  Q.   And, turning to the house, when you cleared the house, was

23  anyone else in the house when you cleared it?

24  A.   No.  No, sir.

25  Q.   And do you know approximately how long the Defendant was in

REDACTED / CLEARED FOR PUBLIC RELEASE

Redirect Examination of Ryan Davis

```
 1    handcuffs from when you placed him in cuffs to when you took
 2    them off?
 3    A.  It was less than 30 minutes.
 4    Q.  And --
 5              THE COURT:  Beg your pardon?
 6              THE WITNESS:  Less than 30 minutes.
 7    BY MR. AARON:
 8    Q.  When he sat on --
 9              THE COURT:  I'm sorry.  Less than?
10              THE WITNESS:  Thirty minutes.
11              THE COURT:  Thirty minutes.  All right.  Thank you.
12    BY MR. AARON:
13    Q.  And, when you sat him on the couch, did you tell him not to
14    get up?  Did you order him around on the couch at all?
15    A.  No, sir.
16    Q.  And, regarding the last subject Ms. Boardman asked about,
17    do you have any personal knowledge regarding defecation on this
18    day by the Defendant?
19    A.  No, sir, I do not.
20    Q.  Do you have any idea when that might have happened at all?
21    A.  No, sir.
22              MR. AARON:  Thank you.  I've got nothing further,
23    Your Honor.
24              THE COURT:  All right.  Thank you, Mr. Aaron.
25              MS. BOARDMAN:  Your Honor, I forgot one thing, and I
```

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED - CLEARED FOR PUBLIC RELEASE

Recross-Examination of Ryan Davis

```
 1    just want to clarify.
 2              THE COURT:  Sure.
 3                    RECROSS-EXAMINATION
 4    BY MS. BOARDMAN:
 5    Q.  You said, after you dropped Mr. Martin into the care of
 6    Mr. Bucalo, you went back to the van, correct?
 7    A.  Yes, ma'am.
 8    Q.  And you waited for the rest of your SWAT team to finish its
 9    job, correct?
10    A.  Yes, ma'am.
11    Q.  And that was about 30 minutes that you waited; is that
12    correct?
13    A.  No.  I think the time from we left the van to when the rest
14    of the -- I -- until I returned to the van, the rest of the
15    team returned to the van was less than 30 minutes is an
16    estimate.  Some of the team might not have gone at the same
17    time I did after he we uncuffed Mr. Martin.  They may have come
18    a few minutes later.
19    Q.  Okay.
20              MS. BOARDMAN:  No more questions.  Thank you very
21    much.
22              THE COURT:  All right.  Thank you very much,
23    Agent Davis.  You may step down.
24              You shouldn't discuss your testimony with anyone
25    until this hearing is concluded in the unlikely event you're
```

REDACTED - CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

```
 1    called back to the witness stand, okay?
 2             THE WITNESS:  Yes, sir.
 3             THE COURT:  So just stand by.  I presume it's
 4    probably better that Agent Davis stay here in case he has to be
 5    called back to the witness stand; is that correct, Mr. Aaron?
 6             MR. AARON:  That would be prudent, Your Honor.
 7             THE COURT:  Okay.  Just stay here in the courthouse,
 8    but just don't discuss your testimony with anyone.
 9             THE WITNESS:  Yes, sir.
10        (Witness excused.)
11             THE COURT:  All right.  With that, I have a bench
12    meeting at 1 o'clock.  We'll take a recess, and we'll start as
13    close to 2 o'clock as we can.  This Court stands in recess.
14             THE CLERK:  All rise.  This Honorable Court now
15    stands in recess.
16        (Luncheon recess -- 12:58 p.m.)
17        (Afternoon session -- 2:14 p.m.)
18             THE CLERK:  All rise.  This Honorable Court resumes
19    in session.
20             THE COURT:  Good afternoon, everyone.
21             Sorry to keep you all waiting, counsel.  We had a
22    bench meeting that just lasted -- went over, and I apologize.
23    It occurred to me, in terms of scheduling, I just want to let
24    everyone know that, whatever the pace is, it is.  Not only we
25    have until 5 o'clock today, but I've made sure my whole
```

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

1  calendar is empty for tomorrow, so I don't know how that jives

2  with everyone, but, as far as I'm concerned, we just do what we

3  do until 5 o'clock today, and we'll be ready to go all day

4  tomorrow starting at 10 o'clock.

5          Does that work for the Government?

6          MR. EISENBERG:  Yes, Your Honor.

7          MR. MYERS:  Yes, Your Honor.

8          THE COURT:  Does that work for the Defense?

9          MS. BOARDMAN:  Yes, Your Honor.

10         MR. WYDA:  Yes, Your Honor.

11         THE COURT:  Okay.  Well, that's good.  I sort of

12  assumed we all sort of knew that, and I tend to keep my

13  calendar pretty clear, and the few things I need to clear off,

14  I've now cleared off, and so we're fine.

15         So, with that, we have the second witness,

16  Mr. Eisenberg.

17         MR. EISENBERG:  Mr. Aaron has Special

18  Agent Paul Scarzello outside.

19         THE COURT:  Mr. Aaron, next witness.

20         MR. AARON:  Paul -- Agent Paul Scarzello.

21         THE COURT:  All right.

22         THE CLERK:  Good afternoon, sir.  You may stand right

23  here and raise your right hand, please.

24     PAUL SCARZELLO, GOVERNMENT'S WITNESS, SWORN

25         THE CLERK:  Thank you.  You may have a seat.

CLEARED FOR PUBLIC RELEASE

1          Please keep your voice up for the Court.  State and

2   spell your full name for the record.

3          THE WITNESS:  Paul Scarzello, P-A-U-L,

4   S-C-A-R-Z-E-L-L-O.

5          THE CLERK:  Thank you.

6          THE COURT:  Counsel, just so you know, my law clerk

7   has noticed the same thing.  The sound here from the lawyers in

8   this part of the courtroom is excellent.  The sound coming from

9   that witness box with that low ceiling is making it very, very

10  difficult up here.  So I just can't emphasize enough that, not

11  just me, but Ms. Daily as well noticed the same thing.  It's

12  very, very difficult to hear up here, so these witnesses are

13  going to have to keep their voices up.

14          MR. AARON:  Thank you.  Your Honor, would you prefer

15  that I ask the questions from over there?

16          THE COURT:  No, no.  Back there is fine, but you

17  don't -- open in the well of the courtroom is hearing, but it

18  is really fading off here in the corner back there.

19          MS. BOARDMAN:  Your Honor, what if we put his chair

20  right there?

21          THE COURT:  No, I don't want to do that.

22          MR. AARON:  Special Agent Scarzello, I'll ask you --

23          THE COURT:  Just try and emphasize with the

24  witnesses, you've got to keep your voices up.  For security

25  reasons, all the sound is turned off in this courtroom, and

CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

| | |
|---|---|
| 1 | there are microphones around here for a reason, and we don't |
| 2 | have access to any of them for these proceedings, so thank you |
| 3 | very much. |
| 4 | **THE WITNESS:**  Okay. |
| 5 | **DIRECT EXAMINATION** |
| 6 | **BY MR. AARON**: |
| 7 | Q.  Good afternoon. |
| 8 | A.  Good afternoon. |
| 9 | Q.  Special Agent Scarzello, would you please state your job |
| 10 | title and where you work.  And please direct your answers, as |
| 11 | we said, over to the Court. |
| 12 | A.  I work for the National Security Agency, and I'm a special |
| 13 | agent. |
| 14 | Q.  And how long have you worked at the National Security |
| 15 | Agency? |
| 16 | A.  I've worked there since January 2001. |
| 17 | Q.  And what are some of the positions that you've held there? |
| 18 | A.  I've worked in our Investigations Division.  I've worked on |
| 19 | our director's protection detail.  I had a detail to the CIA. |
| 20 | I worked in our Security Operations command center, and I've |
| 21 | worked in our Counterintelligence Division, and I've worked as |
| 22 | a -- detailed as a task force officer to the FBI. |
| 23 | Q.  And do you recall approximately what time frame you were |
| 24 | assigned as a task force officer at the FBI? |
| 25 | A.  Yes.  From February 2013 until July 2017. |

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1   Q.  And, for the Court, could you briefly describe what a task

2   force officer is.

3   A.  A task force officer performs similar duties as an agent at

4   the FBI.

5   Q.  And were you sworn as a law enforcement officer for that

6   time?

7   A.  Yes.

8   Q.  Thank you.

9       On August 27, 2016, did you participate in an interview of

10  the Defendant, Harold Martin?

11  A.  Yes.

12  Q.  And where did that take place?

13  A.  That took place at his home in Glen Burnie, Maryland.

14  Q.  Is that at 7 Harvard Road?

15  A.  Yes.

16  Q.  And, very briefly, what was the reason to interview the

17  Defendant that date?

18  

19  

20  Q.  Thank you.

21      Were search warrants executed at that location on the same

22  day?

23  A.  Yes.

24  Q.  And do you recall what the FBI had warrants to search?

25  A.  They had warrants to search the house, the car, and the

Direct Examination of Paul Scarzello

1  shed outside.

2  Q.  And was there additional legal authority to do anything

3  else?

4  A.  Yes.  We had a warrant to place a tracker on his vehicle.

5  Q.  Did the search warrant authorize agents to enter

6  Mr. Martin's residence without knocking?

7  A.  Yes.

8  Q.  And do you know why the FBI sought that authority?

9

10

11

12

13

14

15  Q.  And did the FBI decide to use a SWAT team to assist with

16  the warrant?

17  A.  Yes.

18  Q.  Was that for similar reasons?

19  A.  Yes.

20  Q.  Do you recall approximately what time you first approached

21  the Defendant's residence on August 27, 2016?

22  A.  It was around 2:30.

23  Q.  And who were you with?

24  A.  I was in a vehicle with Task Force Officer Brook Donovan,

25  Agent Pino, and Agent Bucalo.

PROVISIONAL TRANSCRIPT NOT CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

| | |
|---|---|
| 1 | Q.  Thank you. |
| 2 | And what did you see when you arrived? |
| 3 | A.  We saw the SWAT team enter the house. |
| 4 | Q.  What happened next?  Did you see the Defendant? |
| 5 | A.  The Defendant was outside of the house. |
| 6 | Q.  Do you recall whether he was sitting or on the ground or |
| 7 | standing? |
| 8 | A.  I do not recall. |
| 9 | Q.  Was there an agent with him? |
| 10 | A.  Yes. |
| 11 | Q.  Do you recall how that agent was dressed? |
| 12 | A.  It was a SWAT agent. |
| 13 | Q.  Okay.  Did you say anything to the agent outside the house? |
| 14 | A.  No. |
| 15 | Q.  Did you go right into the house when you arrived? |
| 16 | A.  No. |
| 17 | Q.  Where did you wait? |
| 18 | A.  We waited in the car outside and outside of the car. |
| 19 | Q.  Thank you. |
| 20 | MR. AARON:  Your Honor, if I can approach to hand |
| 21 | exhibits? |
| 22 | THE COURT:  Certainly. |
| 23 | (Document tendered to the Witness.) |
| 24 | MR. AARON:  I'm going to hand you a binder of |
| 25 | exhibits, as well as a white binder, which is Exhibit 19 for |

Direct Examination of Paul Scarzello

```
 1    later.
 2    BY MR. AARON:
 3    Q.  I'll ask you to look at Exhibits 8 and 9.  Exhibit 8, can
 4    you describe what that is, behind Tab 8?
 5    A.  That's the aerial of the house.
 6    Q.  Okay.  Is that what's on the easel as well?
 7    A.  Yes.
 8    Q.  And what is Exhibit 9?
 9    A.  That's a picture of the front of the house.
10    Q.  Thank you.  And if you can just mark with your initials on
11    each of those exhibits where you were waiting outside the
12    house.  I have a pen if you need one.
13        (Witness complying.)
14    Q.  Okay.  If you don't mind just coming down briefly and just
15    indicate on the blowup of the exhibit for the Court where that
16    was.
17    A.  The -- I have black ink.  It's not showing up on here.
18            MR. AARON:  Maybe this will work.
19        (Witness complying.)
20            MR. AARON:  Just push hard, and that should do it.
21            If you can just indicate the same spot where you put
22    your initials.
23            THE WITNESS:  (Indicating).
24            MR. AARON:  All right.  Thank you.  You can have a
25    seat.
```

REDACTED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1          (Whereupon, the Witness resumes the stand.)

2     **BY MR. AARON**:

3     Q.   At some point, Special Agent Scarzello, did you enter the

4     house?

5     A.   Yes.

6     Q.   And where did you go?

7     A.   We went into the living room.

8     Q.   And what was the next time you saw the Defendant?

9     A.   In the living room, when I entered the house.

10    Q.   So he was already in the living room when you entered?

11    A.   Yes.

12    Q.   I'll ask you just to flip to Exhibit 11.  Is that a rough

13    sketch of the first floor of the house?

14    A.   Yes.

15    Q.   Is it to scale?

16    A.   No.

17    Q.   Which room in that is the living room?

18    A.   Room C.

19    Q.   And which room is the kitchen?

20    A.   Room D.

21    Q.   All right.  And, if you could -- I know it's not depicted

22    on the diagram itself, but if you can describe where in

23    relation to a room on that diagram the shed would be.

24    A.   The shed would be behind Room F in the backyard.

25    Q.   If you can just mark that on the exhibit with an "S," and

REDACTED; SEALED FOR PUBLIC FILING

Direct Examination of Paul Scarzello

```
 1    then maybe, when you're done, come down and just indicate to

 2    the Court where that is.

 3         (Witness complying.)

 4         (Witness enters the well of the courtroom.)

 5              THE WITNESS:  (Indicating).

 6              MR. AARON:  Thank you.

 7         (Whereupon, the Witness resumes the stand.)

 8    BY MR. AARON:

 9    Q.  If you can take a look, please, at Exhibits 13, 14, 15, and

10    16, and let me know what those are.

11    A.  These are pictures of the living room, Room C.

12              THE COURT:  They shall also be admitted.

13              MR. AARON:  Thank you, Your Honor.

14              THE COURT:  As was Exhibit 8.

15              MR. AARON:  Thank you, Your Honor.

16    BY MR. AARON:

17    Q.  Special Agent Scarzello, do those exhibits show the living

18    room in the same condition as it was in during the interview

19    with the Defendant?

20    A.  No.

21    Q.  What was different?

22    A.  If you --

23    Q.  Let's use Exhibit 14, which is up on the easel, for ease of

24    reference.  What was different?

25    A.  Between the couch and the chair was a coffee table.
```

[REDACTED WATERMARK]

Direct Examination of Paul Scarzello

1   Q.   Okay.  And how did that coffee table get there?

2   A.   It was moved there by the Defendant.

3   Q.   All right.  Did you see a SWAT agent inside the residence

4   with the Defendant when you came in?

5   A.   Yes.

6   Q.   What did he do?  What did you see him do?

7   A.   He -- he left as we -- as we came in, after we came in.

8   Q.   Was the Defendant in handcuffs at that time?

9   A.   No.

10  Q.   So who stayed in the room with you and the Defendant?

11  A.   Agent Bucalo and Agent Pino.

12  Q.   And that was it --

13  A.   And the Defendant.

14  Q.   -- at that time?  And the Defendant?  Thank you.

15       Did you and the other agents talk to the Defendant?

16  A.   Yes.

17  Q.   Where within the house did you talk to him?

18  A.   In the living room.

19  Q.   And who decided to use the living room for the discussion?

20  A.   The Defendant.

21  Q.   Did anyone offer to talk anywhere else?

22  A.   Yes.

23  Q.   Where else did they offer to talk?

24  A.   We offered to talk in the car outside.

25  Q.   And how did the Defendant respond?

Direct Examination of Paul Scarzello

1   A.  He preferred to talk in the living room.

2   Q.  Was the conversation recorded?

3   A.  Yes.

4   Q.  And how was it recorded?

5   A.  It was recorded on two audio recorders.

6   Q.  Were those concealed?

7   A.  One was in a key fab, and the other one was in a portfolio

8   binder.

9   Q.  Which one did you carry?

10   A.  The portfolio binder.

11   Q.  Did anyone tell the Defendant that the conversation was

12   being recorded?

13   A.  No.

14   Q.  And have you listened to Exhibit 18, which is several sound

15   files?

16   A.  Yes.

17   Q.  Do you recognize the voices in those recordings?

18   A.  Yes.

19   Q.  And what are some of the voices that you hear?

20   A.  I heard the Defendant's.  I heard my voice.  I heard

21   Agent Bucalo, Agent Pino, Task Force Officer Brook Donovan,

22   Agent Dan Gray, Agent Lou Luciano.

23   Q.  Did you hear the Defendant on that recording as well?

24   A.  Yes.

25   Q.  Now, were all of those law enforcement officers in there at

Direct Examination of Paul Scarzello

```
 1    the same time?

 2    A.  No.

 3    Q.  And, again, for the initial section of the interview, it

 4    was you and two other agents with the Defendant?

 5    A.  Yes.

 6    Q.  Thank you.

 7        Were there some times when you stepped away and left the

 8    recording device on?

 9    A.  Yes.

10    Q.  Are there some times when the microphone didn't pick

11    everything up?

12    A.  Yes.

13    Q.  Do you know why that was?

14    A.  It was either because we left the room, or because there

15    was background noise.

16            MR. AARON:  And we've already played the first five

17    minutes or so, but, at this time, Your Honor, if we can play

18    from -- starting where we left off on the file Backup_1, time

19    stamp 5 minutes, 51 seconds, and we'll play that through 12

20    minutes, 9 seconds.  Your Honor, in the transcript, this

21    corresponds to Pages 7 through 13.

22            THE COURT:  All right.  Thank you very much.

23        (Whereupon, a portion of an audio recording was played.)

24            MR. AARON:  I'm sorry.  Special Agent Scarzello, you

25    have the draft transcript there.  You're free to follow along
```

Direct Examination of Paul Scarzello

 1  with that.

 2      (Whereupon, a portion of an audio recording continued to be

 3  played.)

 4  **BY MR. AARON**:

 5  Q.   Special Agent Scarzello, did the Defendant at some point

 6  ask if he was under arrest?

 7  A.   Yes.

 8  Q.   And what was the answer?

 9  A.   He is not.

10  Q.   How were you dressed at this point during the interview?

11  A.   I was wearing like khaki pants and a buttoned-down shirt

12  that was untucked.

13  Q.   And how was Special Agent Bucalo dressed?

14  A.   He was wearing slacks and a buttoned-down shirt that was

15  untucked.

16  Q.   And Special Agent Pino?

17  A.   Slacks and a sports coat and a buttoned-down shirt.

18  Q.   Were any of your weapons displayed?

19  A.   No.

20  Q.   Were any of you wearing raid jackets?

21  A.   No.

22  Q.   Any kind of raid gear at all?

23  A.   No.

24  Q.   And how would you describe the Defendant's physical

25  demeanor at this point?

Direct Examination of Paul Scarzello

```
 1    A.  He seemed comfortable.

 2    Q.  Okay.  I'm going to ask you now to look again at

 3    Exhibit 11.  That's the sketch.

 4        If you wouldn't mind marking with your initials where you

 5    sat in the room.

 6        (Witness complying.)

 7    Q.  And we'll have you come down and show everyone after all of

 8    it, but if you can mark "HM" where the Defendant sat, and "JB"

 9    where Special Agent Bucalo sat, and "LP" for Special

10    Agent Pino.

11        (Witness complying.)

12            MR. AARON:  And if you don't mind coming down now and

13    just indicating on the exhibit.  So watch the wires.

14    BY MR. AARON:

15    Q.  If you can indicate -- where is the couch that the

16    Defendant was sitting on?

17    A.  (Indicating).

18    Q.  Okay.  And so where on the couch did the Defendant sit?

19    A.  (Indicating).

20    Q.  So towards the bottom of the diagram?

21    A.  Yes.

22    Q.  And Agent Pino was on the opposite end of that couch?

23    A.  (Indicating).  Yes.

24    Q.  And where did you sit?

25    A.  (Indicating).
```

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1    Q.  So a couch at the bottom of the diagram.

2        And Special Agent Bucalo?

3    A.  (Indicating).

4    Q.  Thank you.

5        (Whereupon, the Witness resumed the stand.)

6    **BY MR. AARON**:

7    Q.  And you testified earlier that there was some furniture

8    between Special Agent Bucalo and the Defendant?

9    A.  Yes.

10   Q.  On your copy of the exhibit, can you just draw a box where

11   that was?  That was a coffee table?

12   A.  Yes.

13   Q.  Thank you?

14   A.  (Indicating).

15   Q.  During the interview, was Special Agent Bucalo in arm's

16   reach of the Defendant?

17   A.  No.

18   Q.  Were you?

19   A.  No.

20   Q.  In addition to that front door into Room C, is there

21   another exit?

22   A.  Yes.

23   Q.  And what room does that exit from?

24   A.  In the kitchen, Room D.

25   Q.  Thank you.

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1      About how long did you talk to the Defendant that day?

2  A.  Around four hours.

3  Q.  And did you take any breaks?

4  A.  Yes.

5  Q.  Did the Defendant ever ask for a break?

6  A.  No.

7  Q.  Do you remember about when you took your first break?

8  A.  I believe it was about two and a half hours or so.

9  Q.  Now, before that first break, how many agents were

10  interviewing the Defendant?

11  A.  It was myself, Agent Pino, and Agent Bucalo.

12  Q.  Did anyone else enter the room at all at that time?

13  A.  Agent Luciano had entered the room.

14  Q.  And what was Special Agent Luciano's job?

15  A.  He was securing all the weapons in the house.

16  Q.  All right.

17        MR. AARON:  If we can play now a short clip.  This is

18  going to be file Backup_1 starting at 45 minutes, 15 seconds

19  through 48 minutes, 9 seconds, corresponding to Transcript 41

20  through 44.

21        THE COURT:  And what pages, please?

22        MR. AARON:  Forty-one through forty-four, Your Honor.

23        THE COURT:  Forty-one through forty-four?  All right.

24     (Whereupon, a portion of an audio recording was played.)

25  BY MR. AARON:

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1   Q.  So was that Special Agent Luciano asking about the guns?

2   A.  Yes.

3   Q.  And how was Special Agent Luciano dressed?

4   A.  He was dressed in like cargo pants and a polo-type shirt.

5   Q.  Was his weapon visible, do you recall?

6   A.  I do not recall.

7   Q.  Do you recall whether he ever drew his weapon?

8   A.  He did not draw his weapon.

9   Q.  Did he make any physical gestures toward the Defendant?

10  A.  No.

11  Q.  Did he threaten the Defendant at all?

12  A.  No.

13  Q.  Did it turn out that the Defendant hadn't listed all of his

14  guns initially?

15  A.  Yes.

16  Q.  And did Special Agent Luciano get angry or anything about

17  that?

18  A.  No.

19  Q.  And did there come a time that Special Agent Luciano

20  located an additional weapon?

21  A.  Yes.

22  Q.  And where did he go after that?

23  A.  He left the house.

24  Q.  Did he stand guard inside the front door?

25  A.  No.

CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1   Q.  Did he block the exit at all?

2   A.  No.

3   Q.  So what happened after Special Agent Luciano left?

4   A.  He was outside.

5   Q.  All right.  You testified that the first break was about

6   two and a half hours in.  Whose idea was the break?

7   A.  It was Agent Bucalo and Agent Pino.

8   Q.  And was the Defendant offered water?

9   A.  Yes.

10  Q.  Did he accept?

11  A.  No.

12  Q.  And who stayed with the Defendant during the break?

13  A.  I stayed in the room, and Task Force Officer Brook Donovan

14  came in the room.

15  Q.  And was Brook Donovan sitting or standing when he was

16  there?

17  A.  He was standing.

18  Q.  And was he any closer to the Defendant than where

19  Agent Bucalo had been sitting?

20  A.  No.

21  Q.  What did you talk about with the Defendant during the

22  break?

23  A.  Just small talk.  I asked him about what his plans were for

24  the evening, and just about sports.

25  Q.  Did you talk about his father at all?

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1  A.  Yes.  The Defendant mentioned that his father had passed

2  the year before, and I offered my condolences.

3  Q.  Why was TFO Donovan in the room during that break?

4  A.  Just because it was standard practice to have two folks in

5  there.

6  Q.  Just remember to project towards the Judge.  I don't know

7  why the acoustics in here are bad.

8      Did you or TFO Donovan -- during this break, did you

9  threaten the Defendant at all?

10  A.  No.

11  Q.  Did you promise him anything?

12  A.  No.

13  Q.  Did either of you move any closer to him?

14  A.  No.

15  Q.  Do you recall about how long the break was?

16  A.  I do not recall.

17  Q.  Having reviewed Exhibit 18, is that break captured on the

18  audio?

19  A.  Yes.

20  Q.  Okay.  And who came into the room at the end of that break?

21  A.  Agent Bucalo and Agent Pino.

22  Q.  And what, if anything, did they say to the Defendant?

23  A.  They were asking him if he had brought any classified

24  information home.

25  Q.  Did they indicate that any had been found?

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

```
 1    A.   Yes.

 2    Q.   Do you recall what they told him had been found?

 3    A.   Some documents.

 4    Q.   Physical documents?

 5    A.   Physical documents.

 6    Q.   That were classified?

 7    A.   Yes.

 8    Q.   Did the Defendant acknowledge that he had brought them

 9    home?

10    A.   Yes.

11    Q.   What, if anything, did he say about how that comported with

12    the rules governing classified information?

13    A.   He said he had mishandled some classified information.

14    Q.   Was he asked whether he had brought home digital media with

15    electronic classified information?

16    A.   Yes.

17    Q.   And did he acknowledge that at the time?

18    A.   He denied having brought any electronic media, classified.

19    Q.   Thank you.

20              MR. AARON:   Your Honor, I'd like to play a slightly

21    longer clip now, about ten minutes, unless Your Honor would

22    rather I just --

23              THE COURT:   That's fine.

24              MR. AARON:   Thank you.  This will be on file Backup_1

25    at 2 hours, 31 minutes, 30 seconds, through 2 hours, 42
```

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1   minutes, 5 seconds.  And, Your Honor, that corresponds to the

2   Transcript Pages 136 through 144.

3       (Whereupon, a portion of an audio recording was played.)

4       MR. AARON:  Your Honor, we can stop here, and that's

5   going to be on Page 141 of the transcript.

6       THE COURT:  That's fine.

7       MR. AARON:  Thank you.

8   BY MR. AARON:

9   Q.  Special Agent Scarzello, during this interview, did the

10  Defendant shrink away from you physically at all?

11  A.  No.

12  Q.  Did he have any physical signs of being afraid to you?

13  A.  No.

14  Q.  Did he shrink away from Special Agent Pino?

15  A.  No.

16  Q.  From Special Agent Bucalo?

17  A.  No.

18  Q.  And, at some point after what we just heard, did

19  Supervisory Special Agent Dan Gray enter?

20  A.  Yes.

21  Q.  And who was Dan Gray?

22  A.  He was the supervisor of the Cyber Squad in Baltimore.

23  Q.  And were you present when SSA Gray came in?

24  A.  Yes.

25  Q.  And who was with him?

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1    A.  When he entered, Task Force Officer Sean Lewis also came

2    in.

3    Q.  And did you leave the room?

4    A.  Yes.

5    Q.  When you left, where were SSA Gray and Task Force

6    Officer Lewis?

7    A.  They were in the living room.

8    Q.  All right.  And if you wouldn't mind just marking a "DG" on

9    your copy of Exhibit 11 where they were.

10        Were they standing together?

11   A.  From what I can remember, yes.

12        (Witness complying.)

13   Q.  And how were they dressed?

14   A.  They were dressed in like cargo pants and either like polo-

15   type shirts or sweatshirts.

16   Q.  Weapons visible?

17   A.  I know Agent Gray's weapon was visible.

18   Q.  All right.  Did you see him draw his weapon at all?

19   A.  No.

20   Q.  Okay.  Did you observe them threaten the Defendant at all?

21   A.  No.

22   Q.  Did they stand between him and the door?

23   A.  No.

24   Q.  Did they physically control his movements at all?

25   A.  No.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1    Q.   And, when you saw the Defendant in the room with SSA Gray,

2    was his physical demeanor any different than it had been during

3    the rest of the interview?

4    A.   No.

5    Q.   So where did you go after SSA Gray entered?

6    A.   We went -- we were outside.

7    Q.   Okay.  At some point, did you go to the Defendant's office?

8    A.   Yes.

9    Q.   And I mean his home office.

10   A.   Yes.

11   Q.   And which room on the sketch is that?

12   A.   Room A.

13   Q.   And who went with you?

14   A.   The computer scientist, Susi Hajeski.

15   Q.   And did the Defendant go in with you as well?

16   A.   Yes.

17   Q.   And what was the purpose of going in there?

18   A.   He was setting up his -- he was configuring his system so

19   we could have access to them.

20   Q.   And did the Defendant stay with you in that room the entire

21   time that you were there?

22   A.   No.

23   Q.   Where did he go?

24   A.   He went back to the living room.

25   Q.   Had anyone told him to go back to the living room?

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Did he walk by himself? |
| 3 | A. | Yes. |
| 4 | Q. | And then you said there came a time that you went outside? |
| 5 | A. | Yes. |
| 6 | Q. | Thank you. |
| 7 | | Who went outside with you, if anyone? |
| 8 | A. | Agent Bucalo was outside. |
| 9 | Q. | Okay.  And, at some point, you returned into the living |
| 10 | room? | |
| 11 | A. | Yes. |
| 12 | Q. | Was the Defendant still sitting where he had been? |
| 13 | A. | Yes. |
| 14 | Q. | And that was on the couch? |
| 15 | A. | Yes. |
| 16 | Q. | And where was SSA Gray? |
| 17 | A. | He was standing in the living room. |
| 18 | Q. | In the similar spot to where you had last seen him? |
| 19 | A. | From what I remember, yes. |
| 20 | Q. | And what about TFO Lewis? |
| 21 | A. | I don't remember exactly where he was in the living room. |
| 22 | Q. | Was he any closer to the Defendant than SSA Gray? |
| 23 | A. | Not that I remember. |
| 24 | Q. | Was anyone getting close to the Defendant? |
| 25 | A. | No. |

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1   Q.  Was the Defendant's demeanor at that point any different

2   than it had been?

3   A.  No.

4   Q.  Did SSA Gray or TFO Lewis appear to have changed in

5   demeanor at all?

6   A.  No.

7   Q.  When you came back in the living room, you were with

8   Special Agent Bucalo and Pino?

9   A.  Yes.

10  Q.  And then who was in the room -- who was in the room then?

11      Did SSA Gray and TFO Lewis leave?

12  A.  Yes.

13  Q.  So, after that, when it was you, Special Agents Bucalo and

14  Pino, and the Defendant, at that point, was anyone else in the

15  room?

16  A.  I can't remember.

17  Q.  Okay.

18          MR. AARON:  If we can play -- this will be file name

19  08272016_5 from 2 minutes, 39 seconds, through 10 minutes, 13

20  seconds, Your Honor, corresponding to Transcript Pages 166

21  through 172.

22      (Whereupon, a portion of an audio recording was played.)

23  BY MR. AARON:

24  Q.  So, Special Agent Scarzello, did Special Agent Bucalo ask

25  the Defendant whether he was willing to help the FBI?

CLEARED FOR PUBLIC RELEASE

REMAINDER TO BE FILED FOR PUBLIC FILING

136

Direct Examination of Paul Scarzello

1    A.  Yes.

2    Q.  And how did the Defendant respond?

3    A.  That he was helping.

4    Q.  And was that Special Agent Bucalo, or did Special

5    Agent Bucalo offer to help the Defendant fix the mistake he had

6    made?

7    A.  Yes.

8    Q.  And did Special Agent Bucalo ever promise anything in

9    particular?

10   A.  No.

11   Q.  At that point, did Special Agent Pino tell the Defendant

12   that anything additional had been found --

13   A.  Yes.

14   Q.  -- in the house?

15       And did the Defendant acknowledge that?

16   A.  Yes.

17   Q.  And what was it that had been found?

18   A.  Electronic media.

19   Q.  Containing what?

20   A.  Classified information.

21   Q.  So, during the interview, was the Defendant told what the

22   FBI primarily suspected him of?

23   A.  Yes.

24   Q.  And, very briefly, what was that again?

25   ███████████████████████████████████████████████████████

REMAINDER TO BE FILED FOR PUBLIC FILING

[REDACTED] FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1   [REDACTED]

2   Q.  And did he deny that?

3   A.  Yes.

4   Q.  During the interview, did he ever deny anything and later

5   admit it?

6   A.  Yes.

7   Q.  What are some examples of that?

8   A.  Of bringing the classified documents home, bringing the

9   classified media home, and then the -- basically how he -- his

10   contract ended at NSA.

11   Q.  Toward the end of the interview, did the Defendant say

12   anything about how honest he thought he had been during the

13   interview?

14   A.  He said he was between a five and a six.

15   Q.  Out of?

16   A.  Ten.

17   Q.  And, in the recording, we hear the Defendant being

18   encouraged, or, actually, do you recall the Defendant being

19   encouraged to help himself?

20   A.  Yes.

21   Q.  What is that a reference to?

22   [REDACTED]

23   [REDACTED]

24   [REDACTED]

25   [REDACTED]

[REDACTED] FOR PUBLIC RELEASE

SEALED - NOT FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

```
 1
 2   Q.   Okay.   Thank you.
 3        What did the agents and you communicate to the Defendant
 4   about how he could help?
 5   A.   To be honest.
 6   Q.   At any time during the interview, did anyone threaten the
 7   Defendant?
 8   A.   No.
 9   Q.   Did anyone draw a weapon?
10   A.   No.
11   Q.   Did anyone tell the Defendant he couldn't leave?
12   A.   No.
13   Q.   Or tell him that he couldn't end the discussion?
14   A.   No.
15   Q.   During the interview, did anyone physically advance on the
16   Defendant?
17   A.   No.
18   Q.   Or get into his personal space?
19   A.   No.
20   Q.   Before he was formally arrested, when he was sitting on the
21   couch, did anyone other than Special Agent Pino get physically
22   closer to him than you and Agent Bucalo were?
23   A.   No.
24   Q.   And did Special Agent Pino ever move aggressively toward
25   the Defendant in any way?
```

RELEASED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

```
1    A.   No.
2    Q.   Did anyone at all act in a way to show physical control
3    over the Defendant?
4    A.   No.
5    Q.   Did anyone give him physical commands in the interview?
6    A.   Can you rephrase it?
7    Q.   I'm sorry.   Did anyone command him to do anything, order
8    him to do anything?
9    A.   No.
10   Q.   During the interview, were other agents already searching
11   the house?
12   A.   No.
13   Q.   Do you know when the search of the house began?
14   A.   The search of the house began after the interview
15   concluded.
16   Q.   During the interview, were law enforcement officers running
17   around the house, walking around the house?
18   A.   Inside?
19   Q.   Yeah.
20   A.   No.
21   Q.   Were SWAT agents walking around inside the house?
22   A.   No.
23   Q.   Was anyone guarding the inside of the front door?
24   A.   No.
25   Q.   Was any agent blocking the way to the kitchen?
```

RELEASED FOR PUBLIC RELEASE

REDACTED / SEALED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

```
 1    A.   No.

 2    Q.   Was anyone blocking the kitchen door?

 3    A.   No.

 4    Q.   Did the Defendant ever try to get up and walk toward the

 5    door?

 6    A.   No.

 7    Q.   And, from where you sat with the Defendant in the living

 8    room, could you see law enforcement officers out the window?

 9    A.   I could not see anyone out the window.

10    Q.   Could you see flashing red and blue lights coming in

11    through the window?

12    A.   No.

13    Q.   Did you see the Defendant's wife outside?

14    A.   No.

15    Q.   Could you see the shed from the living room?

16    A.   No.

17    Q.   Could you see someone guarding the door outside?

18    A.   No.

19    Q.   Could you see the driveway?

20    A.   No.

21    Q.   During the interview, did there ever come a time when the

22    Defendant asked to stop talking?

23    A.   No.

24    Q.   Did he ever ask to leave?

25    A.   No.
```

REDACTED / SEALED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Direct Examination of Paul Scarzello

1    Q.  Did he ever ask to call an attorney?

2    A.  No.

3    Q.  Was his dog in the room during any of the interview?

4    A.  Yes.

5    Q.  And what, if anything, did the agents do with the dog?

6    A.  Nothing.

7    Q.  All right.  Did the Defendant ever ask to talk to his wife?

8    A.  Yes.

9    Q.  And what happened when he asked to talk to his wife?

10   A.  He spoke to her.

11   Q.  When you went to the Defendant's house that day, did you

12   know he would be arrested?

13   A.  No.

14   Q.  Had the FBI had any plans to monitor him after executing

15   the search warrant?

16   A.  Yes.

17   Q.  What are some examples?

18   A.  Surveillance and the tracking device for the vehicle.

19   Q.  Now, at some point, did it appear that the Defendant had

20   soiled his pants?

21   A.  After the completion of the interview, it was noticed.

22   Q.  Okay.  And so you perceived that at the end of the

23   interview?

24   A.  Yes.

25   Q.  Do you recall what, if anything, anyone said to the

REDACTED CLEARED FOR PUBLIC RELEASE

Cross-Examination of Paul Scarzello

```
 1    Defendant?
 2    A.   He was -- I don't remember the exact words or verbiage, but
 3    he was given the opportunity to change his clothes, and he
 4    denied it.
 5    Q.   Thank you.
 6              MR. AARON:   I have nothing further, Your Honor.
 7              THE COURT:   All right.   Thank you very much,
 8    Mr. Aaron.
 9              Cross-examination, Ms. Boardman?
10              MS. BOARDMAN:   Yes, Your Honor.
11                         CROSS-EXAMINATION
12    BY MS. BOARDMAN:
13    Q.   Agent Scarzello, anytime during your interactions with
14    Mr. Martin on August 27th, 2016, did you issue him Miranda
15    warnings?
16    A.   No.
17    Q.   Did any of the agents who questioned him issue him Miranda
18    warnings?
19    A.   No.
20    Q.   Now, Mr. Aaron asked you about a number of different people
21    who were present that day, correct?
22    A.   Yes.
23    Q.   What I'd like to try to do is exhaust your memory as to how
24    many officers were on scene that day, okay?
25    A.   Okay.
```

Cross-Examination of Paul Scarzello

1    Q.  All right.  We've heard prior testimony that nine SWAT team

2    officers were there.  Does that sound about right to you?

3    A.  I -- I don't know.  I don't remember.

4    Q.  Very good.  Let's move on.

5        Let's focus on FBI agents.  There is you, Agent Pino,

6    correct?

7    A.  Correct.

8    Q.  Bucalo?

9    A.  Correct.

10   Q.  Is Luciano -- is he an FBI agent?

11   A.  Yes.

12   Q.  Gray?

13   A.  Yes.

14   Q.  Donovan?

15   A.  Yes.

16   Q.  The computer specialist, Ms. -- what's her name?

17   A.  Susi Hajeski.

18   Q.  She was there as well?

19   A.  Yes.

20   Q.  In addition to those people, who else was present that day

21   from law enforcement?

22   A.  Outside the house?

23   Q.  Let's start with outside the house.

24   A.  Well, I don't -- I don't remember anyone else being inside

25   during -- like having entered into the house, but, outside --

Cross-Examination of Paul Scarzello

1   Q.  Other than those people we've just identified?

2   A.  Yeah.  So, outside, I know there is Special

3   Agent Ken Pondo, Special Agent Michelle McElwee.

4           THE REPORTER:  Do you have spellings of these?

5           THE WITNESS:  Pondo is P-O-N-D-O.  McElwee is

6   M-C-E-L-W-E-E.

7           THE REPORTER:  Thank you.

8           THE WITNESS:  Special Agent Alexis Velahos.  I'm not

9   sure of the spelling.

10          MR. EISENBERG:  V-E-L-A-H-O-S, for the record.

11          THE COURT:  I beg your pardon?

12          MR. EISENBERG:  I spelled "Velahos" for the record,

13  Your Honor.

14          THE COURT:  Yes.  All right.

15  BY MS. BOARDMAN:

16  Q.  So I just want to be clear.  We're at three agents outside

17  so far.

18  A.  Yes.

19  Q.  Who else other than those three?

20  A.  Special Agent Mike Fowler, F-O-W-L-E-R; Special

21  Agent Jeff Fillar, F-I-L-L-A-R.  And that's all I recall.

22  Q.  In addition to those people, there were also Maryland State

23  police officers, correct?

24  A.  The only time I saw a Maryland State Police was when we

25  arrived on scene.

DRAFTER COPY IL FOR Public States

Cross-Examination of Paul Scarzello

```
 1    Q.  All right.
 2    A.  When I left, I don't remember seeing them outside.
 3    Q.  Okay.  But, when you arrived, when the SWAT team went in,
 4    the Maryland State Police were there as well, correct?
 5    A.  Yes.
 6    Q.  How many Maryland State Police cars?
 7    A.  I just remember seeing one.
 8    Q.  Okay.  Any other law enforcement that we haven't discussed
 9    that was present that day that you remember?
10    A.  Not that I remember.
11    Q.  All right.  Now, when Mr. Martin was -- Mr. Martin was
12    brought into the house in handcuffs, correct?
13    A.  I don't remember exactly when it was from the time he was
14    outside until the time he went in --
15    Q.  All right.
16    A.  -- but --
17    Q.  Okay.  Once he was in the house, he was seated here on this
18    couch (indicating) -- and I'm pointing to the couch on the far
19    side of the room which is perpendicular to the bottom of the
20    diagram, correct?
21    A.  Correct.
22    Q.  And you were seated on this couch closest to the bay window
23    (indicating), correct?
24    A.  Correct.
25    Q.  And Agent Pino was sitting next to Mr. Martin on the couch
```

REDACTED VERSION OF ORIGINAL DOCUMENT

Cross-Examination of Paul Scarzello

```
 1    against the wall (indicating), correct?

 2    A.  Correct.

 3    Q.  And Agent Bucalo was in a chair across from Pino and Martin

 4    (indicating), correct?

 5    A.  Yeah.  A little bit offset, but --

 6    Q.  Okay.  And between them was a coffee table?

 7    A.  Correct.

 8    Q.  And this is not drawn to scale, correct?

 9    A.  No.

10    Q.  In fact, it's a little bit tighter than this would suggest,

11    correct?

12    A.  Yeah.

13    Q.  Okay.  Now, at any time while Mr. Martin was asked

14    questions or in the house, before he was taken away to the FBI,

15    was he allowed to roam freely throughout the house?

16    A.  Yeah.  He -- we never told him he couldn't.

17    Q.  Did he ever roam freely throughout the house?

18    A.  I don't recall.

19    Q.  Okay.  You were there the whole time, right?

20    A.  Yeah.  He was sitting in the seat.

21    Q.  He was sitting in this seat on a couch (indicating),

22    correct?

23    A.  Correct.

24    Q.  And, when Agent Pino and Bucalo left the room, you stayed

25    there with him, correct?
```

Cross-Examination of Paul Scarzello

1    A.   Correct.

2    Q.   And, in fact, another agent came in.  Donovan came in with

3    you and stood in the room with Mr. Martin, too, correct?

4    A.   Correct.

5    Q.   And, at some point, you escort Mr. Martin to his office,

6    which is Room A, correct?

7    A.   Yes, we went in there.

8    Q.   And in the room is you and the computer specialist and

9    Mr. Martin, correct?

10   A.   Correct.

11   Q.   And then, at some point, he leaves this door, correct

12   (indicating)?

13   A.   Yes.

14   Q.   And I'm pointing to the door in the office.  And goes back

15   into the living room, back to the seat on the you couch where

16   he had been before, correct?

17   A.   Yes.

18   Q.   And, in the living room, there were at least two agents

19   there, correct?

20   A.   I don't know that there were -- I -- I only remember -- I

21   remember Agent Gray being in there at that time.

22   Q.   Okay.  But there was an agent in there, correct?

23   A.   Yes.

24   Q.   And, the whole time that you were asking Mr. Martin

25   questions, you have a search team going through his shed in the

Cross-Examination of Paul Scarzello

```
1    backyard, correct?

2    A.   The search team was searching the outside, yes, correct.

3    Q.   Including the shed?

4    A.   Correct.

5    Q.   And you also had a search team searching his car, correct?

6    A.   Yes.

7    Q.   And, at some point, Agent Luciano comes into the room and

8    is looking for his keys -- the car keys.  Do you remember that?

9    A.   Yes.

10   Q.   And he says to Mr. Martin -- and I can show you in the

11   transcript -- if you don't have the keys, I'm going to have to

12   break open the car door.

13        Do you remember that?  Or the car lock?

14            MS. BOARDMAN:  Page 61, please, of the transcript,

15   Government's Exhibit --

16            THE COURT:  Nineteen.

17            MS. BOARDMAN:  Thank you.

18   BY MS. BOARDMAN:

19   Q.   Are you on Page 61 --

20   A.   Yes.

21   Q.   -- of Government's Exhibit 19?

22   A.   Yes.

23   Q.   Do you see, about five or six, seven lines up:

24        "Luciano:  Excuse me.  Car keys sir so we don't have to

25   break one of the locks."
```

Cross-Examination of Paul Scarzello

1      Do you see that?

2   A.  Yes.

3   Q.  So the search team at that time was trying to search his

4   car, correct?

5   A.  Yes.

6   Q.  All right.  Incidentally, you mentioned in the beginning of

7   your direct with Mr. Aaron that the search warrant was for his

8   house, car, and shed, correct?

9   A.  Yes.

10  Q.  And also to put a tracker, correct?

11  A.  Yes.

12  Q.  The search warrant was also for his person, to search his

13  person, correct?

14      Would you like me to show you the search warrant?

15  A.  Yes.

16  Q.  Okay.

17          MR. AARON:  Your Honor, we'll stipulate that the

18  warrant --

19          THE COURT:  It was definitely for the person, yes,

20  that's correct.

21          MS. BOARDMAN:  Thank you.  Thank you very much.

22          THE COURT:  So stipulated.

23          MS. BOARDMAN:  All right.

24          THE COURT:  Thank you, Mr. Aaron.

25          MS. BOARDMAN:  Give me one moment.  I'm going to

REDACTED - RELEASED FOR PUBLIC RELEASE

Redirect Examination of Paul Scarzello

1    streamline this, Your Honor.  I don't have very much.

2           Your Honor, there are portions of the transcript that

3    I would like to emphasize.  I'm not sure I need this agent to

4    do that.  It would be more argument.  As long as this

5    transcript is admitted into the record.

6           **THE COURT:**  The entirety of Government's Exhibit 19

7    is in evidence.

8           **MS. BOARDMAN:**  Very good.

9           **THE COURT:**  And you're certainly free to make

10   reference to it.

11          **MS. BOARDMAN:**  Okay.  Thank you.

12          No further questions.  Thank you.

13          **THE COURT:**  All right.  Thank you very much,

14   Ms. Boardman.

15          Any redirect, Mr. Aaron?

16          **MR. AARON:**  Very briefly, Your Honor.

17          **THE COURT:**  All right.

18                      **REDIRECT EXAMINATION**

19   **BY MR. AARON:**

20   Q.  Special Agent Scarzello, on cross, you testified about a

21   number of agents present outside the residence.  Were all the

22   agents you listed there at the same time?

23          Were those agents inside the house at the same time?

24   A.  No.

25   Q.  For that first two and a half hours of the interview,

Redirect Examination of Paul Scarzello

1    total, how many agents were sitting with the Defendant?

2    A.   It was myself, Agent Pino, and Agent Bucalo.

3    Q.   And, from the living room, could you see what was going on

4    outside?

5    A.   I could not.

6    Q.   You listed a bunch of agents who were outside.  Other than

7    the ones you testified about on direct, did any of the agents

8    that you listed for Ms. Boardman come in during the interview,

9    to your recollection?

10   A.   No.

11   Q.   Did anyone ever tell the Defendant that there was a search

12   warrant for his person?

13   A.   I don't remember.

14   Q.   Do you recall anyone ever saying that he had to stay in

15   order to be searched?

16   A.   No.

17   Q.   All right.

18           MR. AARON:   Thank you.  Nothing further.

19           THE COURT:   Thank you.

20           Any recross just on those points, Ms. Boardman?

21           MS. BOARDMAN:   Nothing more, Your Honor.  Thank you.

22           THE COURT:   Thank you very much, Agent Scarzello.

23   You may step down.

24           You shouldn't discuss your testimony with anyone

25   until this hearing is concluded, probably tomorrow, in the

1   unlikely event you are called back to the witness stand.

2          Thank you very much.

3          THE WITNESS:  Okay.  Thank you, Your Honor.

4     (Witness excused.)

5          THE COURT:  Next witness, Mr. Aaron?

6          MR. AARON:  The Government has no additional

7   witnesses, Your Honor.  Would you like me to ask Special

8   Agent Scarzello to stay around, or should I release him?

9          THE COURT:  Well, just in the abundance of caution, I

10  think it might be good.  Just have him stay around.  That would

11  be fine.

12         MR. AARON:  Very good.  Stick around.

13         THE COURT:  All right.  Ms. Boardman, are there any

14  witnesses to be called by the Defense?

15         MS. BOARDMAN:  Yes, Your Honor.  Your Honor, we'd

16  call Anthony Contrino, and I will go get him.

17         THE COURT:  That's fine.  Thank you.

18         MR. AARON:  Your Honor, as I understand it, this is a

19  civilian witness, so just letting everyone know we should --

20         THE COURT:  Okay.  You're right.  All right.  Okay.

21  I'm sorry.  Okay.  The next two witnesses are what are called

22  open witnesses, correct?

23         MS. BOARDMAN:  Yes.

24         THE COURT:  All right.  So, just so we're clear on

25  the procedure on that, everything up to this point in time has

 1   been sealed, and, after review of the transcript, portions that

 2   the Court Security Officer, Ms. Peterson, and I agree can be

 3   released and after review by counsel, so that there is no

 4   confusion, certain portions of the transcript can be made

 5   available to the public, but I assure you that's not going to

 6   be done until all precautions are taken and everyone signs off

 7   on it, and Ms. Peterson will have a major voice in that.

 8            So, with that, the matter of calling -- this portion

 9   of the proceeding can be open because it's -- these are not

10   secure -- these are not secured witnesses, and so who are the

11   two witnesses you were planning to call, Ms. Boardman?

12            **MS. BOARDMAN:**  Anthony Contrino and Deborah Shaw.

13            **THE COURT:**  And they are neighbors, or who are they?

14            **MS. BOARDMAN:**  One is a neighbor, and one is

15   Mr. Martin's wife.

16            **THE COURT:**  Okay.  All right.  So, with that, I don't

17   think we need to take paper off the door.  These are open

18   proceedings.  If there is anybody from the media or anyone

19   else, any member of the public wanted to come, technically they

20   could be allowed to come in.  I don't think that's an issue.

21            So, given that there are other portions that will

22   need to be resealed, I don't think we need to go through the

23   process, Ms. Peterson, of actually taking the paper off the

24   window.  We can just keep the paper on, correct?  Is that

25   agreeable to you from the point of view of court security.

REDACTED; CLEARED FOR PUBLIC RELEASE

```
 1              MS. PETERSON:  Sure.  Can I approach the bench, Your
 2    Honor?
 3              THE COURT:  Sure.  Sure.  Come on up.
 4         (Whereupon, a conference was held at the bench off the
 5    record with the Reporter.)
 6              THE COURT:  Mr. Giordano has to change his tape
 7    recording machine now as well.
 8              MS. PETERSON:  Correct, Your Honor.
 9         (Whereupon, a conference was held at the bench off the
10    record with the Security Officer.)
11              THE COURT:  What we're going to do is we're going to
12    change some of the equipment here.  We're not going to open up
13    the rest of the proceedings the rest of the day, mainly
14    because, at some point in time, there may or may not be legal
15    argument that would require referring to classified
16    information, and I don't want anyone to feel constrained on
17    either side in terms of referring to the evidence.
18              So what I suggest we do is we can take a ten-minute
19    recess -- no more than ten-minute recess to take the steps to
20    clear the courtroom or permit the courtroom to be opened.  I
21    don't think you need to need to go taking the paper off the
22    window as far as I'm concerned.
23              And then we'll go back to a sealed proceeding after
24    these witnesses testify.  I don't know how long they're going
25    to be, but, by agreement of everyone, these two witnesses will
```

1  not be what I call secure witnesses, and they can testify.

2          Is that agreeable, Mr. Myers and Mr. Eisenberg

3  Mr. Aaron?

4          MR. EISENBERG:  Yes, Your Honor.  That's agreeable to

5  the Government.

6          THE COURT:  Agreeable to you, Mr. Wyda?

7          MR. WYDA:  Yes, Your Honor.

8          THE COURT:  Okay.  With that, we'll take a ten-minute

9  recess.

10          MR. MYERS:  Your Honor, may I approach to hold onto

11  the classified transcript on your desk?

12          THE COURT:  I'm sorry?

13          MR. MYERS:  May I approach just to hold onto the

14  classified transcript?

15          THE COURT:  Sure.

16          MR. MYERS:  That way, we can secure all the

17  classified before letting unsecured people in.

18          THE COURT:  That's fine.  You don't think it's secure

19  up here on by bench?

20      (Laughter.)

21          MR. MYERS:  I'm sure it is, Your Honor, but --

22          THE COURT:  Seriously, do you think there is any

23  danger of the public being able to raid my desk?

24          MR. MYERS:  If Maura is okay with it, I'm okay with

25  it.

```
 1              MS. PETERSON:  If you're comfortable, Judge --
 2              THE COURT:  I think, if I've got it, it's pretty
 3     secure.
 4              MR. MYERS:  Thank you, Your Honor.  Not a problem.
 5              MR. WYDA:  One of our witnesses is pretty large, Your
 6     Honor.
 7              THE COURT:  Whatever.  I've only had one defendant
 8     charge the bench in 15 and a half years, Mr. Myers, and the
 9     Marshals got him halfway up, although the word is I stayed up
10     here, and I was ready to help them, because I wasn't sure.
11        (Laughter.)
12              MR. MYERS:  Yes, Your Honor.
13              THE COURT:  So, with that, we'll take a ten-minute
14     recess.
15              THE CLERK:  All rise.  This Honorable Court stands in
16     recess for ten minutes.
17        (Recess taken, 3:26 p.m.)
18        (Whereupon, an open proceeding was held, prepared under
19     separate cover.)
20        (Whereupon, closed proceedings continued at 4:58 p.m.)
21              THE CLERK:  All rise.  This Honorable Court resumes
22     in session.
23              THE COURT:  Good afternoon, everyone.
24              We've now secured the courtroom again, and we're
25     ready to have closing argument on the motions to suppress
```

1    statements, Paper Number 130, filed by the Defendant, and the

2    Government having filed its response, Paper Number 141, and the

3    Defendant having filed his reply, Paper Number 150, and, having

4    now taken the evidence and testimony, we're ready to proceed

5    with argument on the motion.

6              Mr. Aaron, I'd be glad to hear from you, sir.

7         **MR. AARON:**  Thank you, Your Honor.

8              Your Honor, first I'd ask that you find the

9    Government's witnesses credible as you saw their testimony, you

10   saw their demeanor, and I'll also note that nearly all of the

11   events at issue are recorded and have been provided to the

12   Court, and Your Honor can hear the tone and the context of

13   whatever portions of the interview Your Honor wishes.

14             Your Honor, the testimony and recordings show that

15   the Defendant was not in custody when he admitted that he had

16   brought classified information home, both in hard copy and

17   digital copy, and that he knew that doing so was wrong and

18   illegal.  The recordings and the testimony also show that he

19   made those admissions voluntarily.

20             Your Honor, I believe the goalpost for this case are

21   established by the *Hashime* case, H-A-S-H-I-M-E.

22        **THE COURT:**  Yes.  The key cases here are *Hashime*,

23   *Hargrove*, and *Colonna* in terms of Fourth Circuit *jurisprudence*.

24        **MR. AARON:**  Yes, Your Honor.  And *Hargrove* --

25        **THE COURT:**  2013, 2010, and 2007 opinion.

RELEASED FOR PUBLIC RELEASE

Closing Argument by the Government

1        **MR. AARON:**  Thank you, Your Honor.

2        *Hargrove*, as well as the *Freeman* case that Your Honor

3        cited earlier from the Eastern District of Virginia, they make

4        clear that a defendant can be detained and then be interviewed

5        subsequently without being in custody for purposes of *Miranda*.

6        This case, Your Honor, is much more similar to

7        *Hargrove*, and the Defendant was not in custody during that

8        interview.  It's important, Your Honor, to remember that the

9        facts in this case should be looked at from the perspective of

10       a reasonable, innocent person in the Defendant's position, so

11       anything that was going on that was not perceivable by the

12       Defendant, Your Honor, is irrelevant.

13       And, without the benefit of knowing what factors the

14       Defense will raise in their argument, because we haven't seen

15       that, I'll note this, Your Honor:  That the approach to the

16       Defendant happened in the afternoon while the Defendant was in

17       street clothes, and that is different from a lot of cases that

18       have been reported.  He was briefly detained by SWAT.  He was

19       then unhandcuffed in his own house, and the first thing that

20       happened, Your Honor, was that the interviewing agent

21       apologized to him.  The interviewing agent then told him three

22       things:  That he was not under arrest, that he was obviously

23       free to leave at any time -- and that's that bit at a minute

24       and 40 seconds into the recording, and that his participation

25       was completely voluntary.

Closing Argument by the Government

```
 1            Now, at that point, Your Honor, the SWAT team was
 2   gone.  The SWAT part of this was over, and there was every
 3   reason for a reasonable person in the Defendant's position to
 4   conclude that the scene had been de-escalated.
 5            THE COURT:  Where is the evidence that you're free to
 6   leave at any time?
 7            MR. AARON:  That, Your Honor, is the bit of the
 8   recording --
 9            THE COURT:  I'm looking at a quote.  It says so
10   Bucalo -- I'm sorry.  Bucalo, according to my review of
11   Government Exhibit 19, says:  So we will have a full
12   discussion, completely volunteer -- volunteer, you know,
13   obviously you at any time, you are not under arrest.
14            Where did it say you're free to leave at any time?
15            MR. AARON:  So, Your Honor, if you look in that draft
16   transcript, there is an annotation "UI" in that same section --
17            THE COURT:  Yes.
18            MR. AARON:  -- meaning unintelligible, and I think
19   that the FBI staff person who was doing the draft transcription
20   wasn't using equipment that let her or him hear everything.
21   When we played it -- and Your Honor, you have the recording.
22   This is at 1 minute, 40 seconds in that sound file.  What is
23   typed in as unintelligible into the draft, non-official
24   transcript -- what's on that recording is:  You're obviously
25   completely free to leave.  And don't believe me, Your Honor, of
```

Closing Argument by the Government

1  course.  We can play the audio again, and we can set it up now
2  or Your Honor can listen to it at a later time.
3          THE COURT:  Why don't we set it up now.
4          MR. AARON:  Okay.  Would you like me to continue and
5  come back to that, or --
6          THE COURT:  No.  We'll wait.  We'll do it right now.
7      (Pause.)
8          THE COURT:  We're referring to the testimony of
9  Special Agent Ryan Davis, who testified this morning, and there
10 was reference to portions of this tape.  I'm looking here.
11         No.  I'm sorry.  I think it was Special Agent
12 Paul Scarzello.
13         MR. AARON:  Your Honor, this portion of the
14 transcript -- portion of the audio was played during Special
15 Agent Davis' testimony.
16         THE COURT:  Okay.  I'm looking here.
17         MR. AARON:  Sorry.
18         THE COURT:  I'm looking at my notes.
19         MR. AARON:  And this was also the subject of --
20         THE COURT:  Yes.  This was played from Government
21 Exhibit 19, the draft here.
22         MR. AARON:  Your Honor, just so there is a complete
23 record, this was the subject of a letter that I believe we sent
24 to the Court and counsel correcting the transcript prior to
25 today, but, again, we'll play the audio.

REDACTED / SEALED FOR PUBLIC RELEASE

Closing Argument by the Government

```
 1              For the record, this will be Transcript Page 3.

 2              THE COURT:  Transcript Page 3.

 3              THE REPORTER:  Transcript Page?

 4              MR. AARON:  Yes.

 5              THE COURT:  And his name is pronounced Bucalo,

 6      correct?

 7              MR. AARON:  Bucalo, Your Honor.

 8              THE COURT:  Bucalo.  Bucalo.  Bucalo.

 9        (Whereupon, a portion of an audio recording was played.)

10              THE COURT:  Stop.  What does he say?

11              AGENT PINO:  "You're not under arrest."

12              MR. AARON:  "Obviously you're free to go at any time.

13      You're not under arrest."

14              MS. BOARDMAN:  Your Honor, I would just let the audio

15      stand for what it says rather than have Mr. Aaron --

16              THE COURT:  Well, I'm listening.  I mean, I've said I

17      have hearing issues here, but I see where it says something, at

18      any time, you're not under arrest.  He clearly says, "You're

19      not under arrest."

20              MR. WYDA:  That's going to help.

21              MR. AARON:  We can try it again, Your Honor.

22              THE COURT:  Of course, for the record, the fact that

23      he says, "You're not under arrest," does or does not have legal

24      significance, counsel, in terms of what the situation was.  So,

25      just so we're perfectly clear, an officer does not say, "You're
```

Closing Argument by the Government

1   not under arrest," and then is free to do whatever and later

2   have a lawyer argue that.  I see that the officer says he was

3   not under arrest.

4        **MR. AARON:**  Yes, Your Honor.

5        **THE COURT:**  It's for me to determine whether it's

6   voluntary or not.  It's not that -- a police officer cannot

7   just lay on anything and say:  You're not this, you're not

8   that.  I'll determine --

9        **MR. AARON:**  Absolutely.

10       **THE COURT:**  -- whether or not it was custodial or

11  not.  That's my decision to make as a finding of fact.  So the

12  question here is that you're representing that he says -- we'll

13  have to listen to it again.  Go ahead.

14       (Whereupon, a portion of an audio recording was played.)

15       **AGENT PINO:**  Too loud.

16       **THE COURT:**  Why don't you get it to a reasonable

17  volume.  There is a lot of static here.  Okay.  Just try it

18  again.  Thank you very much, Mr. Myers.  Thank you.

19       Sorry.  Mr. Aaron, go ahead.  So let's start with --

20  perhaps we ought to do -- sure -- Martin says:  Sure.  My creds

21  are on the floor, as a matter of fact.  When you guys -- and

22  then Bucalo says:  Yes, I understand.  Special Agent

23  Jeremy Bucalo.  So let's start right from there, if we can, so

24  I can just lead into the sentence that's important.

25       Okay.  Thank you, Mr. Myers.

REDACTED/CLEARED FOR PUBLIC RELEASE

Closing Argument by the Government

1       (Whereupon, a portion of an audio recording was played.)

2          **THE COURT:**  All right.  I see what you're

3 representing in terms of his saying that.

4          **MR. AARON:**  Thank you.

5          **THE COURT:**  I'm not sure I hear it the way you're

6 saying he said it, but I understand what your argument is.

7          **MR. AARON:**  Thank you, Your Honor.  And of course no

8 words like that are *Talismanic*, as Your Honor indicated --

9          **THE COURT:**  Well, that's right.

10          **MR. AARON:**  That doesn't answer the entire question,

11 so certainly --

12          **THE COURT:**  Just so we're clear, it does not.  Okay.

13          **MR. AARON:**  Completely agree, Your Honor.  I think

14 the point is, in the case law, that statements like that are

15 taken into account as part of the totality of the

16 circumstances.

17          **THE COURT:**  Yes.

18          **MR. AARON:**  And certainly having Agent Bucalo

19 apologize and explain why they used SWAT in the first place and

20 then give this explanatory statement, you know:  We're really

21 sorry, you're not under arrest, you're free to leave, that this

22 is voluntary, at that point, again, Your Honor, Special

23 Agent Bucalo, for any objective analysis of a reasonable person

24 in the Defendant's position --

25          **THE COURT:**  Well, I have no idea.  The Government has

Closing Argument by the Government

```
 1    not put Agent Bucalo before me.

 2              MR. AARON:  I'm sorry.  From the audio, Your Honor.

 3              THE COURT:  Yes, but, in terms of the approach and

 4    what was done, the Government has not put Agent Bucalo before

 5    me, so I can't judge how he handled himself one way or the

 6    other.  I haven't had a chance to judge him on the witness

 7    stand.

 8              MR. AARON:  That's correct, Your Honor.  What you do

 9    hear is what he says on the audio.

10              THE COURT:  I understand.  And, so the record is

11    clear, he has not testified before me here today.

12              MR. AARON:  That's correct, Your Honor.

13              THE COURT:  Okay.  All right.

14              MR. AARON:  But, on the audio, he is heard telling

15    the Defendant what we just heard, telling the Defendant that he

16    apologized for using SWAT.  And, at that point, Your Honor, the

17    situation that had initially occurred had been de-escalated.

18    There had been an apology.  The Defendant had been told he was

19    not under arrest.  He was asked if he would talk, where he was

20    most comfortable talking, and he chose the location, Your

21    Honor.

22              There was then a wide-ranging conversation for about

23    two and a half hours that was mostly about the Defendant's

24    background                              and not about the

25    conduct for which the Defendant was ultimately arrested and
```

Closing Argument by the Government

1    charged.

2              At times, Your Honor, as you review the transcript,

3    or the audio, at times the Defendant dominates the

4    conversation.  The Defendant invited questions.  In fact, there

5    was -- during one of the audio portions that we played, when

6    the conversation turned to firearms, it was the Defendant who

7    turned the subject back from that to what the agents were there

8    to talk about.

9              The Defendant was interviewed for those two and a

10   half hours by three agents in plain clothes, with no weapons

11   visible, in his own living room.  He felt comfortable enough,

12   Your Honor, to question the agents' security clearance and

13   whether they were able to talk about the things that they were

14   asking him about.

15             There was no threat.  No one physically controlled

16   him.  The Defendant at some points referred to hosting the

17   agents later, perhaps a week later, talked about getting to the

18   range more.  No one corrected him.  No one said: No, no, no.

19   You're not going to be going to your office.  You're not going

20   to be going to the range.

21             And, Your Honor, even after he failed to list all of

22   his firearms to the agent whose job it was to secure them, to

23   make the house safe, no one, again, expressed any anger.  No

24   one expressed any threat.

25             So, Your Honor, at no time did anyone say or do

Closing Argument by the Government

1    anything to contradict the statements that the audio reflects

2    from Agent Bucalo that the Defendant was not under arrest, that

3    his participation was completely voluntary.

4          All of the activity going on outside the house and

5    everything going on outside the house with Ms. Shaw is

6    irrelevant to this analysis, because the only testimony from

7    inside the house is that that was not perceivable from inside

8    the house.

9          The Defendant did not know that Ms. Shaw wanted to

10   see him or that someone wasn't letting her see him.  The law

11   enforcement officers outside the house were not visible from

12   inside the living room.  The shed was on the opposite side of

13   the house.  The driveway was not visible.  The cars were not

14   visible.  Even on the video that we just saw that the Defense

15   played, Your Honor, the lights don't come on until 8:30, which

16   is after the four-hour period of the interview.

17         So, Your Honor, the facts in this case are very close

18   to the facts in *Hargrove* that the Court identified as key

19   facts, and this is on Pages 179 to 180 of that opinion:

20         That the Defendant was not handcuffed during the

21   interview.  We have that here.

22         That the agents did not draw weapons in the room when

23   the Defendant was interviewed.  We have that here.

24         The conversation was amicable and non-threatening in

25   tone.  And, Your Honor, you can hear on the audio agents trying

Closing Argument by the Government

1    to empathize, trying to minimize the Defendant's culpability,

2    talking to him about fixing the problems that he had caused.

3           In *Hargrove*, another key fact is that the agent said

4    the Defendant was not under arrest, and they also said he was

5    free to leave.  Your Honor, we have that here, in addition to

6    that part of the audio which is discussed.  There was a

7    statement that this is completely voluntary.

8           In *Hargrove*, the law enforcement officers encountered

9    the Defendant at his own door.  The Court contrasted that with

10    other cases where defendants were roused in their own rooms.

11    Here, we have the Defendant being encountered outside and not

12    in his room.

13           In *Hargrove*, the Court noted that there were not as

14    many officers in that case as there were in cases finding

15    custody, such as *Colonna*.  We have the same fact here.

16           And the fact that the defendant was not constantly

17    guarded was important in *Hargrove*, and certainly the Defendant

18    was talking to agents a lot during this interview, but he was

19    not guarded, and, in fact, moved freely from one room to

20    another at one point, as Special Agent Scarzello testified.

21           So, Your Honor, thank you for the opportunity to

22    respond to whatever facts the Defense brings up.  I would

23    ask -- I'm not going to go point by point with them, but, you

24    know, the context of any particular statement is important in a

25    totality of circumstances and review, and Your Honor has the

⬚⬚⬚⬚⬚⬚ ⬚⬚ ⬚⬚⬚⬚⬚ ⬚⬚⬚ ⬚⬚⬚⬚⬚ ⬚⬚⬚⬚⬚⬚

Closing Argument by the Government

```
 1   full audio and transcripts.  But that's all I have for right
 2   now.
 3            THE COURT:  Thank you, Mr. Aaron.
 4            Just in terms of that portion that we played, that is
 5   literally -- I think you said -- I know you were making
 6   notations as to the minute marker.  I just was noting the pages
 7   here for my notes.  That was approximately 1 minute and how
 8   many seconds into --
 9            MR. AARON:  Forty, Your Honor.
10            THE COURT:  I'm sorry.  1 minute and 40 seconds?
11            MR. AARON:  Sorry.  I'm hearing from co-counsel --
12            THE COURT:  Whatever.  Just ballpark.
13            MR. AARON:  -- 1 minute and 38, Your Honor.
14            THE COURT:  All right.  So it's 1 minute and 38
15   seconds into the interview, correct?
16            MR. AARON:  Correct, Your Honor.  Well, Your Honor,
17   if you start the interview at the first word spoken to the
18   Defendant, no questions had been asked.
19            THE COURT:  I'm just saying that the comment that
20   you've noted, so we will have a full discussion completely
21   volunteer, you know, and let's just say that the Government
22   contends that he says you're obviously free to leave.  I guess
23   that's what -- I'm willing, for the purpose of this hearing, to
24   say that's apparently what the agent seemed to say very
25   quickly.  He certainly didn't emphasize it.  And, at any time,
```

Closing Argument by the Government

1   and you're not under arrest, that was at 1 minute and 38

2   seconds into the interview.

3           Is there any other such quote that you want me to see

4   besides that?

5           MR. AARON:  Yes, Your Honor.  There was a point at

6   which Special Agent Pino stated that the Defendant was not

7   under arrest.  And, even when the Defendant joked with Special

8   Agent Davis, when Special Agent Davis was asking if the car was

9   fast, even when the Defendant joked about whether or not he was

10  under arrest, he was told he was not and the conversation was

11  just about whether the car was fast.

12          THE COURT:  Right.  Well, as to that, I think what

13  you're referring to is that Agent Scarzello basically stated --

14  I thought that Agent Scarzello said that he and/or Special

15  Agent Brock -- that was the person -- Brock?

16          MR. AARON:  Brook Donovan?

17          THE COURT:  Was there a Special Agent Brock there at

18  the time?

19          MR. AARON:  There is a Special Agent Brook.

20          THE COURT:  Brook.  Okay.

21          MR. AARON:  First name Brook.

22          THE COURT:  Yes.  Brook Donovan.  I'm sorry.  Yes.

23  Special Agent Brook Donovan.  I thought that Agent Scarzello

24  and Special Agent Brook Donovan state -- he indicated they

25  stayed with the Defendant in the house.  I don't know that he

UNDER SEAL PER ORDER FOR PUBLIC RELEASE

Closing Argument by the Government

1   was ever left alone.

2           MR. AARON:  At a different point --

3           THE COURT:  If I missed that, correct me.

4           MR. AARON:  At a different point in Agent Scarzello's

5   testimony, Your Honor, it's not that the Defendant was left

6   alone in the house.  It's that he walked by himself from one

7   room and back into the living room, from the study back into

8   the living room.

9           THE COURT:  Well, I'm trying to clarify the facts,

10  because I don't think the facts are that he was free to walk

11  around the house by himself.  I think there were agents in the

12  house, and I thought, as Special Agent Scarzello testified,

13  that he and Special Agent Brook Donovan stayed with him in the

14  house.

15          MR. AARON:  There was --

16          THE COURT:  Somebody was with him at all times is the

17  point.  Is the Government contending that he, at times, was

18  left alone in the house?

19          MR. AARON:  No.  No, Your Honor, certainly.

20          THE COURT:  Okay.

21          MR. AARON:  He was talking to agents the entire time.

22  No one -- you know, he never asked to leave.  No one ever told

23  him he couldn't leave.

24          THE COURT:  Okay.

25          MR. AARON:  No one ever said, "You can't go out of

1    this room."  He just -- he stayed and engaged in conversation.

2              THE COURT:  The Government's position is that

3    Mr. Martin was free to leave at any time after a minute and 38

4    seconds into the interview?

5              MR. AARON:  I would say this, Your Honor:  A

6    reasonable person in the Defendant's position would have

7    believed that he was not under the level of compulsion

8    equivalent to formal arrest, which is the standard for whether

9    or not he's in custody.

10             THE COURT:  Well, let me just pursue that, Mr. Aaron.

11   Let me just ask you.  Your point is that a reasonable person,

12   at the 1-minute-and-38-second mark that you played here -- from

13   that point forward, a reasonable person would have believed

14   that he could leave at any time he wanted and walked out of the

15   house?

16             MR. AARON:  At that point, yes, Your Honor, and, in

17   fact --

18             THE COURT:  No.  From that point forward.

19             MR. AARON:  Yes, Your Honor.

20             THE COURT:  So, at any time after 1 minute and 38

21   seconds on this tape --

22             MR. EISENBERG:  Your Honor, may I have a moment?

23             THE COURT:  Sure.

24             MR. AARON:  I think I know what Mr. Eisenberg is

25   trying to tell me.  The statement --

Closing Argument by the Government

1       THE COURT:  Well, this is not a complicated question.

2       MR. AARON:  No, Your Honor.  I'm --

3       THE COURT:  I'm trying -- you've stated a principle

4   of law, and you're correct, the principle applied.  Would a

5   reasonable person at 1 minute and 38 seconds into this

6   interview -- would a reasonable person believe that he or she

7   was permitted to then say, whether it's at the two-hour mark or

8   the two-and-a-half-hour mark, at any point in time after a

9   minute and 38 seconds, the four-minute mark of the interview,

10  after 1 minute and 38 seconds into the interview, a reasonable

11  person, you're saying, on these facts, would have felt that

12  they are free to leave and say, "I've had enough.  I'm

13  leaving."  Is that the position of the Government?

14      MR. AARON:  Yes, Your Honor, with additional facts,

15  such as, when Agent Pino, on Transcript Page 13, told the

16  Defendant again that he was not under arrest.

17      THE COURT:  And where is that in the mark?  Where is

18  that on the time frame here?  Page --

19      MR. AARON:  That's at about 11:46.  Eleven minutes --

20      THE COURT:  So we have 1 minute and 38 seconds in to

21  the interview, and then we have 11 minutes and some seconds

22  into the interview that the transcript reflects that Special

23  Agent Pino, the case agent, who is here, had indicated that he

24  was free to leave at any time; is that right?

25      MR. AARON:  Yes, Your Honor.  I believe that --

Closing Argument by the Government

1      THE COURT:   I'm looking there at Page 13.

2      MR. AARON:   Mr. Martin --

3      THE COURT:   Mr. Aaron, if I can, Page 13 of the

4  transcript.

5      MR. AARON:   Your Honor, this --

6      THE COURT:   I note that Page 13 of the transcript

7  reflects Agent Bucalo says, at the very top of the page:  Do

8  you feel more comfortable coming back to our office?

9      MR. AARON:   Yes, Your Honor.   The context for that is

10  important, because the Defendant had just hesitated about

11  talking about classified NSA information.

12      THE COURT:   I understand.

13      MR. AARON:   So Jeremy -- Agent Bucalo offers, and

14  says:   We can go to our office if you prefer.

15          The Defendant says, no, he'd rather stay.

16          So everyone listens to him.

17      THE COURT:   No, I understand the context in which --

18      MR. AARON:   Then --

19      THE COURT:   But that implies that, if he doesn't want

20  to come back to the office or doesn't want to sit there, he's

21  free to walk out the door?

22      MR. AARON:   Yes, Your Honor.   And, in fact, you heard

23  testimony today, Your Honor, that the FBI had physical

24  surveillance ready for if the Defendant left.   They had the

25  authority, which they executed, to install the tracker on his

Closing Argument by the Government

1    car.  All of that indicates that the agents themselves were

2    ready for the Defendant to walk out that door at the end of the

3    interview, Your Honor.

4            MR. EISENBERG:  Right.

5            MR. AARON:  So this is not speculative.  This isn't

6    an after-the-fact rationale.  They had surveillance agents in

7    place in the event that he left, and they had a tracker on his

8    car in the event that he left.  So they were, in fact, prepared

9    for him to leave, Your Honor.

10           But, more importantly than that, Your Honor, he was

11   told three times -- he was told by Special Agent Davis, Special

12   Agent Bucalo, and Special Agent Pino that he was not under

13   arrest.  Nothing happened after that to dispel what the agents

14   had told him, and that is an important difference between this

15   case and *Hashime*.  It's a very important difference.

16           In those cases, steps were taken that undermined what

17   the agents said to him -- said to the defendant about being in

18   custody.

19           Here, the agents very clearly stated that the

20   Defendant was not.  They talked about all kinds of things,

21   including the Defendant offering up what he called his Ph.D.

22   pitch.

23           THE COURT:  Well, no.  Mr. Aaron, just so you're

24   clear, I am perfectly clear, with respect to this defendant,

25   for whatever reason, chatting it up with the case agents --

UNCERTIFIED COPY NOT FOR FILING OR USE OF COURT

Closing Argument by the Government

1  very cordial, joking conversations.

2        Is that dispositive of the issue before me?

3        **MR. AARON:**  No.  No one fact will be dispositive,

4  Your Honor.

5        **THE COURT:**  No matter how much a defendant chats it

6  up, talks with the police officer, no matter how gracious and

7  professional police officers are, is that my inquiry with

8  respect to whether or not he is in custody or not?

9        **MR. AARON:**  Your Honor, I think that the officers'

10  demeanor toward him, the words that they used in their

11  conversation with him, the degree to which they allowed him to

12  control the conversation, all of those would affect how a

13  reasonable person in the Defendant's situation would understand

14  his situation, and I'm saying to you, Your Honor, that someone

15  in the Defendant's situation, essentially holding court,

16  talking about his Ph.D. thesis, and anything else he wanted to

17  talk about, after being told he's not under arrest, after being

18  told this is completely voluntary, after being reassured twice

19  more that he was not under arrest, and being questioned about a

20  matter that he later offered to help with, he would not

21  perceive himself to be in custody at that time, Your Honor.

22        **THE COURT:**  And then my last inquiry, Mr. Aaron, is:

23  What is the significance of Ms. Shaw not being allowed to go

24  into the house or touch him, but I gather he was allowed to

25  come out of the house and touch her?

Closing Argument by the Government

1        **MR. AARON:**  Your Honor, the important part of

2   Ms. Shaw's testimony is that she was outside the entire time.

3        **THE COURT:**  I understand.

4        **MR. AARON:**  In cases such as *Hashime*, *Colonna*, there,

5   defendants saw their family separated from them.  They saw

6   their family held at gunpoint, often in their underwear on the

7   front lawn.  We don't have that here.  The Defendant --

8        **THE COURT:**  Right.  Admittedly not, but that's not my

9   answer.  You didn't answer my question:  My question is that

10  clearly the FBI agents have every right, in the execution of a

11  search warrant, to secure the premises.  They have every right

12  to indicate that no one is allowed to come back into the house.

13       **MR. AARON:**  Yes, Your Honor.

14       **THE COURT:**  My question is:  At some point in time,

15  when she's permitted back in the house, she's not allowed to

16  touch him, but I gather he'd been allowed to go touch her?

17       **MR. AARON:**  Your Honor, if he left the house,

18  whatever he did with Ms. Shaw outside the house would not

19  render the house no longer secure.

20       **THE COURT:**  I understand what your argument is,

21  Mr. Aaron.  You've argued the applicable cases, and, as far as

22  you're concerned, the evidence in this case shows that this man

23  was free to leave the house at any time he wanted --

24       **MR. AARON:**  Yes, Your Honor.

25       **THE COURT:**  -- and he was not ever in custody, and I

1   understand that's what your argument is.

2          MR. AARON:  And, more importantly, Your Honor, from

3   his perspective, he would have understood that he was free to

4   leave.

5          THE COURT:  Yes.  And a reasonable person would have

6   believed that they could leave the house during the entirety of

7   that interview.

8          Thank you very much, Mr. Aaron.

9          MR. AARON:  Thank you, Your Honor.

10         THE COURT:  Thank you very much.

11         Ms. Boardman, I'd be glad to hear from you.

12         MS. BOARDMAN:  Yes, Your Honor.  Thank you.

13         I think the testimony and the evidence that we've

14  heard today shows that, under the totality of the

15  circumstances, Mr. Martin was in custody.  The standard, of

16  course, is an objective one, and the Fourth Circuit has

17  emphasized it's an objective one, quoting the Supreme Court,

18  and the Fourth Circuit case I'm talking about is a 2013

19  Judge Wilkinson opinion in *Hashime* --

20         THE COURT:  Yes.

21         MS. BOARDMAN:  -- in which Judge Wilkinson emphasizes

22  the following.  And I say this, Your Honor, because so much of

23  the Government's paper and evidence today and some of the

24  discussion just now is about what was in Mr. Martin's mind,

25  that he was chatty, that he was relaxed, and things like that.

Closing Argument by the Defendant

1    And I just caution all of us here to be reminded of what

2    Judge Wilkinson said in *Hashime*, which is:  As the Supreme

3    Court emphasized, the test for whether an interrogation is

4    custodial is an objective one.  Quoting the Supreme Court, the

5    subjective views harbored by either the officers or the person

6    being questioned are irrelevant.  The word is "irrelevant."  So

7    what he was thinking, what the officers were thinking about,

8    whether they were going to arrest him or not that day,

9    irrelevant.

10           And it actually makes the Court's analysis easier,

11   because you don't have to try to get in the mind of the agents

12   you heard from today, or Bucalo, who you did not hear from, or

13   Mr. Martin.  You look at the facts, and the facts show here

14   that, for six and a half hours, in Glen Burnie, Maryland, in a

15   middle-class neighborhood, this house was under occupation by

16   the FBI.  The Maryland State Police had blocked off the road.

17   The neighbors were ordered to stay in their home.  They

18   approach Mr. Martin, nine of them, armed, M4 rifles, one of

19   them with a battering ram.

20           He didn't expect it.  He defecates on himself at some

21   point during all of this.  He's ordered down to the ground.

22   He's facedown in his front lawn, hands behind his back,

23   handcuffed.  He's handled by the officer who is arresting him.

24   He has completely lost control of his car, his front yard, his

25   home.  He is then handed to another agent.  Over the next seven

Closing Argument by the Defendant

```
 1   hours, he is never left alone.  He is never out of the presence

 2   of a law enforcement officer.

 3          He's eventually escorted into his front door, which

 4   he had just been entering in and out freely, in handcuffs, by a

 5   SWAT team member.  He is sat down, and the transcripts will

 6   show that Agent Bucalo, who didn't testify, is the one who told

 7   him where to sit.  He said:  Sit on the couch.  Sit right

 8   there, Your Honor.

 9          Agent Davis, who testified, he used a number of

10   words.  He used the terms "custody."  He used the term

11   "control."  He used the term "possession," when referring to

12   Mr. Martin.  He handed over control of Mr. Martin to

13   Mr. Bucalo.  And, on Page 7 of the transcript, Mr. Davis --

14   Agent Davis says:  You are in good hands.  Take care, sir.

15   He's now handed over his custody to Bucalo.

16          Then, from that point forward, Mr. Martin is never

17   left alone.  He doesn't leave his house.  He's in the presence

18   of one or more agents the entire time.  During the two-and-a-

19   half-hour interview in his living room, there were three agents

20   there.  To Mr. Martin's left was Agent Pino.  They were sitting

21   on a couch sitting next to each other.  To his right was

22   Scarzello, and in front him was Bucalo.  To his back was a

23   wall, and the door was behind Scarzello.

24          For two and a half hours, they asked him questions,

25   and they did not give him his *Miranda* rights.
```

Closing Argument by the Defendant

1    Your Honor, the Government tries to bifurcate what

2    happened in the front yard and the SWAT team and say, all of a

3    sudden, everything is fine in the living room.  None of the

4    cases say that happens.

5    Your Honor has to look at this in the totality of the

6    circumstances.  What would a person who has been walking in his

7    front yard, to and from his car, think?  He's arrested by the

8    SWAT team, handcuffed, put n his living room, and then the FBI

9    is executing a search warrant in his home.  There is a forensic

10   computer scientist in his office room.  There is an agent who

11   is removing his lawfully-owned firearms from his home.  There

12   are agents in his car trying to get into his car, and he knows

13   this, because they're asking for his keys.  This is a home

14   occupied, and he was absolutely in custody.

15   Now, let's talk about the statements that they claim

16   the officers made that somehow make this non-custodial.

17   First off, I think --

18   **THE COURT:**  I think the Fourth Circuit -- we've

19   talked about the *Colonna* case, the *Hargrove*, and *Hashime*.

20   There is another Fourth Circuit case in this line last year,

21   *United States versus Giddins*, G-I-D-D-I-N-S, at 858 F.3d 870,

22   where the Fourth Circuit noted that the fact that a suspect is

23   advised that he's not under arrest is one factor to consider in

24   determining whether he is in custody for purposes of *Miranda*,

25   but the Fourth Circuit specifically noted that it's not

Closing Argument by the Defendant

1    dispositive, and then cites Judge Wilkinson's opinion four

2    years earlier in *Hashime*.  But it is a factor I consider, but

3    it's not dispositive.

4         **MS. BOARDMAN:**  It's absolutely a factor to consider,

5    so let's just address that factor now.

6         We have an unintelligible statement by a law

7    enforcement officer who did not testify, and we sat here and

8    played that statement two or three times, and it is what it is,

9    okay?  All I know is:  Whatever was said was said fast.  It was

10   not particularly clear.  It wasn't emphasized.  It came within

11   a minute and a half or less than a minute and a half of him,

12   Mr. Martin, being decuffed.  He had just been taken over by

13   police officers in his front yard, marched into his house.  And

14   then, all of a sudden, an officer we haven't heard from utters

15   something unintelligible that we are all straining to hear when

16   we have the speakers on at full volume?

17        So let's just agree on that set of facts.  Even if he

18   had been intelligent or articulated it very clearly, that still

19   doesn't help them.  *Hashime*, that was a custody case in the

20   house, Wilkinson's case.  In *Hashime*, the officers said very

21   clearly:  You are free to leave.  You are not under arrest.

22   That didn't make it non-custodial.

23        Same thing in *Giddins*.  The officer said:  You are

24   free to leave.  You are not under arrest.  That did not make it

25   custodial -- excuse me -- non-custodial.

1          This case is *Hashime* on steroids.  Let's go through

2    *Hashime*.  And the facts are -- I can just summarize them

3    quickly.  This is the execution of a search warrant, and this

4    was in a suburban place in northern Virginia similar to this

5    Glen Burnie suburban area, 9:00 in the morning, 15 to 30 law

6    enforcement officers.  They were equipped with a battering ram.

7    That's what we have here.  Their guns were drawn.  That's what

8    we have here.  Here, they went into his bedroom.  They happened

9    to be asleep.  In this situation, Mr. Martin was on his front

10   lawn going in and out of his car.  In *Hashime* --

11          **THE COURT:**  In *Hashime*, he was interrogated for three

12   hours in a storage room in the basement.

13          **MS. BOARDMAN:**  Correct.  His family was upstairs,

14   Your Honor.  His family needed a place to go because it was

15   really cold outside.  So it's not -- I mean, we have to

16   consider the context of where he was interrogated in that case.

17   It was freezing outside, and his mother was ill.  And so the

18   family was upstairs, and he was downstairs.

19          Now, the other thing in *Hashime* that's very important

20   is there was the family isolation, and, in *Hashime*, he was

21   never handcuffed.  Let me just repeat:  He was never

22   handcuffed.  In this case, we have man handcuffed on his front

23   lawn.

24          In *Hashime*, at the beginning of the interview, the

25   officer said that he did not have to answer their questions and

Closing Argument by the Defendant

1    he could leave at any time.  We don't even have that here.

2         And I would actually direct the Court to Page 3 to

3    look at Mr. Bucalo's statement, the one that we've talked about

4    a lot, Your Honor, and I'm on Page 3 of the transcript.

5         THE COURT:  Referring to Government's Exhibit --

6         MS. BOARDMAN:  Nineteen, yes.

7         THE COURT:  -- 19.

8         MS. BOARDMAN:  So Mr. Bucalo starts and says, "We

9    will have a -- a full discussion."  That is a statement that we

10   are going to have a discussion.  That is not a question, "Do

11   you want to speak with me?"  I just want to be clear.  If we're

12   going to read those words, we need to put them in the proper

13   context.

14        He then says, "completely volunteer," doesn't say

15   it's completely voluntary.  I mean, I don't even think we need

16   to mine down into these words, but, to the extent they carry

17   any weight, I want the Court to give integrity to what he

18   actually says during this very short statement at a minute and

19   28 or a minute-38 into the statement.

20        Your Honor, I would also just add that the young man,

21   Mr. Contrino, testified that he saw Mr. Martin be escorted in

22   handcuffs into the road, okay?  So he could see Mr. Martin from

23   his home.

24        Why this is important is, one, it corroborates what

25   Agent Davis said, which is that he handed him off to another

Closing Argument by the Defendant

```
 1    agent.  But, number two, Mr. Martin was then able to see the
 2    Maryland State Police car to his left, the Maryland State
 3    Police car to his right.  He had a perception of, oh, my gosh,
 4    this is a really big deal.  I am -- the FBI, the Maryland State
 5    Police is here.  So, to the extent they're trying to eliminate
 6    or sort of push under the rug the fact that agents were in the
 7    shed and occupying that and he couldn't see that, he absolutely
 8    could see what was happening in his front lawn and that his
 9    street was basically occupied by law enforcement.
10             THE COURT:  Well, I already previously noted the
11    subjective attitude by the law enforcement or by Mr. Martin
12    isn't at issue; it's more of an objective test, though, as
13    you've noted, Ms. Boardman.
14             MS. BOARDMAN:  It's absolutely objective, and any
15    objective person standing in Mr. Martin's shoes on that street
16    would have looked around and seen the presence of Maryland
17    State Police, FBI SWAT, FBI search agents, and would have known
18    that he was in custody at that time; he was not free to leave.
19             Your Honor, I should also mention a fact that's sort
20    of remarkable -- the flashbang.  We haven't even really talked
21    about that.  A flashbang went off.  Whether it's to scare the
22    dog or not, it really doesn't matter.  What matters is a
23    flashbang went off 18 feet or 15 feet from where Mr. Martin
24    was.  It was so loud that Ms. Shaw heard it down the street.
25    It was so loud that Mr. Contrino heard it two houses away
```

REDACTED / CLEARED FOR PUBLIC RELEASE

Rebuttal Argument by the Government

1  inside his mudroom inside the house, and Agent Davis even

2  testified that, well, he didn't hear it because he had the

3  benefit of having hearing protection on.  Mr. Martin didn't.

4  And this is a diversionary tactic.  Those were his words.  And

5  it is meant basically to disorient a person.  So that cannot be

6  separated from the interrogation that started in his living

7  room a few minutes later.

8          Your Honor, I think I may be winding down.  Some of

9  the other factors, of course, are the number of officers.  I

10  tried to get that out in the testimony.  My math comes out to

11  at least 17.  I will defer to the Court to that number.  And

12  I'm sure it was more when you count the Maryland State Police.

13      (Pause.)

14          **MS. BOARDMAN:**  And, Your Honor, I just don't know how

15  much weight the Court will give this fact, but I think we're

16  all in agreement that this was such a startling situation and

17  so scary for him that he did lose control over his bowels.

18          **THE COURT:**  All right.  Well, that's fine.  Thank you

19  very much, Ms. Boardman.

20          Mr. Aaron, I'd be glad to hear anything else you have

21  to add in rebuttal on this.

22          **MR. AARON:**  Thank you, Your Honor.

23          **MS. BOARDMAN:**  Oh, wait.

24          **MR. AARON:**  On the subject of the defecation, Your

25  Honor, I am not going to get into when it might have happened

Rebuttal Argument by the Government

1    or how.  I will say that, in the *Freeman* case you cited, at
2    Page 545, Judge Cacheris specifically said that that was a
3    subjective factor that was not relevant to the totality of the
4    circumstances.  I would agree with him, and I don't think it
5    needs further discussion, Your Honor.
6         In regards to Agent Bucalo, Defense counsel made a
7    point of repeating over and over that he did not testify.  I'll
8    just let Your Honor know he was here at the Defense request.
9    He was available to testify.  The Defense told us that they
10   were going to call him.  They decided not to.  Whatever
11   conclusion they want to draw about the fact that he didn't
12   testify, Your Honor, is because they didn't call him.
13        Your Honor, regarding the allegation that the house
14   was under occupation, that is something that you do see in
15   *Hashime*, you do see in *Colonna*.  In this case, Your Honor, you
16   heard direct testimony that the search team did not enter that
17   house -- they did not begin their search until after the
18   interview was over.
19        This was not a house that had law enforcement
20   officers running at will throughout the house during the
21   interview.  It's a very different environment than in *Hashime*.
22   And, again, as Your Honor has pointed out several times, what's
23   important is what is objectively perceivable by the situation
24   the Defendant is in.
25        Of course there was a SWAT operation that began this,

Rebuttal Argument by the Government

```
 1    just as, you know, there was a very loud, armed encounter that
 2    began in Hargrove, or that -- that happened in both cases, and
 3    that is not dispositive.  That situation was over.  What the
 4    Defendant saw outside his house was over.
 5            He was inside his own house.  He was unhandcuffed.
 6    He was told what he was told.  And, in the cases that Your
 7    Honor has noted, such as Hashime, where a defendant is told
 8    you're not under arrest, and then custody is found, there is
 9    affirmative conduct after that that courts point to that
10    undermine the law enforcement officers' assurance.
11            I think the facts of Hashime demonstrate that this
12    case is not Hashime on steroids.  In Hashime, the defendant was
13    naked and asleep when he was awakened to what the Court
14    describes as a harrowing scene of an officer pointing a gun at
15    him, a flood of armed officers in his house, that took the
16    defendant and his family outside.  The defendant is allowed
17    only to put on underwear.  He and his family are corralled
18    outside on the front lawn.  His ill mother asked if she could
19    lie down, and the defendant sees law enforcement officers not
20    let her.
21            And then he's interrogated in a basement storage
22    room, Your Honor, as you pointed out, and a law enforcement
23    officer stated to him, "I don't care if you say:  I don't want
24    to answer that or if I'm afraid to answer."  And it was that
25    conduct, Your Honor, in Hashime that undermined the agents'
```

Surrebuttal by the Defendant

```
1    initial assurance that the Defendant was not under arrest.  It
2    was the statement, "I don't care if you say you don't want to
3    answer," telling him that he had to answer, Your Honor.  And
4    that was after he saw that harrowing scene that I just
5    described.
6              Thank you, Your Honor.
7              THE COURT:  All right.  Thank you very much,
8    Mr. Aaron, and I thank counsel, and I want to thank staff here,
9    and, also --
10             MS. BOARDMAN:  Your Honor?  I'm sorry.
11             THE COURT:  Yes, Ms. Boardman?  Go right ahead.
12             MS. BOARDMAN:  Just a few things, Your Honor.  I'm
13   sorry.  Just before the Court deliberates, I want to cite a few
14   cases to support our position of in-home custody.
15             THE COURT:  That's all right.
16             MS. BOARDMAN:  And --
17             THE COURT:  And clearly the significant cases I've
18   been looking at are Colonna from the 2007 Fourth Circuit
19   opinion, Hargrove from 2010, Hashime from 2013, and then
20   Giddins is from 2017, was last year.
21             MS. BOARDMAN:  Your Honor, those are the key Fourth
22   Circuit cases, so maybe I don't even need to add these.  These
23   are a few cases.  They were actually in the Government's brief,
24   and they're from the Ninth, the Fifth, and the First Circuit.
25             THE COURT:  Do you want to cite those so I make sure
```

1    I have them?  Go right ahead.

2            **MS. BOARDMAN:**  Just for citation purposes.  The First

3    Circuit case is *Mittel-Carey*, M-I-T-T-E-L, dash, Carey,

4    C-A-R-E-Y, 493 F.3d 36.  That's a 2007 case.

5            The Ninth Circuit is *U.S. v. Craighead*, 539 F.3d

6    1073.  That's 2008.

7            And then *United States versus Cavazos*, C-A-V-A-Z-O-S,

8    668 F.3d 190 (2012).

9            One factual thing I would like to note for the Court

10   is that Mr. Aaron had suggested that no searching was conducted

11   in the house while Mr. Martin was being interrogated.  That's

12   incorrect.  At least two items were being searched for:  His

13   firearms -- we know that; and there was a computer technician

14   in his office next door, who was searching his computers.

15           As a result of that search, they allegedly discovered

16   classified information during the interview.  So there is

17   evidence that there was some searching conducted while he was

18   being interrogated by law enforcement in his living room.

19           The last thing I will say is that *Hargrove* is

20   completely not this case.  Only 10 to 15 law enforcement

21   officers.  They knocked on the door.  Someone answered the

22   door.  There was no SWAT team.

23           They cleared the residence to make sure there were no

24   weapons.  They told him he was not under arrest.  They told him

25   he was free to leave the house at any time.

REDACTED FOR PRIOR TO PUBLIC RELEASE

Surrebuttal by the Government

```
 1            The officer asked him if he would speak with him, and
 2   he said, "Yes."  There were two agents that were sitting around
 3   a kitchen table.  One was at a able.  One was at the kitchen
 4   door.
 5            He was freely moving around at times during the
 6   interview.  He had never been handcuffed.
 7            And so the facts in Hargrove are extremely different.
 8   The only similarity is that they were both in their own home,
 9   but this is much more of a case that Judge Wilkinson has cited
10   in Hashime, and, in fact, I think it's far more custodial than
11   Hashime.
12            Thank you very much.
13            THE COURT:  Thank you very much.
14            Mr. Aaron, you still get one more shot if you want.
15            MR. AARON:  Thank you, Your Honor.
16            THE COURT:  I'm not finding who has the burden here.
17   Quite frankly, I'm not sure really -- you know, I'll deal with
18   that in terms of who has the burden, but anything else you want
19   to add, Mr. Aaron, is fine.
20            MR. AARON:  Yes, Your Honor.  The computer scientist
21   went in to look at the computer.  That's actually not where the
22   evidence that was referred to later in the interview was
23   recovered.  I don't think that's terribly important.  And
24   Special Agent Luciano had a single job and was in and out.
25            I just do want to point out, on Hargrove, the time of
```

RETRACTED - NOT FOR PUBLIC RELEASE

```
 1    that case was 6:00 a.m.  Here, the Defendant was approached in
 2    the afternoon.
 3            You had 10 to 15 officers executing the search
 4    warrant inside the defendant's house, and there was a smaller
 5    entry team in this case.
 6            The Defendant was interviewed by two law enforcement
 7    officers with a third sometimes in the doorway of the kitchen
 8    that he was in, so, actually, blocking the way out.  And the
 9    Court did not find that that rose to the level of custody.
10            Your Honor, I'm not going to take up the Court's time
11    running through a fact-by-fact comparison of Hargrove, but, if
12    Your Honor does, I think you'll see this case is substantially
13    more similar to Hargrove.
14            The case that counsel cited, Mittel-Carey, is cited
15    in Hargrove as a counter example, so, you know, that sets up
16    the goalpost just as well as Hargrove, Your Honor.
17            That's all.
18            THE COURT:  Thank you.  Thank you very much,
19    Mr. Aaron.
20            And, with that, I would just note that we're right on
21    schedule here with respect to before we close for the evening.
22    I want to thank everyone, and particularly want to thank
23    Ms. Peterson, the court security officer.  Thank you very much
24    for your work here, and the U.S. Marshals, and the steps taken
25    to secure the courtroom, and particularly Mrs. Smith and
```

RETRACTED - NOT FOR PUBLIC RELEASE

```
 1      Mr. Giordano for their great patience throughout these
 2      proceedings, and thank the U.S. Marshals Service as we manage
 3      to handle this in both closed and open proceedings.
 4              According to the scheduling order that I entered this
 5      summer, by Friday, January 25, the Defendant shall file his
 6      notice of intention to disclose classified information pursuant
 7      to § 5 of CIPA.  I think we're right on track for the
 8      scheduling order to my knowledge.  We've now had the motions
 9      hearing on unclassified motions.  And I gather the
10      Rule 26(a)(2) expert information has been exchanged, I gather?
11      Is that correct?
12              MS. BOARDMAN:  We've received two reports from the
13      Government.  That's where we're at, Your Honor.
14              THE COURT:  Okay.
15              MS. BOARDMAN:  We've received two --
16              THE COURT:  Okay.  All right.  Well, if you have any
17      problems, let me know on that.
18              MS. BOARDMAN:  Two computer --
19              THE COURT:  I'm just looking at the Government shall
20      disclose all Rule 26(a)(2) expert information by August 17, and
21      the Defendant shall disclose all Rule 26(a)(2) expert
22      information by November 16.  Just where are we on that?
23              MS. BOARDMAN:  They provided disclosure in August,
24      Your Honor, and a supplemental report in October.
25              THE COURT:  Okay.  And then have you disclosed any
```

1    expert information yet?

2              MS. BOARDMAN:  Your Honor, we're at a difficult

3    position because of the issue with our computer expert, so

4    that's going to be delayed, Your Honor, unfortunately.

5              THE COURT:  Well, how much is it going to be delayed?

6              MS. BOARDMAN:  Well, Your Honor, we filed the motion

7    yesterday for access to the mirror images.

8              THE COURT:  Well, my point is that I'll wait -- I'm

9    just trying to go over the schedule here --

10             MS. BOARDMAN:  Sure.

11             THE COURT:  -- just trying to integrate that in.

12   That's why I'm doing this.  The motion for discovery filed

13   yesterday -- and the Government has time to respond on this.

14             Mr. Myers, how much time do you think you'll need to

15   respond to that motion?  I'm going to integrate this in with

16   the scheduling order, and we'll have a supplemental scheduling

17   order here.

18             MR. MYERS:  So, Your Honor, because the Court, I

19   think, is rightly concerned for the schedule and Defense has

20   raised the concern of the briefing, you know, the core issue is

21   that we sent a letter to the Defense on August 25th explaining

22   the two computer languages and concepts that an expert needs to

23   know to be able to interact with the repository.

24             On the first day that the computer expert came, which

25   I believe was in October, when confronted with the command line

```
 1      interface, which a picture of that interface -- of a similar
 2      interface was put in the letter, he expressed bafflement as to
 3      what this was.
 4              When I asked him if he was familiar with the computer
 5      languages and the computer software described in the letter, he
 6      said he didn't know what I was talking about.  And, because of
 7      that, he's been unable to interact with the repository,
 8      because, frankly, he doesn't know what he's doing despite what
 9      we explained to them about --
10              THE COURT:  Well, I'm not going to resolve that this
11      afternoon.  My point is that we have to zero in on this,
12      because --
13              MR. MYERS:  Yes, Your Honor.
14              THE COURT:  -- there are certain things that are
15      etched in stone here, and, as I've said, I'm going to be
16      conscious of staying on track.
17              MR. MYERS:  Absolutely.  We've made the lab
18      available --
19              THE COURT:  We've worked hard on these dates, which
20      means January 25 is the notice of intention to disclose
21      classified information, so, as far as I'm concerned, if we have
22      to massage dates back on the experts, we will do it, and my
23      first question is:  What time do you need to respond to the
24      Defendant's motion for discovery that was filed yesterday?
25              MR. EISENBERG:  Your Honor, I believe you already set
```

1    a schedule for that at the beginning of these proceedings.

2              THE COURT:  Did I say what time, when you're supposed

3    to respond?

4              MR. EISENBERG:  I think we --

5              LAW CLERK:  December 3rd.

6              THE COURT:  December 3rd.  So we've done that.

7              MR. EISENBERG:  Yes.  You gave them a week --

8              THE COURT:  And they'll respond -- let me see --

9    December 13th.

10             LAW CLERK:  Yes.

11             MR. EISENBERG:  Yes, that's correct.

12             THE COURT:  That's fine.  All right.  And we're going

13   to integrate that in, because I want to stay on track.  Okay.

14             MR. EISENBERG:  To directly answer the Court's direct

15   question, we did give expert witness disclosures on time to the

16   Defense.

17             THE COURT:  Okay.  I'm not --

18             MR. EISENBERG:  We've supplemented that.

19             THE COURT:  I'm not trying to mediate --

20             MR. EISENBERG:  Well, you didn't get an answer.  I

21   want you to have an answer on the record.

22             THE COURT:  You know, schedules -- certain things are

23   etched in stone, like trial dates and what have you, but, in

24   terms of this kind of give and take, that's fine.  We'll deal

25   with it, and, if we have to have a hearing on this, we will,

REDACTED, CLEARED FOR PUBLIC RELEASE

1    and we'll get this moving.  And so I want to make sure we move

2    on that, because it's very important that the Defendant

3    disclose its expert information by a certain date, and we're

4    looking here now at the holidays on the horizon.  They're

5    coming, and the Defendant has a very definite deadline of

6    January 25 on the § 5 disclosures, because then that gets into

7    what we all know is a rather lengthy process with respect to

8    the § 6 hearings at end of March.

9            We've just allocated two days for that.  If we need

10   more, we're going to have to take them, and I'm just trying to

11   make sure we stay on track, because I know, in one previous

12   case that I had, where I think some of the counsel involved in

13   the *Drake* case, it lasted more than two days, if I recall.  It

14   seemed like it lasted a month, but I don't think it lasted a

15   month.  It was definitely more than two days.  I know that.

16           **MR. EISENBERG:**  Just seemed like it.

17           **THE COURT:**  So that's where we are.  Is there

18   anything else from the point of view of the Government here

19   this afternoon?

20           **MR. EISENBERG:**  No, Your Honor.  Thank you very much.

21           **THE COURT:**  Okay.  Anything else from the Defense?

22           **MS. BOARDMAN:**  Your Honor, if we could have the

23   Government tell us when we will get the classification guides

24   that the Court ordered, that would be appreciated.

25           **THE COURT:**  Yes.  I did order that.  Yes, Mr. Aaron?

1    MR. AARON:  Your Honor, ████████████████

2    ████████████  We're still working with the agencies to

3    determine -- first of all, Your Honor, I wanted to clarify Your

4    Honor's order.  We're only talking about excerpts that applied

5    to the documents underlying the Indictment; is that correct?

6         THE COURT:  I don't know, quite frankly, Mr. Aaron.

7    I can't pull these things out of my hat and go over all the

8    rulings I've made.  I think it's pretty clear I ruled in favor

9    of the Defendant on it, and it's very clear you check with -- I

10

11

12         MR. AARON:  Yes, Your Honor.

13         THE COURT:  We're not going to do this on Government

14   time, by the way.

15         MR. AARON:  Absolutely.

16         THE COURT:  We're not going to be caught until after

17   the holidays, and we'll catch you in January on this stuff.

18   You're going to do it.  I want it done.

19         MR. AARON:  That's the way this team and our agency

20   partners have been operating, Your Honor.

21         THE COURT:  Okay.

22         MR. AARON:  And I can just give you an example.

23

24

25

1
2          THE COURT:  Okay.  That's fine.

3          MR. AARON:  -- those parts --

4          THE COURT:  When do you think you can start giving

5   them information on that?

6          MR. AARON:  We can give some probably within a week,

7   and then, for the rest, I'm trying to -- I don't want to get

8   myself -- I don't want to promise Thanksgiving, but I think two

9   weeks --

10          THE COURT:  Thanksgiving is a week from tomorrow.

11          MR. AARON:  Okay.  So, Your Honor, for the more

12   complicated ones, we're going to need three weeks given the

13   holiday, and that is with a full court press, at NSA, with

14                                          one of which I can show you

15   as an example.

16          THE COURT:  An official from NSA is here, and, as far

17   as I'm concerned, the issue --

18          MR. AARON:  Your Honor, the NSA attorney has actually

19   brought one with him that we can show you --

20          THE COURT:  The point is that we're not -- I want

21   this to be done.  I understand it takes time, but I want it to

22   be done, okay?

23          MR. AARON:  Yes, Your Honor.

24          THE COURT:  It's not dealing with the issue of

25   admissibility.  It's just a matter of I've ruled as a matter of

```
 1        discovery.  It's discoverable, okay?

 2             MR. AARON:  Your Honor, I agree.  What we're dealing

 3        with is extremely high-level officials at the agencies have to

 4        authorize the disclosure, and we're working it up through them

 5        so we can get their authorization to disclose it to counsel.

 6             THE COURT:  I understand.

 7             MR. AARON:  There are some we'll be able to do

 8        substantially sooner.

 9             THE COURT:  Okay.  Well, then, as far as I'm

10        concerned, start doing it in pieces if you have to.  Just --

11             MS. BOARDMAN:  That's -- we'll take it in piecemeal,

12        Your Honor, and I just have to say for the record:  We asked

13        for these in June.

14             THE COURT:  I understand.

15             MS. BOARDMAN:  Okay.  June.

16             MR. AARON:  If we're making records, Your Honor, we

17        continue to think they're not relevant as opposed to the

18        executive order.  We --

19             THE COURT:  I'm well aware that you don't think

20        they're relevant.  I'm well aware that you don't think they're

21        relevant.

22             MR. AARON:  Thank you.

23             THE COURT:  I --

24             MR. AARON:  I don't want to start the clock back in

25        August, Your Honor.
```

1     **THE COURT:**  I'll make a ruling on that.  The bottom

2  line is, as far as I'm concerned, it's discoverable at this

3  point, and so we've got to get it over to them.

4     **MR. AARON:**  I understand, Your Honor.  We are working

5  on it.

6     **THE COURT:**  There is no reason to wait.  If they're

7  still incomplete, you can do it piecemeal.

8     **MR. AARON:**  We will, Your Honor.

9     **THE COURT:**  And the Defendant will accept it

10  piecemeal, because I'll tell them they have to.  They can

11  accept it piecemeal.  That's fine.  Just start getting

12  information to them.

13     **MR. AARON:**  Yes, Your Honor.

14     **THE COURT:**  All right.

15     **MR. EISENBERG:**  Your Honor, let me just tell the

16  Court for the record and for Your Honor's knowledge:  The

17  moment we received your Order, which contradicted your

18  preliminary thoughts in a prior hearing --

19     **THE COURT:**  Not the first time, yes.

20     **MR. EISENBERG:**  That's fine.  I'm not arguing that.

21  We took immediate steps to contact the agencies to put them on

22  notice that we had to do this fast, and we have been working on

23  it, but we've also had other things come up between then and

24  now.

25     **THE COURT:**  Sure.

1             **MR. EISENBERG:**  So let me assure the Court:  As fast

2   as it can be done, I guarantee you, it will be done, piecemeal

3   or otherwise.  However, we will, as Your Honor noted in the

4   Order, may have to come to the Court for § 4.  We're not in

5   CIPA § 4 yet.  It's a simple discovery matter.  We may have to

6   come to you in CIPA § 4.  That could delay things, not of our

7   doing, but that's the way CIPA works.  Just so you know.

8             **THE COURT:**  Well, what is -- you're going to delay

9   what?

10           **MR. EISENBERG:**  If we have to come to you for CIPA

11   § 4, discovery deletion, that will take a process *ex parte* with

12   the Court.  It may take a few days.  That's all.

13          **THE COURT:**  All right.  I'm more than willing to make

14   myself available to do that, and we'll do it.

15          **MR. EISENBERG:**  Not arguing the point.  I just want

16   to let the Court know.

17          **THE COURT:**  I understand.  We're all going to do our

18   homework here, and I'm willing to do it as well.  If we have to

19   do that, we'll do it.  It's as simple as that.

20          **MR. EISENBERG:**  Very well, Your Honor.

21          **THE COURT:**  And I hear you.  And, if we do that

22   *ex parte*, I'll decide what goes over, and we'll do it, and

23   we're going to at least start getting piecemeal --

24          **MR. EISENBERG:**  We've already started the process,

25   Your Honor.  That's all I wanted to let you know.

```
 1            THE COURT:  All right.  Anything else from the point
 2   of view of the Government?
 3            MR. EISENBERG:  No, Your Honor.
 4            THE COURT:  All right.  Anything else from the point
 5   of view of the Defense?
 6            MS. BOARDMAN:  No, Your Honor.  Thank you.
 7            THE COURT:  All right.  Well, it's nice to have you
 8   all here.  I've enjoyed today.  It's been a stimulating day,
 9   and it's before 6 o'clock, so we're right on normal time,
10   Mrs. Smith.  We're good.
11            Mr. Giordano, I'll see you in a few minutes for the
12   next proceeding.
13       (Laughter.)
14            THE COURT:  So, with that, this Court stands
15   adjourned for the day.
16            MR. AARON:  Thank you, Your Honor.
17            THE CLERK:  All rise.  This Honorable Court now
18   stands adjourned.
19       (Proceedings adjourned.)
20
21
22
23
24
25
```

```
 1                   CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5          I, Martin J. Giordano, Registered Merit Reporter and

 6     Certified Realtime Reporter, in and for the United States

 7     District Court for the District of Maryland, do hereby certify,

 8     pursuant to 28 U.S.C. § 753, that the foregoing is a true and

 9     correct transcript of the stenographically-reported proceedings

10     held in the above-entitled matter and that the transcript page

11     format is in conformance with the regulations of the Judicial

12     Conference of the United States.

13

14                         Dated this 14th day of December 2018.

15

16                         _____

17                         MARTIN J. GIORDANO, RMR, CRR

18                         FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX

UNITED STATES v. HAROLD T. MARTIN, III

MOTIONS HEARING - NOVEMBER 14, 2018

                                                        PAGE
COMMENCEMENT OF PROCEEDINGS............................  2

WITNESSES FOR
  THE GOVERNMENT:

RYAN DAVIS
  Sworn................................................  65
  Direct Examination by MR. AARON......................  66
  Cross-Examination by MS. BOARDMAN....................  88
  Redirect Examination by MR. AARON.................... 106
  Recross-Examination by MS. BOARDMAN.................. 109
  Witness Excused...................................... 110

RYAN DAVIS
  Sworn................................................ 111
  Direct Examination by MR. AARON...................... 113
  Cross-Examination by MS. BOARDMAN.................... 142
  Redirect Examination by MR. AARON.................... 150
  Witness Excused...................................... 152

CLOSING ARGUMENT BY THE GOVERNMENT..................... 157

CLOSING ARGUMENT BY THE DEFENSE........................ 177

REBUTTAL ARGUMENT BY THE GOVERNMENT.................... 185

SURREBUTTAL BY THE DEFENSE............................. 188

SURREBUTTAL BY THE GOVERNMENT.......................... 190

PROCEEDINGS ADJOURNED.................................. 202